**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

_____

|  |  |  |
|---|---|---|
| | : | |
| ALBEMARLE CORPORATION, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 1:23-cv-600 |
| | : | |
| v. | : | |
| | : | |
| OLIN CORPORATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

## **COMPLAINT**

### I.   INTRODUCTION

1.      Plaintiff Albemarle Corporation ("Albemarle") brings this action to recover damages incurred as a direct result of Defendant Olin Corporation's ("Olin") unlawful monopolization of the North American railcar merchant chlorine market, in which Olin is the largest producer and Albemarle is a regular buyer. Because Albemarle's claims arise under the Sherman Antitrust Act, any damages award will be automatically trebled.

2.      As set forth below, Olin has willfully maintained monopoly power in the relevant market by means of predatory, anticompetitive conduct, giving it the power to extract supra-competitive chlorine prices from Albemarle and others. Among other things, Olin has deliberately used its dominance over chlorine production to systematically restrict supply, against a background of already-tight supply in a market with high barriers to entry, to unilaterally drive up the price of chlorine. And it has bullied and threatened buyers like Albemarle, who have long-term supply contracts based on freely negotiated market prices, to pay

Olin's artificially inflated, monopolistic chlorine prices under threat of being deprived of needed supply.

3.     Albemarle is a specialty chemical manufacturer and supplier. It carries out the development, manufacturing, and marketing of highly engineered, value-added products including catalysts, bromine and derivatives, and lithium compounds.

4.     Olin is a manufacturer of, among other things, chlorine and sodium hydroxide.

5.     For over 15 years, Olin has been Albemarle's primary provider of chlorine and sodium hydroxide. Chlorine is an essential and irreplaceable input for several of Albemarle's processes and products—most importantly, its production of bromine, an element with many industrial applications as a fire safety solution, in mercury remediation, and for oil field drilling, food safety, airbags, plastics, and consumer electronics. Without access to chlorine, Albemarle cannot manufacture its bromine or bromine derivative products for sale to its customers.

## II.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE

6.     Albemarle brings this action pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, seeking relief for Olin's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

7.     This Court has subject matter jurisdiction over this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, and 28 U.S.C. §§ 1331 and 1337(a).

8.     This Court has personal jurisdiction over Olin.

9.     Venue is proper in this District and Division under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391, because, upon information and belief, Olin transacts business in and is found within this District and Division.

10.    Albemarle is a Virginia stock corporation incorporated in Virginia.

11.    Upon information and belief, Olin is a Virginia stock corporation incorporated in Virginia.

12.     Olin engages in, and its activities substantially affect, interstate trade and commerce. Olin provides a range of products—including chlorine, the relevant product in this case—that are marketed, distributed, and offered to buyers across state lines throughout the United States.

III.    **INDUSTRY BACKGROUND**

13.     Chlorine is a natural element that is commercially produced and consumed in the molecular form $Cl_2$. References to "chlorine" in this Complaint are to $Cl_2$.

14.     Chlorine is not found in nature except in compounds with other elements, so it must be manufactured by passing an electrical current through salt water, producing chlorine, caustic soda (sodium hydroxide), and hydrogen. The electrolysis of salt water produces a fixed ratio of 1.0 ton of chlorine, 1.1 tons of caustic soda, and 0.03 ton of hydrogen. That output, in those fixed proportions, is referred to as an Electrochemical Unit ("ECU"). The co-production of chlorine and caustic soda is also referred to as "chlor alkali" production.

15.     Chlorine is used as a raw material in the production of thousands of products, including vinyls, urethanes, epoxy, water treatment chemicals, bleach, and pulp and paper processing. A significant portion of chlorine production is consumed in the manufacturing of vinyls intermediates such as ethylene dichloride and vinyl chloride monomer, both of which are precursors for the polyvinyl chloride (PVC) commonly used in applications such as vinyl siding, pipes, pipe fittings, and automotive parts.

16.     Production facilities for chlorine require large capital investments and are subject to significant regulatory and permitting requirements. Thus, there are high barriers to entry by potential new chlorine producers.

17.     In addition, because of chlorine's toxicity and corrosiveness, it is not stored in any significant quantity for any significant length of time. As Olin wrote in its Form 10-K for 2021,

3

"Since we cannot store large quantities of chlorine, we may not be able to respond to an imbalance in customer demand for these products quickly or efficiently." Therefore, there are no stockpiles of chlorine available to meet demand. Instead, chlorine demand must be satisfied based on current production.

## IV.    RELEVANT MARKET

18.    This case concerns the North American market for railcar merchant chlorine.

19.    The relevant geographic market is North America (the United States, Canada, and Mexico).

20.    Due in large part to the hazards and costs involved in transporting a toxic and highly corrosive substance, chlorine is not transported intercontinentally in significant quantities. But chlorine produced in North America is sold and transported throughout North America, with the vast majority of that production and commerce concentrated in the continental United States.

21.    The relevant product market is railcar merchant chlorine.

22.    Chlorine has unique chemical properties, and where chlorine is needed for a particular application, process, or product—for example, in the production of certain complex organic chemicals, such as bromine—there are no reasonably available substitutes.

23.    Approximately 68% of the chlorine produced in North America is consumed internally by the chlorine producers themselves, as feedstock for their own chlorine derivative products. This high level of "captive consumption" means that, at most, only 32% of chlorine production is available to buyers in the merchant market.

24.    Merchant market chlorine is generally sold and delivered in one of two ways:  by pipeline, which accounts for approximately 80% of the merchant market, or by railcar, which accounts for the remaining 20%.

25.     For the same reasons that chlorine is not imported, exported, or stored in significant quantities, chlorine is not transported across significant distances via pipeline. Chlorine pipelines cover only very short distances, so buyers who receive chlorine by pipeline are either co-located with a chlorine production facility or sited immediately adjacent to one.

26.     The physical infrastructure available to a particular buyer determines whether that buyer participates in the pipeline or railcar segment of the merchant market. A buyer that lacks physical access to a chlorine pipeline cannot obtain such access except by undertaking a major investment to relocate its manufacturing operations next to a chlorine producer. Such a buyer is therefore effectively confined to participation in the railcar merchant chlorine market and cannot substitute pipeline merchant chlorine if the price of railcar merchant chlorine rises.

27.     Albemarle is a buyer of chlorine in the North American railcar merchant market and does not have access to the pipeline merchant chlorine market. Albemarle's facility in the United States that uses chlorine as an essential input is located in Magnolia, in a rural area of southwest Arkansas, where there is no chlorine producer or pipeline.

28.     Within the merchant chlorine market (both pipeline and railcar), almost all available production is pre-committed to buyers under long-term supply contracts. In other words, there is effectively no chlorine spot market. As a result, a buyer with an unforeseen or unplanned need for chlorine will find it difficult or impossible to obtain supply in the short term, and will have to pay a large premium if supply is available at all.

## V.     OLIN OPENLY ADOPTS A STRATEGY TO PUSH UP THE PRICE OF CHLORINE BY EXPLOITING ITS UNILATERAL CONTROL OVER SUPPLY

29.     Olin's leadership has openly admitted that Olin has the power to impose unilateral price increases on chlorine buyers like Albemarle for an indefinite period, because it knows that

buyers will find it difficult or impossible to find supply elsewhere. In fact, that approach has been the foundation of Olin's business strategy since at least 2020.

30.     In October 2015, Olin announced the completion of its acquisition by merger of The Dow Chemical Company's chlorine and related businesses. As a result of this transaction, Olin became, and has remained, the largest producer of chlorine in North America.

31.     On July 15, 2020, Olin announced the appointment of Scott M. Sutton as President and Chief Executive Officer, effective September 1, 2020.

32.     Sutton had previously worked at Albemarle for almost 20 years, including overseeing its overseas bromine plant in Jordan and helping to lead the development of its chlor alkali self-production capability at that plant. Therefore, he understands Albemarle's dependence on chlorine for its own manufacturing and its vulnerability to sudden chlorine supply deficiencies or price increases.

33.     During Olin's November 5, 2020 earnings call, its new leadership announced that Olin's "building phase" was complete and that it was inaugurating its "leading phase" to exploit its "#1 position in every product and geography."

34.     Sutton also noted in the November 5, 2020 earnings call that demand for chlorine would continue to increase, while "there's no meaningful supply coming online." Against that background, Sutton announced Olin's intention to "set an ever-rising floor on the unit ECU profit we will accept" and bragged that the company had recently "sold some railcar chlorine at the highest price since 2003."

35.     When asked how Olin's competitors would react to Olin unilaterally raising the price of its chlorine, Sutton responded, in essence, that it didn't matter: "[W]e're the leader in

chlorine and derivatives. And we're critical to the world. It doesn't matter what the operating rate is. We're critical to the world."

36.     In subsequent public statements, Olin made plain its intention to push up the price of chlorine by deliberately exercising its decisive power over the supply of chlorine. "Olin people are masters of the ECU," Sutton declared on January 29, 2021. "That means we don't sell excessive volumes into poor quality markets. Instead, **we withdraw supply**, and we generate purposeful activations on both sides of the ECU, up and down our derivative chains, resulting in margin improvements on both sides of the ECU."

37.     By mid-2021, Olin made it clear that raising the price of chlorine was at the core of the company's business strategy. "[W]e're the leader in elemental chlorine," Sutton said during a July 28, 2021 earnings call. "[W]e've identified elemental chlorine as the #1 driver of this company's overall value evolution. And it is a ratchet and a linchpin because of that, and that's how we treat it."

38.     In the same earnings call, Sutton explained the company's new approach to pricing the company's "linchpin" products, including chlorine: "Our pricing in those products is a ratchet. Our pricing only turns one way and does not reverse. If necessary, we will sell zero volume into the freely negotiated market to preserve our ratchet principle and the value of our broad downstream chains based on those linchpin products."

39.     Sutton also made it clear that Olin wanted market participants to know that they had no choice to but pay higher chlorine prices: "[O]ur strategy is to move Olin's pricing up as we run our model. … I mean we're taking very specific actions and trying to telegraph those actions in advance so that the world understands that this is a purposeful activity."

40.     At the same time, Olin predicted that its ability to keep chlorine prices elevated through its control over supply would persist into the future, as overall supply would continue to be low relative to demand: "[W]e're running our model. And so we control supply/demand characteristics of our business. … But even if you fast forward to 2022, ECU demand growth outstrips ECU supply growth."

41.     Thus, within a short time after Sutton took over as CEO of Olin, Olin openly adopted and began to execute a deliberate strategy of exploiting its market dominance to unilaterally raise the price of chlorine—the "ratchet" that "only turns one way."

## VI.   OLIN SYSTEMATICALLY WITHDRAWS SUPPLY TO MAINTAIN ITS MONOPOLISTIC CHLORINE PRICING STRATEGY

42.     By early 2021, Olin was already making good on its stated intention to "withdraw supply" to force up chlorine prices. It began a series of facility shutdowns that permanently removed significant amounts of chlorine production capacity from the North American market, deliberately squeezing an already tight supply in the merchant market.

43.     On March 16, 2021, Olin announced it would permanently shut down 50% of chlorine production capacity at its McIntosh, Alabama facility, removing 200,000 tons of supply from the market. This and the tonnages in the following paragraphs are annualized figures.

44.     On May 18, 2021, Olin announced it would permanently shut down 20% of chlorine production capacity at its Plaquemine, Louisiana facility, removing 225,000 tons of supply from the market.

45.     In the same press release, Olin stated it was also proceeding in 2021 with a previously announced shutdown of 230,000 tons of chlorine capacity at its Freeport, Texas facility.

46.     On October 21, 2021, Olin announced it would permanently shut down its remaining chlorine production capacity at its McIntosh, Alabama facility—another 200,000 tons.

47.     On August 24, 2022, Olin announced that by year end it would permanently shut down a further 225,000 tons of chlorine production capacity at its Freeport, Texas facility.

48.     Altogether, over a period of less than two years, Olin intentionally removed over a million tons of annual chlorine production capacity from the market.

49.     For perspective, the entire annual chlorine production capacity in North America before Olin began to withdraw supply was approximately 17 million tons. Thus, Olin single-handedly cut North American chlorine production capacity by almost 6% between mid-2021 and the end of 2022, during a time period when Olin's leadership was publicly acknowledging that supply was tight and demand growth would outstrip supply growth for the foreseeable future.

## VII.   OLIN EXPLOITS *FORCE MAJEURE* PRODUCTION INTERRUPTIONS TO MAINTAIN ITS MONOPOLISTIC CHLORINE PRICING STRATEGY

50.     On top of its permanent chlorine production shutdowns, on several occasions since 2020, Olin has announced temporary production curtailments based on *force majeure*.

51.     For example, in February 2021, Olin announced that it had halted chlorine production at its Freeport, Texas facility due to weather conditions. Within a short period Olin similarly declared its Plaquemine, Louisiana, and McIntosh, Alabama facilities to be suspended. The outages persisted for weeks, and Olin kept chlorine on *force majeure* status for months.

52.     In April 2022, Olin declared a "system-wide" *force majeure* for chlorine (among other products), citing "significant, unplanned production and power outages" at its Plaquemine, Louisiana and Freeport, Texas facilities. Again, these production outages persisted for weeks. And although the problem at Olin's Freeport facility principally affected its electricity cogeneration plant—a key input for the electrolysis process used to produce chlorine—Olin

elected to reduce chlorine production drastically rather than buy electricity on the market to maintain pre-outage production levels.

53.     While Olin's *force majeure* declarations may have been initially justified by their putative causes, upon information and belief, Olin used them as a pretext to further constrict chlorine supply and drive up the price by keeping their facilities suspended and production artificially low far longer than necessary. And as explained below, Olin also used its prolonged *force majeure* supply reductions to extract higher prices for chlorine over time.

## VIII.   OLIN TAKES AFFIRMATIVE STEPS TO REDUCE MARKET TRANSPARENCY FOR CHLORINE SUPPLY AND PRICING

54.     While it was implementing its strategy to raise the price of chlorine by unilaterally restricting supply, Olin was also taking steps during 2021 to obfuscate the market effects of its monopolistic conduct and to deprive market participants of access to accurate information about the available supply and market pricing of chlorine. Taking these steps left Olin free to portray its inflated chlorine prices as "market" prices and pressure buyers to agree to Olin's terms for fear that no alternative supply would be available to them in a tight market.

55.     The Chlorine Institute identifies itself as a trade association, in existence since 1924, for companies involved in the production and distribution of chlorine and related substances. It publishes monthly and annual reports on the production capabilities and production levels of various producers of chlorine and its co-product, caustic soda.

56.     Upon information and belief, Olin terminated its long-standing membership and withdrew from the Chlorine Institute as of the end of 2021. Upon information and belief, Olin did this, at least in part, to avoid continuing to report its chlorine production statistics for publication and to reduce market transparency with respect to chlorine production levels. As one news report observed, "the Chlorine Institute's monthly production report is widely followed in

10

the industry as an indication of production capacity, industrywide plant operating rates and domestic supply. When paired with import and export figures, the report provides a guide to availability."

57.     Until 2022, IHS Markit was a business information service that aggregated and published chlorine prices as reported by parties to transactions in the merchant chlorine market—in other words, it published a market price index for chlorine. (Upon information and belief, IHS Markit merged into S&P Global in 2022, and S&P Global continues IHS Markit's chlorine market price reporting.)

58.     Part of Olin's strategy for exercising its monopoly power in the chlorine market was to decouple its pricing from neutral third-party market price indices like IHS Markit's.

59.     As early as Olin's November 5, 2020 earnings call, Sutton announced the company's intention to "unwind" from participating in third-party industry trade indices and stop basing its own prices on such indices. He also said that Olin would be using its leverage over "customer security of supply out in the future" to "open up contracts" in which pricing was tied to industry indices—in other words, to increase prices regardless of what Olin's contracts said.

60.     Consistent with its stated intentions, a representative of Olin told a representative of Albemarle in September 2021 that Olin was going to stop reporting chlorine transaction prices to IHS Markit.

61.     Upon information and belief, in 2021 Olin ceased reporting chlorine transaction prices to IHS Markit and any other business information services that compile market price indices. Upon information and belief, Olin—as the largest producer of chlorine in North America, without whose participation market price indices would essentially become useless—did this to reduce market transparency with respect to chlorine pricing.

11

**IX.   TO ENFORCE MONOPOLISTIC CHLORINE PRICING, OLIN BEGINS TO SABOTAGE THE REMAINING LONG-TERM SUPPLY CONTRACTS THAT STAND IN ITS WAY—INCLUDING ALBEMARLE'S**

62.   By 2021, with Olin squeezing supply to implement its one-way price ratchet strategy, the only factor preventing Olin from immediately imposing monopolistic chlorine pricing on all buyers was that some buyers—like Albemarle—had long-term supply contracts with freely negotiated and binding market price terms.

63.   As early as late 2020, Olin was articulating its intention to escape from its legacy supply contracts that constrained its ability to raise prices at will. On the November 5, 2020 earnings call, Sutton signaled that Olin would use its market power to "open up" contracts by threatening its customers' future chlorine supply:

> So today, we're much too heavily weighted toward having contracts that are tied to perhaps, an external indices [*sic*]. So we're going to be working to reduce that. And we're going to try to even pull forward some of that work because we have the ability to trade, getting control over that knob today or given customer security of supply out in the future, and that allows us to open up contracts that you might think that we couldn't otherwise open up.

In the same call, Sutton complained that in Olin's merchant chlorine business, "way too much, okay, is tied to the index. And as far as, how long it's going to take us to work our way out of that, I mean, we are working on it hard today. And I expect, as we go through 2021, we're going to get a chunk unwound. And we'll still have part of it tied to an index in 2022."

64.   By January 29, 2021, the next Olin earnings call, Sutton was reporting that "[o]ur merchant chlorine netbacks go to a multiyear high, following our fourth quarter activations, which included shifting an additional 30% of our ongoing business away from arbitrary external trade indices."

65.   One of the legacy long-term chlorine supply contracts that Olin wanted to "open up" as part of its monopolistic pricing strategy was its contract with Albemarle.

12

66.     Olin and Albemarle had entered into a requirements contract for chlorine and caustic soda on October 10, 2007, with subsequent amendments and extensions (the "Contract"). Olin was obligated to supply Albemarle's chlorine requirements as outlined in the Contract, and Albemarle was obligated to buy all of its chlorine requirements from Olin.

67.     Under the Contract, the parties agreed to a base price for chlorine, in addition to which Albemarle would pay Olin specified transportation costs, plus a "profit adder" representing Olin's return on investment. The base price of chlorine was subject to adjustment every six months based on changes in Olin's costs of production. Olin's "profit adder" was subject to adjustment annually and was indexed, for that purpose, to a specified U.S. government inflation statistic.

68.     The chlorine price terms in the Contract were freely negotiated by the parties, represented a fair market price for chlorine, and guaranteed Olin a return on investment that would be periodically adjusted for inflation and a base chlorine price that would be periodically adjusted to take account of its manufacturing costs.

69.     But the Contract pricing was not consistent with the monopolistic pricing strategy Olin had adopted under Sutton's leadership. Olin therefore began to undermine the Contract by engaging in predatory, anticompetitive conduct directed at Albemarle.

70.     On multiple occasions, Olin unilaterally, materially increased the prices it required Albemarle to pay for chlorine, contrary to the agreed prices in the Contract. Upon information and belief, Olin engaged in this conduct because it was confident that Albemarle had nowhere else to turn to meet its chlorine requirements. Albemarle reasonably believed, based on Olin's conduct and statements, that if Albemarle refused to acquiesce in the price increases, Olin would refuse ongoing supply. In one particular instance, Olin expressly stated that it would not

ensure it could honor its volume commitments under the Contract unless Albemarle agreed to renegotiate the pricing terms.

71.     On other occasions, Olin unilaterally decreased its Contract volume requirements for chlorine, again leaving Albemarle to either accept the reduced supply amounts for periods of time or be without supply. For example, in 2021 Olin pointed to its *force majeure* declaration as justification for reducing deliveries of chlorine to just 60% of Albemarle's requirements. When Albemarle asked for more information about the alleged *force majeure* conditions, as well as to visit Olin's affected facilities to assess the situation for itself, Olin refused. Albemarle reasonably believed, based on Olin's conduct and statements, that if Albemarle pressed the issue further, Olin would refuse ongoing supply. Only when Albemarle expressed a willingness to consider renegotiating the Contract did Olin suddenly find itself able to promptly supply 100% of Albemarle's chlorine requirements once again.

72.     Eventually, Olin tried to use veiled threats to induce Albemarle to abandon the Contract and instead participate in a "volume auction" in which Olin planned to auction 200,000 tons of chlorine per year to the highest bidders. Participating in the volume auction would have resulted in Albemarle paying a far higher price for chlorine than under the Contract.

73.     Olin's sales representative, Michael Graveson, pointed out that the chlorine market was short of supply and would continue to be short as Olin continued to reduce its chlorine production, and that by 2025 or 2026 Albemarle would no longer be able to obtain chlorine except by buying it from Olin. Graveson likened participating in Olin's volume auction to reserving a seat at the dining table. The message was clear: we know you can't go anywhere else, and if you don't eat here, you don't eat.

14

74.     When Olin's attempts to intimidate Albemarle into abandoning the Contract in favor of the volume auction had failed, Olin's next gambit was to suggest that Albemarle should renegotiate the Contract to pay substantially more for chlorine. By doing so, Olin suggested, Albemarle would still be able to meet its future chlorine requirements even though it had missed out on the volume auction. Again the implicit threat was clear: renegotiate the Contract now and pay our monopolistic price for chlorine, or you won't have supply in the future once the term of the Contract ends.

75.     On June 6, 2022, Olin gave notice that it was terminating the Contract and took the position that the Contract will terminate on December 31, 2024. Since giving that notice, Olin has continued to insinuate to Albemarle that the only way Albemarle can assure itself that its chlorine requirements will be met from 2025 onward is by renegotiating with Olin and agreeing to start paying a substantially higher price for chlorine *now*.

76.     By the beginning of 2023, Olin was telling the marketplace that its efforts to "open up" legacy supply contracts like Albemarle's were succeeding. On the company's January 27, 2023 earnings call, the executive responsible for the division that includes chlorine told analysts, "On the positive side, our merchant chlorine ratchet continues to turn only one way. Chlorine pricing is expected to step up through 2023 as legacy contracts end." The same executive noted that Olin had "baked in or locked in a lift in chlorine prices for this year over last year of at least $100 million."

77.     On the same earnings call, when asked about the possibility of weakening merchant chlorine demand in the second half of 2023, Sutton responded, "we've had contract resets. Patrick already mentioned $100 million a year. And even looking beyond 2023, we would expect additional resets as well. So chlorine has a very nice runway." Sutton's answer makes

15

plain Olin's confidence in its ability to continue using its monopoly power to raise chlorine prices regardless of its legacy, pre-monopoly contractual obligations.

78.     During Olin's April 28, 2023 earnings call, Sutton predicted that Olin would be able to keep raising the price of merchant chlorine even in a global downturn: "And when you have sort of a global recession going on, it doesn't necessarily mean that at this moment in time, we can repeat those levels of earnings, but it will certainly support higher merchant chlorine pricing and higher pricing and value in other chlorine derivatives as well."

79.     On the same call, Sutton informed analysts that Olin was already operating its chlor alkali production facilities at only two-thirds capacity to maintain its chlorine pricing strategy. He also declared, "We will change those operating rates to anything that's necessary to support value for Olin." Again, Sutton's statements constitute an admission by Olin that it has the unilateral power to control the price of merchant chlorine by manipulating the volume of supply reaching that market.

80.     Sutton also boasted during the April 2023 earnings call about Olin's success in decoupling its own ever-increasing chlorine pricing from market indices: "I mean it's just like the chlorine index that is published in a trade indication [*sic*] actually went down just a little bit here recently, yet our chlorine index moved up, yet our chlorine price in the first quarter moved up over the fourth quarter and yet our chlorine price will move up in the second quarter versus the first quarter as well."

81.     On March 16, 2023, Olin commenced a new form of predatory conduct when it filed suit against Albemarle in the Circuit Court for the City of Richmond. The lawsuit accuses Albemarle of breaching the Contract by buying chlorine from Olin and allegedly transferring it to one of Albemarle's own subsidiaries. At approximately the same time, Olin began rejecting

16

purchase orders from Albemarle under the Contract, leaving Albemarle without supply of chlorine beginning in April.

82.     Based on Olin's conduct since at least 2021 to undermine the Contract and induce Albemarle to renegotiate or abandon it, it is clear that Olin's lawsuit is not motivated by any genuine interest in upholding the Contract. Instead, upon information and belief, the true purpose of Olin's lawsuit is to increase Albemarle's costs, to interfere with Albemarle's ability to use the chlorine it buys from Olin (effectively another reduction in supply), to deter Albemarle from seeking an alternative source of chlorine supply, and—as with Olin's other tactics—to put Albemarle in a position where Albemarle would be willing to renegotiate the Contract or agree to its early termination (that is, termination before December 31, 2024).

## X.     OLIN'S ANTICOMPETITIVE CONDUCT HAS INJURED ALBEMARLE

83.     Olin repeatedly, unilaterally, and materially increased the price it required Albemarle to pay for chlorine beyond the freely negotiated price agreed in the Contract. Upon information and belief, if Albemarle had not acquiesced in those price increases, Olin would have cut off Albemarle's chlorine supply. Albemarle paid the monopolistic prices Olin demanded under protest and duress, because it could not risk having to go without the chlorine essential to its own business operations.

84.     Olin also repeatedly, unilaterally, and materially decreased the amount of chlorine it supplied to Albemarle below the amount agreed in the Contract. Upon information and belief, if Albemarle had not acquiesced in those supply reductions, Olin would have cut off Albemarle's chlorine supply altogether. Although Albemarle accepted and paid for those reduced quantities of chlorine, it did so under protest and duress. Olin's actions forced Albemarle to make up the shortfall by sourcing chlorine in the short term from an alternative supplier in conditions of low market supply and prices artificially inflated by Olin's predatory conduct. As a result, to obtain

all of its chlorine requirements, Albemarle had to pay prices materially higher than the freely

negotiated prices agreed in the Contract.

85.    On occasion, Olin used its *force majeure* declarations as an excuse for not

supplying Albemarle's full chlorine requirements. As already noted, for example, during 2021

Olin was supplying only 60% of Albemarle's chlorine requirements, ostensibly based on *force

majeure*. However, as soon as Albemarle indicated that it might be willing to renegotiate the

terms of the Contract to include higher chlorine pricing, Olin suddenly regained its ability to

promptly supply 100% of Albemarle's chlorine requirements.

86.    As a result of Olin's unilateral, arbitrary price increases and supply reductions,

and after Olin rejected Albemarle's purchase orders for April 2023 chlorine supply and the next

day filed a lawsuit against it, Albemarle realized it could no longer risk relying on Olin as its

primary chlorine supplier and had no choice but to negotiate a new long-term supply contract

with another supplier. Because Albemarle had to scramble to secure a new source of supply at

short notice, and because Olin's monopolistic conduct since 2020 has artificially inflated the

price of chlorine in the North American railcar merchant market, Albemarle can only obtain

chlorine at a price substantially higher than the freely negotiated price agreed in the Contract.

Albemarle will now have to pay those inflated prices through the end of 2024, instead of being

able to obtain its chlorine requirements from Olin at the market-based Contract price.

87.    As noted above, Olin has also sued Albemarle in a transparent attempt to coerce

Albemarle into agreeing to pay Olin an artificially inflated price for chlorine and to deter

Albemarle from seeking an alternative source of chlorine supply, inflicting further injury by

forcing Albemarle expend resources to defend itself against Olin's baseless, predatory claims.

## COUNT I – MONOPOLIZATION

88.    Albemarle incorporates the allegations of paragraphs 1 through 87 above.

89.     Olin has monopolized and is monopolizing the railcar merchant chlorine market.

90.     Olin possesses monopoly power in the relevant market because, by its CEO's own admissions and as demonstrated by its actual conduct since 2020, Olin has the unilateral power to control prices in that market.

91.     Olin has willfully maintained its monopoly power through anticompetitive conduct including (a) purposely, permanently removing significant chlorine production capacity from the market in conditions of tight supply and demand growth in excess of supply growth, (b) exploiting *force majeure* declarations to further restrict chlorine output more than was necessary or justified, (c) ceasing to report chlorine production statistics and transaction pricing so as to reduce market transparency, (d) threatening to withhold and actually withholding supply from chlorine buyers like Albemarle, both to coerce then into paying artificially inflated prices and to stop them from questioning Olin's production curtailments, and (e) engaging in predatory litigation against a buyer like Albemarle that will not acquiesce in all of Olin's demands.

92.     Olin has been reaping monopoly profits since 2020, seeing its share price increase from approximately $19 at the end of 2019 to $56 at the end of 2022.

93.     Olin's conduct as alleged in this complaint has directly and proximately injured Albemarle by forcing Albemarle to pay monopolistic prices for chlorine, to expend resources finding alternative sources of chlorine supply at artificially inflated prices, and to incur the cost of defending itself against Olin's baseless, predatory lawsuit.

## COUNT II – ATTEMPTED MONOPOLIZATION

94.     Albemarle incorporates the allegations of paragraphs 1 through 93 above.

95.     In the alternative, Olin has attempted and is attempting to monopolize the railcar merchant chlorine market.

96.     Olin has engaged in predatory, anticompetitive conduct as set forth throughout this Complaint and in the preceding Count I.

97.     Olin has engaged in this predatory, anticompetitive conduct with the specific intent to monopolize the railcar merchant chlorine market—that is, with the specific intent to exercise unilateral control over the price of railcar merchant chlorine.

98.     There is a dangerous probability that Olin will achieve monopoly power in the railcar merchant chlorine market by continuing to reduce chlorine supply and threaten buyers with supply reductions or cut-offs unless they pay grossly inflated prices, in the full knowledge that high barriers to entry, lack of imports, and the inability or unwillingness of other North American chlorine producers to compensate for Olin's supply reductions will preclude meaningful competition that could restore market pricing.

## REQUEST FOR RELIEF

Albemarle respectfully requests that the Court enter judgment in its favor and against Olin and grant Albemarle the following relief:

i.      Award Albemarle three-fold damages in an amount to be proven at trial;

ii.     Award Albemarle its reasonable attorneys' fees and costs of suit;

iii.    Award appropriate interest;

iv.     Award other and further relief as the Court deems appropriate.

**JURY TRIAL DEMAND**

Albemarle hereby demands a trial by jury on all of its claims so triable.


Dated: May 3, 2023                              Respectfully submitted,

                                                _____
                                                William T. DeVinney (VSB 94032)
                                                BRIGLIA HUNDLEY, PC
                                                1921 Gallows Road
                                                Suite 750
                                                Tysons, Virginia 22182
                                                Tel:  (703) 924-8076
                                                Fax: (703) 883-0899
                                                wdevinney@brigliahundley.com


                                                *Attorneys for Plaintiff*
                                                *Albemarle Corporation*