**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| ALBEMARLE CORPORATION, | |
| Plaintiff, | |
| v. | Civil No. 1:23-cv-600 |
| OLIN CORPORATION, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORTS OF OLIN CORPORATION'S RULE 12(B)(6)
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF
CAN BE GRANTED**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

STANDARD OF REVIEW ............................................................................................. 4

ARGUMENT ................................................................................................................... 5

    I.     ALBEMARLE FAILS TO ALLEGE ANY EXCLUSIONARY CONDUCT
         TENDING TO CREATE OR MAINTAIN A MONOPOLY, AS
         DISTINGUISHED FROM THE LAWFUL CHARGING OF
         MONOPOLY PRICES. ........................................................................... 6

         A.    Charging monopoly prices is entirely lawful and does not
              constitute "monopolization." ................................................... 8

         B.    Refusing to provide competitively sensitive pricing information
              to third-party publications is not exclusionary, and federal
              antitrust law actively discourages sharing price information. ........... 10

         C.    Albemarle does not adequately allege sham litigation. ........................ 13

    II.    ALBEMARLE FAILS TO ALLEGE ANY HARM TO COMPETITION
         OR ANTITRUST INJURY. .............................................................. 15

    III.    ALBEMARLE FAILS TO ALLEGE MONOPOLY POWER IN A
         PUTATIVE NORTH AMERICAN RAILCAR MERCHANT CHLORINE
         MARKET ......................................................................................... 18

Conclusion ..................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**

*A Fisherman's Best, Inc. v. Recreational Fishing All.*, 310 F.3d 183 (4th Cir. 2002) ........... 14, 15

*Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924 (4th Cir. 1990) ........................................................ 11

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 4

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ............................................. 5

*Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394 (4th Cir. 2001) ................. 13, 14, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................................... 4

*Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284 (4th Cir.) ..................................... 5, 18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ............................... 6, 16, 18

*Cavalier Tel., LLC v. Verizon Va., Inc.*, 330 F.3d 176 (4th Cir. 2003) ............................. 5, 11, 18

*Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) .......................................................... 19

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435 (4th Cir. 2011) ............... 6, 19

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) ............ 13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ................................... 6, 18

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999) ....................................................... 4

*Giarratano v. Johnson*, 521 F.3d 298 (4th Cir. 2008) .................................................................. 4

*Goldwasser v. Ameritech Corp.*, 222 F.3d 390 (7th Cir. 2000) .................................................. 11

*Host Int'l v. MarketPlace, PHL, LLC*, 32 F.4th 242 (3d Cir. 2022) ............................................ 17

*In re National Ass'n of Music Merchants, Inc.*, FTC Case No. 001-0203 (Apr. 10, 2009) .......... 12

*Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006) ............................................................. 17

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160 (4th Cir. 2014) ...... 5, 6, 18, 19

*M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160 (4th Cir. 1992)

...................................................................................................................................... 6, 18

ii

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014)................................ 14

*Oksanen v. Page Mem. Hosp.*, 945 F.2d 696 (4th Cir. 1991)....................................... 17

*Olin Corp. v. Albemarle Corp.*, Case No. CL23-1331-6 ............................................... 1

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ....................................... 8, 11

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49 (1993) ........................ 14

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362 (M.D.N.C. 2002) .......... 16

*Schlotzsky's, Ltd. v. Sterling Purchasing and Nat'l Distribution Co.*, 520 F.3d 393 (5th Cir. 2008)

.................................................................................................................................. 17

*Smith v. Mercer*, 580 F. App'x 871 (11th Cir. 2014) ..................................................... 4

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ............................................ 5

*Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318 (D.N.J. 1999) ............................ 17

*Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317 (4th Cir. 1995).... 6, 16

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) .......................................................... 7

*United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965) ............................................ 13

*United States v. Sinclair Broadcast Group, Inc., et al.*, ECF No. 1, No 1:18-cv-02609 (D.D.C.

Nov. 13, 2018) ................................................................................................................ 12

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978)............................................................ 7

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ................. 9, 11

**Statutes**

15 U.S.C. § 13.................................................................................................................... 10

15 U.S.C. § 15..................................................................................................................... 2

15 U.S.C. § 2................................................................................................................... 2, 5

**Other Authorities**

Antitrust Guidelines for Collaborations Among Competitors, Federal Trade Commission & the

U.S. Department of Justice (April 2000), ................................................................. 12

Ohlhausen, Hon. Maureen, "The Elusive Role of Competition in the Standard-Setting Antitrust

Debate," 20 Stan. Tech. L. Rev. 93 (2017)............................................................... 16

Principal Deputy Assistant Attorney General Doha Mekki of the Antitrust Division Delivers

Remarks at GCR Live: Law Leaders Global 2023, U.S. Department of Justice, February 2,

2023........................................................................................................................... 12

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................................. 4

**Treatises**

IIIB Areeda & Hovenkamp, Antitrust Law ¶ 806a (3d ed. 2008) ................................... 6

## INTRODUCTION

Fifteen years ago, plaintiff Albemarle Corporation ("Albemarle") and defendant Olin Corporation ("Olin") entered into a contract for Olin to supply Albemarle with two chemicals: chlorine and sodium hydroxide (which is also known as caustic soda). As time went by, the relationship between Albemarle and Olin soured until, finally, Olin sued Albemarle earlier this year in the Circuit Court for the City of Richmond, alleging that Albemarle breached its contract and seeking a declaratory judgment prohibiting Albemarle from partially assigning the contract under which Olin supplies Albemarle chlorine and caustic soda to a newly-created subsidiary. *See* Exh. A, Complaint, *Olin Corp. v. Albemarle Corp.*, Case No. CL23-1331-6. In that suit, Olin does not seek to terminate the contract, only to restrict the chlorine and caustic soda chemicals from being diverted elsewhere. *See id.* Albemarle responded with a counterclaim alleging that Olin has breached the contract by refusing to provide chemicals that Albemarle would then send to its subsidiary. *See* Exh. B, Answer, Affirmative Defenses, and Counterclaim to Complaint, *Olin Corp. v. Albemarle Corp.*, Case No. CL23-1331-6, at ¶ 41. In its counterclaim, Albemarle indicates that when Olin stopped supplying Albemarle (and its subsidiary), "Albemarle was forced to source supply of the chemicals for April 2023 at materially higher prices (almost double for chlorine) than those promised under the Contract." *Id.* ¶ 41. The same day that Albemarle filed its Answer and Counterclaim in the contract case, Albemarle filed this suit based on essentially the same facts.

Albemarle's half-hearted effort to dress up its contractual counterclaims as antitrust allegations fails and should be dismissed. Indeed, the facts Albemarle pleads establish that there is competition for Albemarle's business and that Albemarle has been receiving better than the open-market price pursuant to its contract with Olin. Olin's refusal to allow Albemarle to pass on that better-than-open-market price (almost half of the open-market price, according to Albemarle's

1

counterclaim in the contract case) to Albemarle's subsidiary is a contractual—not an antitrust—issue.  And Albemarle's ability to procure supply of chemicals at greater than its contracted price demonstrates that there is competition and that Olin's refusal to supply Albemarle's subsidiary enhanced that competition by creating an opportunity for Olin's competitors to compete for Albemarle's (and its subsidiary's) business.

While Albemarle styles its claims as ones for monopolization and attempted monopolization under Section 2 of the Sherman Antitrust Act, 15 U.SC. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15, its Complaint is almost entirely filled with Albemarle's expressed frustration that Olin is unwilling to sell Albemarle chlorine at the much lower price that Albemarle wants, which Olin is doing because Albemarle is transferring contracted-for chemicals to its subsidiary.  Unfortunately for Albemarle, it is black letter antitrust law that monopoly claims (and attempted monopolization claims) require monopoly power, exclusionary conduct, and antitrust injury (injury to a plaintiff stemming from harm to competition).  The first is not adequately pled and the latter two are not pled at all.

In no part of the twenty-one-page Complaint does Albemarle allege that any of Olin's chlorine competitors (or would-be competitors) were excluded from its defined market by any conduct that Olin has undertaken, nor that such exclusion led to the higher prices of which Albemarle complains.  Not once in the Complaint is the concept of "antitrust injury"—which is an injury that results from "harm to competition"—addressed or mentioned.  Albemarle does not even go through the effort of trying to recite the words "antitrust injury" or "harm to competition."  In place of alleging exclusion and harm to competition, Albemarle presses theories that are entirely inconsistent with the purposes of federal antitrust law by asking this Court, under the guise of an antitrust statute, to order Olin to give Albemarle preferred, non-open market pricing.  Albemarle

also perversely wants this Court to compel Olin to make its competitively sensitive pricing *more* transparent to Olin's competitors.  And Albemarle wants this Court to punish Olin for filing a breach of contract lawsuit—not to force Albemarle to stay in its exclusive agreement with Olin (which denies Albemarle's business to Olin's competitors), but to *stop providing supply to Albemarle that in turn goes to Albemarle's subsidiary*—which would necessarily open up competition of that subsidiary's business to Olin's competitors.

If the complete absence of alleged exclusionary conduct and harm to competition were not enough, the Complaint also fails to adequately make one of the most basic allegations necessary to sustain a claim of monopolization or attempted monopolization: that the defendant has monopoly power or has created the dangerous probability of achieving it.  Albemarle has simply elected not to make any allegations whatsoever as to Olin's market share in its putative North American "railcar merchant chlorine" market—much less allegations of sufficient share to qualify for "monopoly power" as defined by this circuit.  Instead, Albemarle spends the rest of the entire Complaint discussing the admittedly broader "merchant chlorine market."  Albemarle also acknowledges in the Complaint that it was able to both refuse Olin's demands and take its business to an Olin competitor—not actions that a customer faced with a monopolist can plausibly take.

Albemarle has tried to dress its contract claims in the cloth of an antitrust suit.  But this suit simply does not fit nor will it ever be able to be tailored to do so.  Because the Complaint fails to state a claim upon which relief can be granted under the Sherman and Clayton Acts and includes facts upon which such claims can never succeed, this Court should dismiss it with prejudice.

## STANDARD OF REVIEW

A motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint.  *See Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Generalized, unsupported assertions are insufficient to state a claim.  *Id.*  A court should dismiss a complaint if the plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff's "obligation to provide the grounds of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal citation omitted).  And complaints that fail to provide even formulaic recitations of the elements certainly fail to survive 12(b)(6) scrutiny.  *E.g.*, *Smith v. Mercer*, 580 F. App'x 871, 873 (11th Cir. 2014) ("Nowhere in Smith's complaint do we find even formulaic recitations of the elements of the claim which, themselves, would not suffice to survive Rule 12(b)(6) scrutiny.") (internal citations and alterations omitted).

A claim will lack "facial plausibility" unless the plaintiff "plead[s] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).[1]

---

[1] While the well-pleaded factual allegations in the Complaint are accepted as true for the purposes of this motion (as they must be under Rule 12(b)(6)), most of those factual allegations are not in fact true.  Albemarle's Complaint blatantly misrepresents and misconstrues public comments made by Olin's CEO to investors and falsely attributes malicious intent to Olin's independent actions without any basis.  Indeed, several of Albemarle's allegations are so far from the truth that Olin does not believe that Albemarle's Complaint complies with Rule 11 of the Federal Rules of Civil Procedure.  To that end, Albemarle does not have a "good faith basis for asserting" the allegations, there can be no "evidentiary support" for them, nor "will [Albemarle] likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Given the falsity of the allegations and the fact (as demonstrated in this motion) that "the claims . . . are [not] warranted by existing law," the Complaint appears to have been "presented for [an] improper purpose, such as to harass" Olin and its executives.

## **ARGUMENT**

To state a monopolization claim under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, Albemarle must allege "(1) that [Olin] possesses monopoly power in the relevant market and (2) that [Olin] willfully acquired or maintained that power 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 296 (4th Cir.), *cert. denied*, 142 S. Ct. 483 (2021) (quoting *Cavalier Tel., LLC v. Verizon Va., Inc.*, 330 F.3d 176, 183 (4th Cir. 2003)). To state an attempted monopolization claim, Albemarle must allege (1) a specific intent to monopolize a relevant market, (2) predatory or anticompetitive acts, and (3) a dangerous probability of successful monopolization. *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 177 (4th Cir. 2014) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). Both a monopolization claim and an attempted monopolization claim in a private damages suit under Section 4 of the Clayton Act (as Albemarle has brought here) also require an antitrust injury to "ensure that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

The second element for both claims and the third element for the attempted monopolization claim require that the defendant have engaged in *exclusionary* behavior—i.e., behavior that tends to exclude competitors from a marketplace so as to prevent them from defeating the defendant's monopoly or attempts to obtain one. This monopolistic exclusion is what is meant by the verb "to monopolize." The defendant must be doing something "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014) (involving the alleged use of long-term, multi-year exclusive supply agreements to deny a competitor access to a market) (citing *Eastman Kodak Co.*

5

*v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482–83 (1992) (involving "exclusionary action" in the form of tying arrangements denying competing service organizations from access to customers)).

As for its attempted monopolization claim, Albemarle must show that Olin employed "methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 177 (4th Cir. 2014) (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 453 (4th Cir. 2011)); *see also M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 166 (4th Cir. 1992) (where "a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory.").

Because the requirements for exclusionary behavior and antitrust injury are substantially identical across both Counts, we address the lack of any alleged monopolistic exclusion or any claimed antitrust injury (harm to competition) as to both claims together. *See, e.g.*, *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 178 (4th Cir. 2014) (citing IIIB Areeda & Hovenkamp, Antitrust Law ¶ 806a, at 412 (3d ed. 2008) for the proposition that "the same basic definition of exclusionary conduct should apply to both monopolization and attempt claims."); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (as to the Clayton Act's antitrust injury requirement for private damages suits); *Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995) (same).

## I.   ALBEMARLE FAILS TO ALLEGE ANY EXCLUSIONARY CONDUCT TENDING TO CREATE OR MAINTAIN A MONOPOLY, AS DISTINGUISHED FROM THE LAWFUL CHARGING OF MONOPOLY PRICES.

Fatal to both claims, Albemarle has failed to allege any exclusionary behavior whatsoever. Rather, its Complaint focuses almost entirely on its frustration with having to pay allegedly monopoly prices.  As a matter of common sense, characterizing prices that Albemarle admits in

6

its counterclaims are half as much as the contemporaneous open-market price are "monopolistic" is ludicrous. Even if that inconvenient fact were not true, it is basic, black letter law that charging monopoly prices is entirely lawful. The act of monopolization requires "exclusion," and charging a monopoly price does not exclude any competitors.

While Albemarle largely focuses on Olin's purported ability to charge high prices for chlorine, it does present a few other theories of monopolization; those theories fare no better. For instance, Albemarle alleges that Olin ceased providing its competitively sensitive price information to third-party publications in order to reduce price transparency. But federal antitrust law does not create any duty on Olin's part to publicize its prices. On the contrary, antitrust law affirmatively *discourages* such price transparency. *See, e.g., Todd v. Exxon Corp.*, 275 F.3d 191, 208–09 (2d Cir. 2001) (refusing to dismiss claim "where the nature of the [information] exchanges appears anticompetitive); *see also, generally*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978). In any event, Albemarle's Complaint makes no allegations that Olin's refusal to publish its price information has excluded a single competitor.

Albemarle also asserts that Olin artificially restricted supply and used force majeure events to maintain its monopoly.[2]  Again, this makes no sense as the basis for a *monopolization* claim, as that requires exclusion of competitors, and restricting supply and/or declaring force majeure naturally pushes customers to other competitors and/or incentivizes entry.

---

[2] Note that the force majeure allegations, Compl. at ¶ 50-53, which focus on temporary outages announced by Olin, do not allege that these outages were not for *bona fide* safety reasons. On the contrary, the Complaint acknowledges that these outages "may have been initially justified by their putative causes, upon information and belief, Olin used them as a pretext to further constrict chlorine supply and drive up the price . . . ."  The only specific allegation of pretextual shutdown—aside from the conclusory "on information and belief" sentence—is the allegation that when Olin's cogeneration plant went down at Olin's Freeport facility, "Olin elected . . . [not] to buy electricity on the market to maintain pre-outage production levels."  Compl. ¶ 52.

Finally, in two short paragraphs, Albemarle alleges that Olin brought its breach of contract lawsuit against Albemarle in bad faith.  Such a claim—called a "sham litigation" claim—is highly disfavored; federal law sets an extremely high bar for such claims, a bar that Albemarle makes no serious attempt to meet.

In the absence of any alleged exclusion of any North American railcar merchant chlorine competitors, Albemarle has failed to state a claim for monopolization or attempted monopolization, and its Complaint should be dismissed.

### A.    Charging monopoly prices is entirely lawful and does not constitute "monopolization."

Almost the entirety of Albemarle's Complaint is focused on allegations of (and frustrations about) Olin reducing its output and raising prices unilaterally, i.e., charging monopoly prices.  *See, e.g.,* Compl. ¶ 2 ("[to] restrict supply [and] unilaterally drive up the price of chlorine. . . . Olin bullied and threatened buyers like Albemarle . . . to pay Olin's artificially inflated, monopolistic chlorine prices under threat of being deprived of needed supply."); *id.* p. 5 ("OLIN OPENLY ADOPTS A STRATEGY TO PUSH UP THE PRICE OF CHLORINE BY EXPLOITING ITS UNILATERAL CONTROL OVER SUPPLY"); *id.* p. 8 ("OLIN SYSTEMATICALLY WITHDRAWS SUPPLY TO MAINTAIN ITS MONOPOLISTIC CHLORINE PRICING STRATEGY"); *id.* ¶ 70 ("On multiple occasions, Olin unilaterally, materially increased the prices it required Albemarle to pay for chlorine, contrary to the agreed prices in the Contract); *id.* ¶ 74 ("Again the implicit threat was clear: renegotiate the Contract now and pay our monopolistic price for chlorine, or you won't have supply in the future once the term of the Contract ends.").

But, it is well-settled, basic, black letter federal antitrust law that "[s]imply possessing monopoly power and charging monopoly prices does not violate § 2" of the Sherman Act.  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447–48 (2009); *id.* at 454 ("[A]ntitrust law

does not prohibit lawfully obtained monopolies from charging monopoly prices."). As the Supreme Court explained in *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004), charging monopoly prices is not unlawful because it is *not exclusionary*. On the contrary, allowing monopolies to charge monopoly prices *encourages competition*:

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.

*Trinko*, 540 U.S. at 407 (emphasis in original).

The encouragement (as opposed to the frustration) of competition is exactly what the Complaint suggests Olin's alleged monopoly pricing caused here. After refusing to agree to pay Olin's allegedly monopolistic prices, Albemarle decided to purchase chlorine from another supplier. *See* Compl. ¶¶ 84, 86 ("Olin's actions forced Albemarle to make up the shortfall by sourcing chlorine in the short term from an alternative supplier in conditions of low market supply and prices artificially inflated by Olin's predatory conduct."). Put another way, a customer (Albemarle) whose demand had been unavailable to any chlorine supplier other than Olin since October 10, 2007, *see* Compl. ¶ 66 (describing the requirements contracts between Olin and Albemarle), left Olin to take its business elsewhere. No competitor was excluded. On the contrary, Olin's alleged monopoly pricing sent Albemarle's business to another competitor.

Albemarle is perversely asking this Court to create price controls that give Albemarle (and its subsidiaries) preferred pricing for "an essential and irreplaceable input" even if the court hearing the contract dispute finds that Olin does not have to continue to abide by the contractual terms that give Albemarle the preferred pricing it seeks. Compl. ¶ 5; *see generally* Robinson-Patman Act of

1936, Pub. L. No. 74-692 (codified at 15 U.S.C. § 13 and which broadly prohibits price discrimination that tends to distort downstream competition).

### B. Refusing to provide competitively sensitive pricing information to third-party publications is not exclusionary, and federal antitrust law actively discourages sharing price information.

Among Albemarle's few paragraphs not dedicated to complaining that Olin tried to charge higher prices is the allegation that Olin stopped providing the Chlorine Institute and IHS Markit its propriety pricing information in 2021. *See* Compl. ¶¶ 54-61. Olin did so, according to the Complaint, in order to "reduce market transparency" with respect to price and chlorine production.

Albemarle's theory presupposes that antitrust law does or could compel Olin to deal with third-party trade publications.[3] This is incorrect. Antitrust law does not force companies (even alleged monopolists) to do business with other companies that it does not wish to. Put another way, antitrust law does not turn monopolies into public utilities with a "duty to deal" with others. As the Supreme Court explained in *Trinko*, to hold otherwise would be to fundamentally pervert the purposes of the antitrust laws:

> Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited. Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion. *Thus, as a general matter, the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal*."

---

[3] What remedy Albemarle is seeking with regard to its lack of information sharing claims is unclear. If Albemarle is seeking that Olin be ordered to provide pricing terms to a third-party publisher, would that third party—not a member of this lawsuit—be compelled to accept Olin's data? How current must such pricing data be? How often must Olin provide it? Would Olin be shielded from lawsuits alleging collusion based on the ordered price sharing?

*Trinko*, 540 U.S. at 407–08 (internal quotation marks, citations, and alterations omitted) (emphasis added).

Where antitrust law *does* create a duty to deal, those very rare cases are limited to duties between *competitors* where one competitor has control of an "essential facility" needed to allow other competitors to stay in the market. *See, e.g.*, *id.* at 408 ("Under certain circumstances, a refusal to cooperate *with rivals* can constitute anticompetitive conduct and violate § 2. We have been very cautious in recognizing such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm.") (emphasis added).[4]  Counsel is unaware of a single case where, as here, a federal court held that a company—even a monopolist—was under a duty to provide its pricing data to a third party trade publication, much less one not a party to the lawsuit.

Nonetheless, Albemarle is seeking, seemingly, to compel Olin to make its prices *more visible* to Olin's competitors.  This is precisely the opposite of what antitrust law encourages. Antitrust regulators have brought enforcement actions against companies for making their competitively sensitive information (such as price) *too visible* to competitors.  *See, e.g.*,

---

[4] Even where the alleged duty to deal is with a competitor (unlike the present suit), federal courts virtually never find for the plaintiff. *See, e.g.*, *Trinko*, 540 U.S. at 411 ("[W]e do not believe that traditional antitrust principles justify adding the present case to the few existing exceptions from the proposition that there is no duty to aid competitors."); *linkLine*, 555 U.S. at 444 (finding that "a firm with no antitrust duty to deal with its rivals at all is under no obligation to provide those rivals with a 'sufficient' level of service"); *Cavalier Tel., LLC. v. Verizon Virginia, Inc.*, 330 F.3d 176, 187–88 (4th Cir. 2003) ("[I]f a company such as Verizon, which was a longstanding legal monopoly, were asked to share its office space and to rent its telephone lines and other facilities to a competitor . . . it could have legally refused . . . without violating § 2 of the Sherman Act.") (citing *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 400 (7th Cir. 2000) ("These are precisely the kinds of affirmative duties to help one's competitors that we have already noted do not exist under unadorned antitrust laws")); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) (observing that a lawful monopolist generally has no duty to help its competitors).

Complaint, *United States v. Sinclair Broadcast Group, Inc., et al.*, ECF No. 1, No 1:18-cv-02609 (D.D.C. Nov. 13, 2018) (enforcement action against competitors exchanging competitively sensitive information through two national intermediaries; the final judgment prohibited the defendants "from communicating non-public pricing, pricing strategy . . . and revenue" information that was less than 18 months old); Decision and Order, *In re National Ass'n of Music Merchants, Inc.*, FTC Case No. 001-0203 (Apr. 10, 2009) (settling charges that the defendant violated federal law by enabling and encouraging the exchange of competitively sensitive price information among its members.).[5]

While the theory is wrong on its face (Olin has no duty to deal with third-party publications) and logically perverse (seeking to order, ostensibly under the antitrust laws, behavior that is decidedly discouraged by such laws), it is also incomplete. For this theory to support a claim of *monopolization*, Olin's conduct must lead to *exclusion*. Albemarle's Complaint does not allege that any competitor at any time was or will be excluded from the North American railcar merchant chlorine market because Olin does not publicize its allegedly monopoly prices.[6] Without exclusion, Albemarle's theory has no purchase.

---

[5] Recently, the Antitrust Division of the Department of Justice signaled that it would increase scrutiny of information exchanges, particularly the exchange of "sensitive price information" and withdrew policy statements that provided "safety zones" for information exchanges, deriding the policy statements as "out of date" and "overly permissive." *See generally* Principal Deputy Assistant Attorney General Doha Mekki of the Antitrust Division Delivers Remarks at GCR Live: Law Leaders Global 2023, U.S. Department of Justice, February 2, 2023, *available at* https://www.justice.gov/opa/speech/principal-deputy-assistant-attorney-general-doha-mekki-antitrust-division-delivers-0; *see also* Antitrust Guidelines for Collaborations Among Competitors, Federal Trade Commission & the U.S. Department of Justice (April 2000), available at https://www.ftc.gov/sites/default/files/attachments/dealings-competitors/ftcdojguidelines.pdf.

[6] As an aside, one wonders how the inclusion of a purported monopolist's pricing to third parties matters. By including this as part of its Complaint, Albemarle essentially concedes that Olin cannot charge monopoly prices—otherwise how would transparency to third parties help?

**C.      Albemarle does not adequately allege sham litigation.**

Albemarle hints at, but does not flesh out, another potential theory.  Albemarle alleges that Olin "commenced a new form of predatory conduct when it filed suit against Albemarle in the Circuit Court for the City of Richmond . . . accus[ing] Albemarle of breaching [its] Contract by buying chlorine from Olin and allegedly transferring it to one of Albemarle's own subsidiaries." Compl. ¶ 81.  Olin did so, Albemarle asserts, to "put Albemarle in a position where Albemarle would be willing to renegotiate the Contract or agree to its early termination." Compl. ¶ 82.  These two paragraphs, interpreted generously, are a half-hearted attempt at stating (more accurately, gesturing towards) a "sham litigation" claim, which is a theory of monopolization whereby one competitor uses the costs imposed on another competitor via frivolous litigation to force their exit from a market.[7]

Sham litigation is a highly disfavored theory of monopolization because it is in tension with a defendant's constitutional rights under the Petitions Clause.  "The *Noerr–Pennington* doctrine[8] guarantees citizens their First Amendment right to petition the government for redress without fear of antitrust liability." *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 398 (4th Cir. 2001).  As the Supreme Court has explained, "[t]he right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Id.* (quoting *Noerr*, 365 U.S. at 138).  "Antitrust law was thus not intended to impose a barrier between the people and their government," and the immunity afforded by *Noerr-Pennington* "extends to petitioning the courts as well." *Id.* at 398–99.  Because

---

[7] As discussed below, by its nature, such a theory has nothing to do with a lawsuit between a supplier *and a customer*.

[8] So named after the two cases first articulating the doctrine, *see Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136–39 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669 (1965).

of the serious constitutional rights at issue in a monopolization-via-sham litigation claim, Courts have erected a very high bar for Plaintiffs to plead it, in order "to avoid chilling the exercise of the First Amendment right to petition the government for the redress of grievances." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014). The standard is one that most plaintiffs fail, and one which Albemarle makes no serious attempt to meet.

First, sham litigation suits are between competitors; the whole idea is to harm one's competitor by forcing it to incur the costs of frivolous litigation. The idea of a sham litigation against a customer makes no sense, especially one that purportedly has the goal of getting Albemarle to "renegotiate the Contract or agree to its early termination." Second, sham lawsuits must be objectively baseless. A lawsuit is objectively baseless only if "no reasonable litigant could realistically expect success on the merits." *Baltimore Scrap Corp.*, 237 F.3d at 399 (quoting *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993)). Third, in the event the challenged litigation is found to be objectively baseless, the lawsuit must conceal an attempt to interfere directly with the business relationships of a competitor. *Id.*

Albemarle nowhere in the Complaint alleges that Olin's Richmond City lawsuit is objectively baseless. Remarkably, it does not even allege that Albemarle *did not breach* the contract at issue in the suit. That is enough to reject this theory out of hand. *See A Fisherman's Best, Inc. v. Recreational Fishing All.*, 310 F.3d 183, 192 (4th Cir. 2002) ("Because AFB cannot overcome the first hurdle in the *Professional Real Estate* test . . . we do not need to discuss the second step—whether baseless action by the defendants concealed an attempt to interfere directly with the business relationship *of a competitor* through the use of governmental process as an anti-competition weapon.") (emphasis added).

Albemarle also does not—in fact, *cannot*—allege that the purportedly sham litigation was designed to interfere with the business relationship of a competitor.   Albemarle makes the conclusory allegation that "the true purpose of Olin's lawsuit is to increase Albemarle's costs, to interfere with Albemarle's ability to use the chlorine it buys from Olin . . . and—as with Olin's other tactics—to put Albemarle in a position where Albemarle would be willing to renegotiate the Contract or agree to its early termination . . . ."  Compl. ¶ 82.  But that is not the subjective intent one must allege to sustain a sham litigation claim.   The subjective intent must be to "attempt to interfere directly with the business relationships of a *competitor*."  *Baltimore Scrap Corp.*, 237 F.3d at 399 (emphasis added); *see also A Fisherman's Best, Inc.*, 310 F.3d at 191  ("The essential element of the sham exception is intent to injure *a competitor* coupled with the absence of a genuine effort to influence the government.") (emphasis added).  Ironically, by claiming that the subjective intent is to terminate the agreement with Albemarle early, Albemarle is alleging that the "sham" litigation's intent it to drive Albemarle to a competitor, thereby benefitting, not injuring, that competitor.

To that end, forcing Albemarle to "renegotiate" or "terminat[e]" its contract with Olin does not exclude a single competitor, nor does Albemarle allege that any competitor *was* excluded.

## II.   ALBEMARLE FAILS TO ALLEGE ANY HARM TO COMPETITION OR ANTITRUST INJURY.

A private plaintiff in an antitrust suit carries an added burden by virtue of Section 4 of the Clayton Act, which is the statute that allows private plaintiffs to bring suits based on the Sherman Act.  That burden is to plead and eventually prove that the claimed injury is "antitrust injury."  The courts have described antitrust injury in a variety of ways, most commonly as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of

anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 395 (M.D.N.C. 2002), *aff'd*, 67 F. App'x 810 (4th Cir. 2003).  Part of "antitrust injury" is that the injury involves some harm to competition.  Indeed, "harm to competition" is the *sine qua non* of an antitrust lawsuit.  Ohlhausen, Hon. Maureen, "The Elusive Role of Competition in the Standard-Setting Antitrust Debate," 20 Stan. Tech. L. Rev. 93, 99 (2017) ("In short, antitrust injury results from a practice that harms competition. The injury flows from the antitrust violation, but does not define it.").  While similar to the element of exclusionary conduct, antitrust injury/harm to competition is a separate requirement because a company could engage in exclusionary conduct (i.e. enter into an exclusive arrangement) without necessarily causing harm to competition or injury to a particular plaintiff.  *See, e.g.*, *Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995) (finding that the defendants' practice of obtaining exclusive contracts did not constitute antitrust injury because the plaintiff was "simply seeking to substitute its proposed method of serving cable companies for that selected by the cable companies without demonstrating that the substitution would advance the competitive process.").

On this front, the Complaint is completely silent.  Indeed, the Complaint does not even pay lip-service to words that suggest that this is something that Albemarle must plead and eventually prove.  On the contrary, the Complaint consistently references actions that Olin has allegedly taken that enhance competition rather than harming it.  For instance, the Complaint asserts that Olin reduced supply by decreasing its capacity and making its force majeure period longer than necessary.  These actions pushed Albemarle and presumably others to seek chlorine from Olin's competitors, who in turn competed for that additional business.  The Complaint also accuses Olin of no longer providing third parties with its price data.  Under traditional antitrust analysis,

decreasing price transparency increases competition.  Finally, the Complaint claims that Olin is suing Albemarle seeking early termination of their contact.  Such early termination would lead to competition among Olin's competitors for Albemarle's business.[9]

What Albemarle has really done, at bottom, is present a *breach of contract* claim with a breach of contract injury as a Section 2 antitrust claim, even as it adjudicates its contract claims in Virginia state court.  But these are not valid antirust claims, and the purported injury is not antitrust injury.  *See, e.g.*, *Host Int'l v. MarketPlace, PHL, LLC*, 32 F.4th 242, 250 (3d Cir. 2022) ("[T]he conclusion that Host pled a plausible antitrust injury stretches the boundaries of antitrust law too far . . . because a breakdown in contract negotiations is outside the Sherman Act's scope . . . ."); *Schlotzsky's, Ltd. v. Sterling Purchasing and Nat'l Distribution Co.*, 520 F.3d 393, 408 (5th Cir. 2008) (finding that a franchisor's requirement that the franchisee change suppliers "was not an antitrust 'tying arrangement' because it was not an exercise of market power but of contract power"); *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 338 (D.N.J. 1999) ("Any injury resulting from alleged restrictions in the Licensing and Non-Disclosure Agreements is contractual in nature. . . . The remedy of signatories to restrictive licensing agreements, if any, is found in the laws of contract, not antitrust."); *cf. also Kloth v. Microsoft Corp.*, 444 F.3d 312, 325 (4th Cir. 2006) ("To the extent that these claims are for actual injury to plaintiffs' computers, the plaintiffs' claims amount to claims for defective products. This type of injury is simply not a type

---

[9] Even Albemarle itself paying monopoly prices, without allegations that those elevated prices are due to anticompetitive exclusion that caused harm to a market, is not an "antitrust injury."  *See, e.g.*, *Oksanen v. Page Mem. Hosp.*, 945 F.2d 696, 708–09 (4th Cir. 1991) (finding "the fact that a hospital's decision caused a disappointed physician to practice medicine elsewhere does not of itself constitute an antitrust injury").

for which plaintiffs can recover under the antitrust law. Rather, it sounds more in the nature of injury from a breach of warranty or other product liability.") (citing *Brunswick*, 429 U.S. at 489).

Albemarle's failure to adequately plead harm to competition is an independent ground for dismissal, and Albemarle's inclusion of facts that make clear that Albemarle can never sufficiently plead or prove harm to competition is grounds for that dismissal to be with prejudice.

## III.   ALBEMARLE FAILS TO ALLEGE MONOPOLY POWER IN A PUTATIVE NORTH AMERICAN RAILCAR MERCHANT CHLORINE MARKET.

The lack of allegations of monopolistic exclusion, as distinguished from mere monopoly pricing, and antitrust injury are both independently enough to dismiss Albemarle's claims.  But they are not the Complaint's only deficiencies.  To succeed on its monopolization claim, in addition to anticompetitive exclusion, Albemarle must show "that [Olin] possesses monopoly power in the relevant market."  *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 296 (4th Cir.), *cert. denied*, 211 L. Ed. 2d 293, 142 S. Ct. 483 (2021) (quoting *Cavalier Tel., LLC v. Verizon Va., Inc.*, 330 F.3d 176, 183 (4th Cir. 2003)).  Albemarle has failed to do so.

"Monopoly power" is not the same as "market power."  In fact, alleging "market power" is insufficient to state a claim of monopolization.  *See Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014) ("[A] showing of [the defendant's] 'market power' is not itself sufficient to prove that [the defendant] possesses 'monopoly power.'"); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1.").  To that end, allegations of less than 50% market share "should usually be rejected," even for attempted monopolization claims.  *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 168 (4th Cir. 1992).  And an allegation of 60% market share, by itself, would "weigh heavily against" a finding of monopoly power, *Kolon Indus.*, 748 F.3d at 174, with courts in this circuit typically

setting the floor for monopoly power at 70%.  *See id.*; *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 450 (4th Cir. 2011) (collecting cases).

Here, Albemarle alleges a "North American railcar merchant chlorine market."  Compl. ¶¶ 1, 18-28.  By the Complaint's own admission, this market excludes 68% of chlorine produced in North America but consumed by the producers. *See* Compl. ¶ 23.  Of the remaining 32%, Albemarle's alleged market also excludes the 80% of merchant chlorine that is delivered by pipeline.  Compl. ¶ 24.  So, Albemarle has alleged a market that comprises less than 6.5% of the chlorine produced in North America.  And yet, even with this gerrymandered market definition, Albemarle makes *no allegations whatsoever* as to Olin's market share.  *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 211, 213 (4th Cir. 2002) (affirming dismissal and holding that "by failing to allege Compaq's and Dell's market share or power, Gravity has failed to set forth factual allegations necessary to support the basic elements of its . . . § 2 claims").

Instead of alleging market shares that would support its conclusory allegations of monopoly power, the Complaint actually makes allegations that are inconsistent with Olin being a monopolist.  At ¶ 75, the Complaint acknowledges that Olin "failed" in its "attempts to intimidate Albemarle" into abandoning its contract pricing.   And at ¶¶ 84 and 86, the Complaint acknowledges that Albemarle left Olin and secured supply from a competing supplier.

Because Albemarle has failed to allege that Olin has monopoly power in its alleged North American merchant chlorine market, or enough of a share to plausibly allege a "dangerous probability" of obtaining monopoly power, the Court should dismiss Counts I and II for failure to state a claim under § 2 of the Sherman Act.

## <u>CONCLUSION</u>

For the reasons stated herein, Olin asks that the Court dismiss Albemarle's Complaint in its entirety. Because it is plain from the content of its Complaint that Albemarle cannot make out a Section 2 case against Olin, any amendment would be futile, and Olin asks that the dismissal be with prejudice.

Dated: May 26, 2023                                    Respectfully submitted,

                                                       */s/ Corey Roush*
                                                       Corey W. Roush (*pro hac vice* pending)
                                                       Robert G. Lian Jr. (36406)
                                                       AKIN GUMP STRAUSS HAUER & FELD
                                                       LLP
                                                       2001 K Street, N.W.
                                                       Washington, DC 20006
                                                       Tel: (202) 887-4115
                                                       Fax: (202) 887-4288
                                                       croush@akingump.com
                                                       blian@akingump.com

                                                       *Counsel for Defendant Olin Corporation*