# Exhibit A

*CC23-1331-b*

# McGuireWoods

McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Phone: 804.775.1000
Fax: 804.775.1061
www.mcguirewoods.com

John J. Woolard
Direct: 804.775.4355
jwoolard@mcguirewoods.com
Fax: 804.698.2055

March 16, 2023

**Via Hand Delivery**

Hon. Edward F. Jewett, Clerk of Court
Richmond City Circuit Court
John Marshall Courts Building
400 North Ninth Street
Richmond, Virginia 23219

RECEIVED AND FILED
CIRCUIT COURT
MAR 15 2023
EDWARD F. JEWETT, CLERK
BY_____ D.C.

RE:    ***Olin Corporation v. Albemarle Corporation***
       **Plaintiff's Filing of Complaint**

Dear Mr. Jewett,

This firm represents Plaintiff Olin Corporation in the above-styled action.  Enclosed please find the following documents to be filed in the above-styled action:

1.     Original signed complaint with exhibits
2.     A copy for the defendant
3.     One copy to be filed-stamped and returned to us for our files
4.     A civil cover sheet
5.     A check for the filing fee

We will be using a private process server to serve the defendant.  Please call either myself (804-775-4355), or my colleague Matt Fender (804-775-1076), when the summons is ready.  We have included a self-addressed stamped envelope for you to mail the summons and the Defendant's copy of the complaint & exhibits to us.

Thank you for your assistance in this matter.  If you have any questions or need any additional information, please do not hesitate to contact me.

Very truly yours,

John J. Woolard

**COVER SHEET FOR FILING CIVIL ACTIONS**
COMMONWEALTH OF VIRGINIA

Case No. CL23-1331-6
(CLERK'S OFFICE USE ONLY)

........................................ City of Richmond ........................................ Circuit Court

Olin Corporation ................................................................ v./In re: ...... Albemarle Corporation ..............................
PLAINTIFF(S)                                                                         DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [X] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

**GENERAL CIVIL**
**Subsequent Actions**
[ ] Claim Impleading Third Party Defendant
    [ ] Monetary Damages
    [ ] No Monetary Damages
[ ] Counterclaim
    [ ] Monetary Damages
    [ ] No Monetary Damages
[ ] Cross Claim
[ ] Interpleader
[ ] Reinstatement (other than divorce or driving privileges)
[ ] Removal of Case to Federal Court
**Business & Contract**
[ ] Attachment
[ ] Confessed Judgment
[X] Contract Action
[ ] Contract Specific Performance
[ ] Detinue
[ ] Garnishment
**Property**
[ ] Annexation
[ ] Condemnation
[ ] Ejectment
[ ] Encumber/Sell Real Estate
[ ] Enforce Vendor's Lien
[ ] Escheatment
[ ] Establish Boundaries
[ ] Landlord/Tenant
    [ ] Unlawful Detainer
[ ] Mechanics Lien
[ ] Partition
[ ] Quiet Title
[ ] Termination of Mineral Rights
**Tort**
[ ] Asbestos Litigation
[ ] Compromise Settlement
[ ] Intentional Tort
[ ] Medical Malpractice
[ ] Motor Vehicle Tort
[ ] Product Liability
[ ] Wrongful Death
[ ] Other General Tort Liability

**ADMINISTRATIVE LAW**
[ ] Appeal/Judicial Review of Decision of (select one)
    [ ] ABC Board
    [ ] Board of Zoning
    [ ] Compensation Board
    [ ] DMV License Suspension
    [ ] Employee Grievance Decision
    [ ] Employment Commission
    [ ] Local Government
    [ ] Marine Resources Commission
    [ ] School Board
    [ ] Voter Registration
    [ ] Other Administrative Appeal

**DOMESTIC/FAMILY**
[ ] Adoption
    [ ] Adoption – Foreign
[ ] Adult Protection
[ ] Annulment
    [ ] Annulment – Counterclaim/Responsive Pleading
[ ] Child Abuse and Neglect – Unfounded Complaint
[ ] Civil Contempt
[ ] Divorce (select one)
    [ ] Complaint – Contested*
    [ ] Complaint – Uncontested*
    [ ] Counterclaim/Responsive Pleading
    [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
[ ] Separate Maintenance
    [ ] Separate Maintenance Counterclaim

**WRITS**
[ ] Certiorari
[ ] Habeas Corpus
[ ] Mandamus
[ ] Prohibition
[ ] Quo Warranto

RECEIVED AND FILED
CIRCUIT COURT

MAR 15 2023 10:44

EDWARD F. JEWETT, CLERK
BY _____ D.C.

**PROBATE/WILLS AND TRUSTS**
[ ] Accounting
[ ] Aid and Guidance
[ ] Appointment (select one)
    [ ] Guardian/Conservator
    [ ] Standby Guardian/Conservator
    [ ] Custodian/Successor Custodian (UTMA)
[ ] Trust (select one)
    [ ] Impress/Declare/Create
    [ ] Reformation
[ ] Will (select one)
    [ ] Construe
    [ ] Contested

**MISCELLANEOUS**
[ ] Amend Birth/Death Certificate
[ ] Appointment (select one)
    [ ] Church Trustee
    [ ] Conservator of Peace
    [ ] Marriage Celebrant
[ ] Approval of Transfer of Structured Settlement
[ ] Bond Forfeiture Appeal
[X] Declaratory Judgment
[ ] Declare Death
[ ] Driving Privileges (select one)
    [ ] Reinstatement pursuant to § 46.2-427
    [ ] Restoration – Habitual Offender or 3rd Offense
[ ] Expungement
[ ] Firearms Rights – Restoration
[ ] Forfeiture of Property or Money
[ ] Freedom of Information
[ ] Injunction
[ ] Interdiction
[ ] Interrogatory
[ ] Judgment Lien-Bill to Enforce
[ ] Law Enforcement/Public Official Petition
[ ] Name Change
[ ] Referendum Elections
[ ] Sever Order
[ ] Taxes (select one)
    [ ] Correct Erroneous State/Local
    [ ] Delinquent
[ ] Vehicle Confiscation
[ ] Voting Rights – Restoration
[ ] Other (please specify)

[X] Damages in the amount of $ 60,000,000.00 ...... are claimed.

................................ 3/16/2023 ................................
DATE

_[signature]_

[ ] PLAINTIFF     [ ] DEFENDANT     [X] ATTORNEY FOR     [X] PLAINTIFF [ ] DEFENDANT

John J. Woolard, Esq.
PRINT NAME

McGuireWoods LLP
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

800 East Canal Street, Richmond, Virginia 23219

804.775.4355    jwoolard@mcguirewoods.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

FORM CC-1416 (MASTER) PAGE ONE 02/23

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

**V I R G I N I A :       IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND**

| | |
|---|---|
| OLIN CORPORATION, | |
| *Plaintiff*, | |
| v. | Case No. _____ |
| ALBEMARLE CORPORATION, | Trial By Jury Demanded |
| Serve: John Owen Gwathmey<br>TROUTMAN PEPPER<br>1001 Haxall Point, 15th Floor,<br>Richmond, VA 23218 - 0000 | |
| *Defendant*. | |

## COMPLAINT

COMES NOW the Plaintiff, Olin Corporation ("Olin"), by counsel, and states as follows for its Complaint against Albemarle Corporation ("Albemarle"):

### INTRODUCTION

1.       Olin Corporation ("Olin") and  Albemarle Corporation ("Albemarle") entered into a  contract in 2007 that is currently valued at $ 60,000,000.  The express intent of the contract was for "[Olin] to sell and [Albemarle] to buy 100% of [Albemarle's] commercial grade" chlorine and sodium hydroxide product requirements from Olin.  Albemarle was provided advantageous pricing and, in return agreed to Olin's terms and conditions; including a strict limitation on assignment of the contract. Now, Albemarle has breached this contract by attempting to assign the contract benefits and its advantageous pricing to a newly formed subsidiary without Olin's consent.

### PARTIES

2.       Olin is a Virginia stock corporation incorporated in Virginia.

1

3.      Upon information and belief, Albemarle is a Virginia stock corporation incorporated in Virginia.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper in this Court under Virginia Code § 17.1-513.

5.      The Circuit Court for the City of Richmond is the proper venue for this action under, at least, Virginia Code § 8.01-262(2) ("Wherein the defendant has a registered office, has appointed an agent to receive process").

6.      Albemarle has appointed John Owen Gwathmey, Esq. of Troutman Pepper to receive process on its behalf as its registered agent.  Mr. Gwathmey's office is located within the City of Richmond, Virginia.

## FACTUAL BACKGROUND

### I.
### Background on Contract Between Olin and Albemarle

7.      Olin and Albemarle entered into a sales contract dated October 10, 2007.  That contract was subsequently amended three times.  The sales contract and its three amendments are collectively referred to as the "Contract" and are attached to this Complaint as **Exhibit 1**

8.      The Contract is "governed by and construed in accordance with the laws of the State of Tennessee[.]"  *See* **Ex. 1** at pg. 4, ¶ 15.

9.      In the very first line of the original agreement, the Contract expressly states, that "the intent of this contract is for Seller [Olin] to sell and Buyer [Albemarle] to purchase 100% of [Albemarle's]" chlorine and sodium hydroxide from Olin "in the form of commercial grade ECUs (CGECU) with one CGECU being defined as one short ton of chlorine and 1.1 tons of CSGH, 100% basis". See **Ex. 1**, Original Agreement, ¶ A.1. This intent has been restated in subsequent amendments including the most recent amendment. *See* **Ex. 1** at Third Amendment.

2

10.    The Third Amendment specifically states: "The intent of the contract is for [Olin] to sell and [Albemarle] to purchase 100% of [Albemarle's] commercial grade ECU (CGECU) requirements up to 55,000 CGECU's per year from [Olin], with one CGECU being defined as one ton of chlorine (CGECU CHLORINE) and 1.1 DST of 100% basis commercial grade sodium hydroxide (CGECU SODIUM HYDROXIDE)." **Ex. 1**, Third Amendment. The term "ECU" is a recognized industry term for "electro chemical unit" "Electrochemical Unit" or "ECU" are terms the industry use to describe the production method and amount of producing chlorine and sodium hydroxide. Chlorine and sodium hydroxide are co-produced commercially by the electrolysis of salt.  These co-produced products are produced simultaneously, and in a fixed ratio of 1.0 ton of chlorine to 1.1 tons of caustic soda.

11.    The Contract further states:

The expected volume is between 40,000 and 55,000 CGECUs per year. [Olin] is not obligated to sell in excess of 55,000 CGECUs in any calendar year unless agreed to in writing by [Olin].

**Ex. 1,** Third Amendment.

12.    The Contract identifies Albemarle, and only Albemarle,  as the "Buyer" for the product. **Ex. 1** at Third Amendment, Second Amendment, First Amendment, Original Contract.

13.    Albemarle's facilities that use the materials supplied under the Contract include, but may not be limited to, facilities in Magnolia, Arkansas; Bayport, Texas; and Pasadena, Texas. *See* **Ex. 1**.

14.    The current approximate value of the Contract is $ 60,000,000.

15.    The Contract provides Albemarle with product at advantageous prices; significantly below current market prices.

3

16.     Olin provided notice of the termination of the Contract on June 6, 2022, so the Contract will terminate on December 31, 2024.  *See* **Ex. 1** at Third Amendment, ¶ 3; **Ex. 3**, Termination Notice.

17.     The Contract does not permit any subsidiary or affiliate of Albemarle to serve as "Buyer".  In fact, the Contract terms do not refer to any subsidiary or affiliate of Albemarle and do not include the terms "subsidiary" or "affiliate" in any form.

18.     Under the express terms of the Contract, only Albemarle can be a "Buyer".  No other company or person, whether via a subsidiary or affiliate of Albemarle or otherwise can be a "Buyer" under the Contract.

## II.
## Background on Albemarle's Newly Created Subsidiary, Ketjen Corporation

19.     On January 30, 2023, Albemarle announced "the official brand launch of Ketjen, its wholly owned subsidiary that crafts tailored, advanced catalyst solutions for the petrochemical, refining and specialty chemicals industries."  A copy of the press release is attached as **Exhibit 2**.

20.     Albemarle's press release stated, in relevant part:

Albemarle Corporation (NYSE: ALB), a leader in the global specialty chemicals industry, today announced the official brand launch of Ketjen, its wholly owned subsidiary that crafts tailored, advanced catalyst solutions for the petrochemical, refining and specialty chemicals industries.

The company shared the new name of its catalysts business in November 2022 after announcing plans to operate the business as a subsidiary. As a distinct brand, Ketjen will continue to support customers in their unique energy transition journeys from fluidized catalytic cracking to clean fuels to hydro-processing to organometallics and curatives.

"As the industry responds to global market dynamics, our customers need innovative solutions to help them navigate their changing landscapes," said Ketjen President Raphael Crawford. "Ketjen will continue to provide its portfolio

of advanced catalyst and specialty chemicals solutions, which are unique to each customer's needs, to increase production performance and business value."

Headquartered in Houston, Texas, Ketjen will collaborate with customers in the petrochemical, refining and specialty chemical industries across three divisions, Fluidized Catalytic Cracking (FCC), Clean Fuels and Hydroprocessing Catalysts (HPC), and Performance Catalyst & Curative Solutions (PCS). Albemarle's existing advanced catalyst solutions team will lead Ketjen operations.

"The launch of Ketjen continues our legacy as a partner-of-choice for industry leaders," said Albemarle CEO Kent Masters. "Establishing Ketjen under this separate structure will allow the business even greater focus and continued development of custom, high-impact catalyst products."

Ketjen's team of qualified experts adopt a flexible, hands-on approach to customer operations to counsel and lead on mission-critical functions. With strong industry engagement and continuing long-term partnerships with major corporations, Ketjen will lead the industry in safe and reliable advanced catalyst solutions.

**Ex. 2**. This press release can be found online at:  https://investors.albemarle.com/news-and-events/news/news-details/2023/Albemarle-Announces-Launch-of-Ketjen-Corporation/default.aspx.

21.     Albemarle describes Ketjen as "a provider of advanced catalysts solutions to leading producers in the petrochemical, refining and specialty chemicals industries. From fluidized catalytic cracking to clean fuels solutions to hydro-processing to organometallics and curatives, Ketjen delivers safe and reliable solutions that increase production performance and business value. A wholly owned subsidiary of Albemarle Corporation (NYSE: ALB), Ketjen Corporation is headquartered in Houston, Texas, and serves global customers through operations in 27 markets." **Ex. 2**.

22.     Based on Albemarle's press release, it appears that Ketjen will continue Albemarle's catalyst business. *See* **Ex. 2**.

23.     Upon information and belief, Albemarle intends for Ketjen to take advantage of the chlorine and sodium hydroxide product sold by Olin under the Contract.

## III.
## Albemarle's Breach of Contract

24.     The Contract has clear language prohibiting assignment of the rights and obligations arising under the Contract:

> 14. ASSIGNMENT. Neither this contract nor any right or obligation hereunder is assignable or transferable by either party in whole or in part without the prior written consent of the other party and any such purported assignment without such consent shall be void, except that either party shall have the right to assign this contract and its rights and delegate its duties and obligations hereunder, without obtaining the prior written consent of the other party, to any entity (a) with which Seller or Buyer merges, (b) to which Seller or Buyer sells a substantial part of its assets or businesses, or (c) to which Seller or Buyer sells a substantial part of its assets or business relating to the manufacture and/or sale of the product.

**Ex. 1** at pg. 15, ¶14 (the "Assignment Clause").

25.     Under the Contact, Albemarle must meet certain purchase requirements to garner the preferential pricing under the Contract. If Albemarle fails to meet those purchase requirements, it could be subject to less advantageous pricing, among other consequences. **Ex. 1** at Third Amendment.

26.     If Olin were to provide the same product to another buyer on the open market, Olin would be able to sell the product at a substantially higher price and realize a greater profit.

27.     Albemarle cannot assign the Contract to another entity without Olin's permission (unless one of three preconditions in the Assignment clause is met). Albemarle cannot purchase product beyond its own requirements and cannot resell or transfer that product to another entity

6

because the Contract limits sales to "100% of Buyers [Albemarle's] commercial grade" product requirements. See **Ex. 1**, Third Amendment.

28.     Upon information and belief, Albemarle has or will assign the Contract (in whole or in part) to Ketjen.

29.     Olin has not consented to the assignment of the Contract, in whole or in part, to Ketjen.  Further, upon information and belief, none of the exceptions in the Assignment clause (**Ex. 1**, Assignment Clause) applies that would permit Albemarle to assign the Contract without Olin's consent.

30.     Even when one of the exceptions to the Assignment Clause applies, only the entire Contract can be assigned; partial assignments remain prohibited without Olin's consent. *See* **Ex. 1**.

31.     Neither Albemarle, nor Ketjen, has requested Olin's consent in assigning the Contract to Ketjen.

32.     Any putative assignment of the Contract from Albemarle to Ketjen is void under the Contract.

33.     Alternatively, on information and belief,  Albemarle intends to purchase product from Olin and transfer that product to Ketjen.  *See* **Ex. 2**.

34.     The Contract does not permit Albemarle to purchase Ketjen's commercial needs for product and transfer the product to Ketjen.  **Ex. 1**.  The express terms of the Contract state that Albemarle must "purchase 100%"  of its requirements from Seller Olin.  If Albemarle purchases product from Olin and then passes it along to Ketjen, it breaches the Contract.

35.     Further, if Albemarle purchases product from Olin and then transfers it to Ketjen, then Albemarle is not acting in good faith in the performance of the Contract. The Contract only provides for Albemarle to purchase its own requirements—not that of a subsidiary.

36.     Albemarle's assignment of the Contract to Ketjen Corporation violates the Contract's Assignment Clause and financially harms Olin. It deprives Olin of the benefit of sales to Ketjen on the open market. Similarly, if Albemarle buys product from Olin pursuant to the Contract and then transfers that product to Ketjen, it deprives Olin of the benefit of sales to Ketjen on the open market.

## COUNT I
### (Breach of Contract)

37.     Olin restates and incorporates by reference all the preceding paragraphs of this Complaint as if fully stated herein.

38.     A valid and enforceable contract exists between Olin and Albemarle.

39.     Olin has fully performed its obligations under the contract.

40.     Albemarle has not performed according to the terms of the Contract.

41.     Albemarle's creation of Ketjen and its formal, or *de facto*, assignment of the Contract to Ketjen without Olin's consent violates, *inter alia*, the Assignment Clause of the Contract.

42.     None of the exceptions to seeking and obtaining Olin's consent for an assignment exists. Therefore, Albemarle must obtain Olin's consent before assigning the Contract, in whole or in part, to Ketjen.

43.     Albemarle has breached the Contract.

44.     Albemarle's improper assignment of the Contract to Ketjen without Olin's consent is a material breach of the Contract, which has not been cured.

8

45.     Olin has been damaged as a result of Albemarle's breach of the contract.

46.     Albemarle's improper assignment of the Contract prevents Olin from selling product at market value (which is substantially higher than the prices in the Contract).

## COUNT II
### (Breach of the Covenant of Good Faith and Fair Dealing)

47.      Olin restates and incorporates by reference all the preceding paragraphs of this Complaint as if fully stated herein.

48.     A valid and enforceable contract exists between Olin and Albemarle.

49.     Olin has fully performed its obligations under the contract.

50.     There is an implied covenant of good faith and fair dealing present in every contract.

51.     There is an implied covenant of good faith and fair dealing present in the Contract between Olin and Albemarle.

52.     Albemarle has breached the implied covenant of good faith and fair dealing in the Contract.

53.     Olin entered into the Contract and placed strict limits on the assignment of the Contract.  Albemarle's creation of Ketjen and assignment of the Contract to Ketjen violates, *inter alia*, the implied covenant of good faith and fair dealing.

54.     Olin has been damaged as a result of Albemarle's breach of the implied covenant of good faith and fair dealing.

55.     Albemarle's improper violation of the implied covenant of good faith and fair dealing prevents Olin from selling product at market value (which is substantially higher than the prices in the Contract).

56.     Albemarle's breach of the implied covenant includes its wrongful abuse of the requirements Contract by purchasing, or attempting to purchase, material to meet the requirements of its subsidiary.

## COUNT III
### (Declaratory Judgment)

57.     Olin restates and incorporates by reference all the preceding paragraphs of this Complaint as if fully stated herein.

58.     The Assignment Clause states as follows:

> 14. ASSIGNMENT. Neither this contract nor any right or obligation hereunder is assignable or transferable by either party in whole or in part without the prior written consent of the other party and any such purported assignment without such consent shall be void, except that either party shall have the right to assign this contract and its rights and delegate its duties and obligations hereunder, without obtaining the prior written consent of the other party, to any entity (a) with which Seller or Buyer merges, (b) to which Seller or Buyer sells a substantial part of its assets or businesses, or (c) to which Seller or Buyer sells a substantial part of its assets or business relating to the manufacture and/or sale of the product.

**Ex. 1** at pg. 15, ¶14.

59.     Albemarle's creation of Ketjen and subsequent assignment of the Contract, formally or *de facto*, to Ketjen violates the Assignment Clause.

60.     The Contract identifies Albemarle as the "Buyer" for the product.  The Contract does not identify any subsidiary or affiliate of Albemarle as the buyer. The Contract terms do not even use the words "subsidiary" or "affiliate".   No subsidiary or affiliate of Albemarle has the right to buy product under the Contract.

61.     An actual controversy exists between Olin and Albemarle relating to the Assignment Clause.

62.     This Court has the power to issue a declaratory judgment in this case.  Va. Code
§ 8.01-184 ("In cases of actual controversy, circuit courts within the scope of their respective
jurisdictions shall have power to make binding adjudications of right, whether or not
consequential relief is, or at the time could be, claimed and no action or proceeding shall be open
to objection on the ground that a judgment order or decree merely declaratory of right is prayed
for.").

63.     This Court should enter a declaratory judgment:

a.  Declaring that Albemarle may not assign the Contract or the rights or benefits of
the Contract to Ketjen without Olin's express consent;

b.  Declaring that Albemarle may not purchase Ketjen's requirements from Olin
under the Contract and then transfer those requirements to Ketjen.

c.  Declaring that Albemarle can only purchase product under the Contract that it
requires; not product that its subsidiaries, including Ketjen requires.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Olin respectfully prays the Court:

A)  Grant it money damages of $60,000,000 or such other amount as may be proven at
trial;

B)  Award Olin prejudgment interest;

C)  Award Olin post-judgment interest;

D)  Declare that Albemarle may not assign the Contract or the rights or benefits of the
Contract to Ketjen without Olin's express consent;

E)  Declare that Albemarle may not purchase Ketjen's requirements from Olin under the
Contract and then transfer those requirements to Ketjen.

11

F) Declare that Albemarle can only purchase product under the Contract that it requires; not product that its subsidiaries, including Ketjen requires.

G) Grant it such other and further relief as justice may require.

<center>**JURY DEMAND**</center>

PLAINTIFF OLIN DEMANDS TRIAL BY JURY OF ALL ISSUES SO TRIABLE.

Dated:  March 16, 2023

OLIN CORPORATION

By Counsel:

Robert F. Redmond, Jr. (VSB No. 32292)
Matthew D. Fender (VSB No. 76717)
John J. Woolard (VSB No. 92612)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
T:  804.775.1000
F:  804.6982145
rredmond@mcguirewoods.com
mfender@mcguirewoods.com
jwoolard@mcguirewoods.com

Exhibit 1
Sales Contract with Amendments



# Third Amendment

## to Sales Contract № CC-14-319

## Third Amendment

### to Sales Contract № CC-14-319 dated October 10, 2007

### between

### Olin Corporation, by and through its Chlor Alkali Products Division and for and on behalf of itself and its subsidiaries which may perform hereunder ("Seller")

### and

### Albemarle Corporation ("Buyer")

WHEREAS, Olin Corporation, by and through its Chlor Alkali Products Division and for and on behalf of itself and its subsidiaries which may perform hereunder ("Seller") and ALBEMARLE CORPORATION ("Buyer") entered into the above referenced written agreement dated OCTOBER 10, 2007 (the "Original Agreement"); and

WHEREAS, Seller and Buyer previously amended the Original Agreement pursuant to the First Amendment and Second Amendment dated as of November 8, 2012 and November 11, 2014, respectively (the Original Agreement, as amended by the First Amendment and Second Amendment, will be referred to hereinafter as the "Agreement"); and

WHEREAS, the parties desire to further amend the Agreement as set forth herein by this Third Amendment, which is effective as of JANUARY 1, 2016.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer agree to amend the Agreement as follows:

1. This Third Amendment shall be effective as of January 1, 2016, except for Paragraph 8 which shall be effective as of the date this Third Amendment has been fully executed.

2. The Quantity section shall be amended as follows:

   a. Section A.1 shall be deleted in its entirety and replaced with the following:

   *A.1 COMMERCIAL GRADE ECUs - The intent of this contract is for Seller to sell and Buyer to purchase 100% of Buyer's commercial grade ECU (CGECU) requirements up to 55,000 CGECU's per year from Seller, with one CGECU being defined as one ton of chlorine (CGECU CHLORINE) and 1.1 DST of 100% basis commercial grade sodium hydroxide (CGECU SODIUM HYDROXIDE). Membrane*



# Third Amendment

## to Sales Contract № CC-14-319

*grade sodium hydroxide, 100% basis, shall be referred to as MGSH. Examples of this Quantity provision are included in Addendum H.*

> *A.1.1   Buyer must purchase the first 15,126 DST of commercial grade sodium hydroxide ("CGSH") demand from Seller each calendar quarter. Beginning in the first calendar quarter of 2016, if Buyer purchases more than 15,126 DST of CGSH from Seller, the next quarter Buyer shall have the right to purchase any remaining quarterly quantities exceeding 15,126 DST of CGSH from any supplier of Buyer's choice or from Seller at a negotiated market price, such price to be negotiated quarterly. However, should Buyer purchase less than 15,126 DST of CGSH from Seller in any given quarter, the deficit shall be carried forward and added to the next quarter's purchase quantity requirements.  The deficit or surplus will be carried forward quarter to quarter thereafter until eliminated.  Addendum I, attached hereto, sets forth an example.  In no event will Seller be obligated to supply in excess of 18,000 DST of CGSH in any calendar quarter unless the deficit volume plus the quarterly commitment of 15,126 DST of CGSH exceed 18,000 DST in which case Seller will supply the deficit volume plus the quarterly commitment of 15,126 DST and no more unless agreed to in writing by Seller.*

> *A.1.2   Buyer must purchase the first 55,000 tons of chlorine demand from Seller in each calendar year.  The month following the month in which Buyer's purchases reach 55,000 tons of chlorine, and each month thereafter for the remainder of the calendar year, Buyer has the right to purchase chlorine requirements over 55,000 tons from any supplier of Buyer's choice or may purchase from Seller at a negotiated market price, such price to be negotiated quarterly. In no event will Seller be obligated to supply in excess of 59,000 tons of chlorine in any calendar year unless agreed to in writing by Seller.*

b.   Section A.2 shall be deleted in its entirety and replaced with the following:

*The expected volume is between 40,000 and 55,000 CGECUs per year.  Seller is not obligated to sell in excess of 55,000 CGECUs in any calendar year unless agreed to in writing by Seller.*

c.   Section A.3 shall be deleted in its entirety and replaced with the following:

*Buyer agrees to purchase and Seller agrees to sell 100% of Buyer's CGSH purchase requirements from Seller up to 60,500 DST per calendar year as set forth above, but if this quantity should fall below 44,000 DST of CGSH in any year, and Buyer's total chlorine requirement is equal to or greater than 40,000 tons, then Seller has the option of: i) supplying MGSH (at the pricing described in Addendum C) in lieu of CGSH in the form of ECUs to achieve the minimum volume of 40,000*



## Third Amendment

### to Sales Contract № CC-14-319

*CGECUs per year, or ii) elect not to supply MGSH in lieu of the CGSH shortfall, in which case the CGECU volume will be reduced accordingly and any chlorine supplied under this contract in excess of the CGECU volume will be considered non-CGECU chlorine pursuant to subpart B below and priced according to Addendum D. Buyer may elect, by providing twelve (12) months prior written notice, to substitute MGSH for CGSH, provided that Seller is not required to provide more MGSH than CGSH that is being substituted, and in its sole discretion, may limit the maximum quantity of MGSH it is required to supply to 30,000 dst per calendar year. If Buyer elects to substitute MGSH for CGSH, the total sodium hydroxide purchase requirement shall remain at 60,500 DST per calendar year as set forth above. In the event Buyer elects to use MGSH and Seller agrees to supply MGSH as set forth in the preceding sentences, the Membrane Premium, as defined by the IHS index, shall be added to the contract price. Should Seller elect to supply MGSH in the absence of a request from Buyer, the Membrane Premium shall not be added to the contract price.*

3. The Delivery Period Section shall be deleted in its entirety and replaced with the following:

   *The initial term of this contract will be January 1, 2009 through December 31, 2024 subject to earlier termination as provided for elsewhere in this contract, and after December 31, 2024 the contract shall continue in effect unless either party provides minimum two year prior written notice of termination to the other party.*

4. The Destination Section shall be amended by removing the destination Orangeburg, SC. Buyer shall have the right to add a new destination so long as the quantity associated with the new destination does not bring to total volume over the 55,000 ECUs in Section A.2 above.

5. Section 4 of the Terms and Conditions ("Credit") shall be deleted in its entirety and replaced with the following:

   *4. CREDIT. Seller may recover for each shipment hereunder as a separate transaction, without reference to any other shipment. If Buyer fails to pay any invoice within 45 days of the due date Seller may, at its option,*
   *i. issue a written notice of delinquency to Buyer. Buyer shall have 5 business days from date of written notice to cure late payment;*
   *ii if Buyer fails to cure late payment within five (5) days of notice, Seller may, at its option, defer further shipments until payment has been made or, in addition to any other legal remedy, Seller may decline further performance of this contract with 90 days written notice.*
   *iii. In the event that any amount due hereunder is not paid when due, then in addition to any other remedies afforded to Seller hereunder or by operation of law, interest shall accrue on the delinquent amount at an annual rate not to exceed 18% or the highest amount allowed under Tennessee law, whichever is less. Interest shall*



# Third Amendment

## to Sales Contract № CC-14-319

*accrue from the day following the due date of payment until all such due and unpaid sums are paid in full with interest.*

*iv.   Additionally, in the event that any payment hereunder becomes delinquent, Buyer agrees to pay any and all costs associated with the collection of such amounts by Seller, including but not limited to reasonable attorneys' fees.*

*v.   If at any time, in the judgment of Seller (acting reasonably), the financial responsibility of Buyer is materially impaired, Seller may change the terms of payment and/or require payment as a condition of shipment.*

6.  Addendum C, Section 1 shall be amended by the addition of the following new Section 1.1:

*Notwithstanding anything herein to the contrary, effective January 1, 2016, the calculated price of CGECU chlorine under the contract shall be converted to a delivered price as follows: The invoice price will be a delivered price and will include the product price as calculated by the Price Model Spreadsheet attached as Exhibit 1 to Addendum C to the Agreement, as may be modified by Seller from time to time, all transportation charges applicable to each shipment as calculated as if shipped from McIntosh, AL regardless of the actual shipping point and Buyer's allocated share of Seller's actual rail car costs as defined in Section 2(b).  This delivered price will be reduced by a freight allowance equal to $58.00 per ton.*

7.  Addendum C, Section 1 shall be amended by the addition of the following new Section 1.2:

*Notwithstanding anything herein to the contrary, effective January 1, 2016, the calculated price of CGECU sodium hydroxide under the contract shall be converted to a delivered price as follows: The invoice price will be a delivered price and will include the product price as calculated by the Price Model Spreadsheet attached as Exhibit 1 to Addendum C to the Agreement, as may be modified by Seller from time to time, all transportation charges applicable to each shipment as calculated as if shipped from McIntosh, AL regardless of the actual shipping point and Buyer's allocated share of*



## Third Amendment

### to Sales Contract № CC-14-319

*Seller's actual rail car costs as defined in Section 2(b). This delivered price will be reduced by a freight allowance equal to $53.00 per DST.*

8. Addendum C, Section 1 shall be amended by the addition of the following new Section 1.3:

   *In the event Buyer purchases at least 50,000 short tons of chlorine from Seller in 2015, Seller shall provide Buyer with a $9/short ton rebate. Rebate to be credited to Buyer on the February 2016 chlorine invoice.*

9. Addendum C, Section 2(a) shall be deleted in its entirety and replaced with the following:

   *All transportation charges, including without limitation railroad line haul rates and fuel surcharges, actual demurrage charges, ancillary charges, common carrier truck rates and fuel surcharges, and barge charges will be prepaid by the Seller. Buyer will be responsible for its allocated share of the Seller's cost of leasing, owning, and properly maintaining a fleet of rail cars and barges used to transport chlorine and sodium hydroxide.*

   *Effective January 1, 2017, any freight rate (line haul cost) cost escalations that are imposed by delivering rail carriers will be shared equally by both Parties after the actual cost escalation is reduced by the annual rate of inflation. The annual rate of inflation used will be determined by the most recently published rate of inflation by the U.S. Department of Commerce, Bureau of Economic Analysis Table 1.1.9 Implicit Price Deflators for Gross Domestic Product. In the event the annual rate of inflation is greater than the actual chlorine freight rate escalation, the actual cost escalation shall equal the chlorine freight rate and shall be borne solely by Buyer.*

   *Example: freight rate increase equals 4.1% and the implicit Price Deflator equals 2.1%. Buyer shall be charged 2.1% plus (4.1%-2.1%)/2 = 3.1%. Seller shall pay for 4.1% minus 3.1% = 1.0%.*

   *Example: freight rate increase equals 2.1% and the implicit Price Deflator equals 2.6%. Buyer shall be charged 2.1%. Seller shall pay 2.1% minus 2.1% = 0.*

Capitalized terms used herein but not otherwise defined herein shall have the meaning given such terms in the Agreement. Except as expressly amended herein, all other terms and conditions of the Agreement shall remain in full force and effect. This Third Amendment is not valid unless executed and returned by Buyer within thirty (30) days from receipt and until accepted and executed by Seller.



## Third Amendment
### to Sales Contract № CC-14-319

"BUYER"                                    "SELLER"

**Albemarle Corporation**          **Olin Corporation,** by and through its
                                               **Chlor Alkali Products Division**

By: _Phillip R. DeVrou_            By: _FWChrumbole_

Name: _Phillip R. DeVrou_          Name: _FRANK W. CHIRUMBOLE_

Title: _Director Chemical Purchases_  Title: _President_

Date: _July 13, 2015_              Date: _Aug 13, 2015_

6



## Third Amendment

### to Sales Contract № CC-14-319

Addendum I

2.A.1.1 Example

| Quarter | Contract Volume | Actual Volume | Difference | Price |
|---------|-----------------|---------------|------------|------------|
| Q1 | 15,126 | 16,126 | 1,000 | Negotiated |
| Q2 | 15,126 | 14,126 | (1,000) | Contract |
| Q3 | 16,126 | 14,126 | (1,000) | Contract |
| Q4 | 17,126 | 18,126 | 1,000 | Negotiated |



**Olin**

**CHLOR ALKALI**
**P R O D U C T S**

490 Stuart Road NE, Cleveland, Tennessee 37312
423/336-4850 ● 423/336-4830
Internet Address: www.olinchloralkali.com

November 11, 2014

Mr. Phil DeVrou
Director, Chemical Purchases
Albemarle Corporation
451 Florida Street
Baton Rouge, LA 70801

Subject:   **Second Amendment to Sales Contract No. CC-14-319 between Olin Corporation
and Albermarle Corporation dated October 10, 2007 (the "Contract").**

Dear Phil:

Confirming our recent discussions, the Contract shall be amended, effective December 1, 2014, as
follows:

**Delivery Period:** This provision shall be amended by the addition of the following:

Notwithstanding any language herein to the contrary, either party may terminate this Contract
effective December 31, 2016 by providing written notice of termination to the other party on or
before March 31, 2015.

Except as expressly stated herein, all other terms and conditions of the Contract shall remain in full force
and effect.   This Amendment is not valid unless executed and returned by your company within thirty
(30) days from receipt and until accepted and executed by Olin.

Thank you for your business and the confidence you have placed in Olin.   Please indicate your
acceptance of the above by signing and returning the two (2) originals of this Second Amendment.   We
will return one duly executed original for your files.

Accepted by:

| | Olin Corporation
Chlor Alkali Products Division,
for and on behalf of itself and its subsidiaries |
|---|---|
| **Albemarle Corporation** | |
| Signature: *Phillip R DeVrou* | Signature: *Fuchrumbole* |
| Name:   Phillip R DeVrou | Name: *Frank W. Chirenbole* |
| Title:   Director of Chemical Purchases | Title: *President* |
| Date:   December 8, 2014 | Date: *Dec 15, 2014* |



CHLOR ALKALI
P R O D U C T S

490 Stuart Road NE, Cleveland, Tennessee  37312
423/336-4850 • 423/336-4830
Internet Address:  www.olinchloralkali.com

November 8, 2012

Mr. Phil DeVrou
Director, Chemical Purchases
Albemarle Corporation
451 Florida Street
Baton Rouge, LA 70801

Subject:   **First Amendment to Sales Contract No. CC-14-319 between Olin Corporation and Albemarle Corporation dated October 10, 2007 (the "Contract").**

Dear Phil:

Confirming our recent discussions, the Contract shall be amended, effective January 1, 2013, as follows:

**Price.**  The following subsection will be added at the end of Addendum C:

"4.  The spreadsheet attached hereto as Exhibit 1 to Addendum C may be utilized by Seller to determine and implement the price adjustments described above."

Exhibit 1 to Addendum C attached is hereby incorporated into the Contract.

Additionally, since it has been formally announced that CMAI pricing will no longer be published after December 31, 2012, the parties acknowledge and agree that the spreadsheet set forth in Exhibit 1 to Addendum C shall be modified such that all references to "CMAI Chlorine Chemical Contract Low" shall be replaced with "IHS Chemical Chlorine Contract Low" and all references to "CMAI Caustic Average Acquisition Price" shall be replaced with "IHS Chemical Contract Liq. Index, FOB USGC".  Application of these IHS Chemical indices will first occur in determining May 1, 2013 pricing.

Except as expressly stated herein, all other terms and conditions of the Contract shall remain in full force and effect.



Page 2

Thank you for your business and the confidence you have placed in Olin. Please indicate your acceptance of the above by signing and returning the two (2) originals of this First Amendment. We will return one duly executed original for your files.

Accepted by:

**Albemarle Corporation**

Signature: _Phillip De Vrou_

Name:     Phillip DeVrou

Title:     Director of Chemical Purchases

Date:     _Dec 18, 2012_

**Olin Corporation**
**Chlor Alkali Products Division,**
for and on behalf of itself and its subsidiaries

Signature: _____

Name:     Chris Cusick

Title:     VP - Sales & Marketing

Date:     1 - 28 - 13



Olin

# Exhibit 1 to Addendum C

## Albemarle ECU Contract Pricing Model

| Pricing Model Input Data | Responsibility | Updates | Calculation Method | Starting Base 12/31/07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 | Oct-08 | Nov-08 | Dec-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 2008 | | | | | | | | | | | |
| | | | | | 1Q | | | 2Q | | | 3Q | | | 4Q | | |
| **Transportation Costs** | | | | | | | | | | | | | | | | |
| ***Chlorine Transportation Costs*** | | | | | | | | | | | | | | | | |
| ***Chlorine Rail Car Transportation Component*** | | | | | | | | | | | | | | | | |
| Albemarle chlorine transportation charge per ton | Actual | Monthly | [(CarCost plus actual freight) / TonsShipped] | | 165.2 | 165.2 | 165.2 | 165.2 | 165.2 | 165.2 | 165.2 | 165.2 | 165.2 | 165.2 | 165.2 | 165.2 |
| ***Actual Total of Transportation Charges will appear on caustic invoice*** | | | | | | | | | | | | | | | | |
| **Shipment Volumes** | | | | | | | | | | | | | | | | |
| ***Chlorine Volumes Shipped*** | | | | | | | | | | | | | | | | |
| South Plant [Ethyl] | Olin CST | Monthly | Current month shipment volume | | 2,865.0 | 2,773.0 | 3,491.0 | 3,759.0 | 3,839.0 | 3,945.0 | 4,650.0 | 3,669.3 | 4,481.0 | 3,579.2 | 4,026.0 | 4,382.0 |
| West Plant [Waldo] | Olin CST | Monthly | Current month shipment volume | | 2,688.0 | 1,613.0 | 2,241.0 | 1,524.0 | 2,340.0 | 1,790.0 | 2,147.0 | 2,149.0 | 1,698.0 | 2,237.5 | 2,498.0 | 1,700.0 |
| Total Chlorine Shipped | Calculated | - | Total chlorine shipped during month | | 5,553.0 | 4,386.0 | 5,732.0 | 5,283.0 | 6,179.0 | 5,735.0 | 6,797.0 | 5,818.3 | 6,179.0 | 5,816.7 | 6,524.0 | 6,082.0 |
| *Chlorine Volume Warning* | Calculated | Monthly | Validates annual run rate of 30,000+ tons | | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| ***Caustic Soda Shipments*** | | | | | | | | | | | | | | | | |
| Total Commercial Grade Shipped | Actual | - | Total commercial grade shipments | | - | - | - | - | - | - | - | - | - | - | - | - |
| **Delivered Prices** | | | | | | | | | | | | | | | | |
| ***CMAI Pricing*** | | | | | | | | | | | | | | | | |
| CMAI Chlorine Chemical Contract Low | Chlorine Director | Monthly | Published CMAI contract-low, FOB Gulf | $315.00 | $295.00 | $295.00 | $275.00 | $265.00 | $265.00 | $265.00 | $255.00 | $255.00 | $255.00 | $240.00 | $230.00 | $210.00 |
| CMAI Caustic, Average Acquisition Cost | Chlorine Director | Monthly | Published Average Acquisition, FOB Gulf | $383.33 | $435.00 | $450.00 | $475.00 | $515.00 | $530.00 | $575.00 | $710.00 | $790.00 | $860.00 | $980.00 | $980.00 | $950.00 |
| ***CMAI Price Quarterly Averaging*** | | | | | | | | | | | | | | | | |
| Prior Qtr CMAI Average Chlorine Price | Calculated | - | Quarter Average | $315.00 | $315.00 | $315.00 | $315.00 | $315.00 | $288.33 | $288.33 | $288.33 | $265.00 | $265.00 | $265.00 | $255.00 | $255.00 |
| Prior Qtr CMAI Average Caustic Price | Calculated | - | Quarter Average | $383.33 | $383.33 | $383.33 | $383.33 | $383.33 | $453.33 | $453.33 | $453.33 | $540.00 | $540.00 | $540.00 | $786.67 | $786.67 |
| Prior Qtr CMAI Average ECU Price | Calculated | - | Quarter Average | $736.66 | $736.67 | $736.67 | $736.67 | $736.67 | $787.00 | $787.00 | $787.00 | $859.00 | $859.00 | $859.00 | $1,120.33 | $1,120.33 |
| Olin System Avg ECU Cost Escalator | Chlorine Director | Feb & Aug | Prior 6 months minus 2007 Actual Cost | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $13.31 | $13.31 | $13.31 | $13.31 | $13.31 |
| GDP Deflator of Prior Calendar Year | Chlorine Director | Annually | GDP deflator for prior calendar year | 106.21400 | 106.21400 | 106.214 | 106.21400 | 106.21400 | 106.21400 | 106.21400 | 106.21400 | 106.214 | 106.21400 | 106.21400 | 106.21400 | 106.21400 |
| ***ECU Price Calculations (See Tab Price Calculations)*** | | | | | | | | | | | | | | | | |
| Current Quarter Contract ECU Price | Calculated | - | Base: $302, changed w/ $ chg in mfg cost | $302.00 | $302.00 | $302.00 | $302.00 | $302.00 | $302.00 | $302.00 | $302.00 | $315.31 | $315.31 | $315.31 | $315.31 | $315.31 |
| Contract Adder *(Escalated for GDP Deflator)* | Calculated | - | Base: $96 changed annually w/GDP deflator | $96.00 | $96.00 | $96.00 | $96.00 | $96.00 | $96.00 | $96.00 | $96.00 | $96.00 | $96.00 | $96.00 | $96.00 | $96.00 |
| **Effective Contract ECU Price, FOB** | **Calculated** | - | **Total CGECU Price to Albemarle** | | **$398.00** | **$398.00** | **$398.00** | **$398.00** | **$398.00** | **$398.00** | **$398.00** | **$411.31** | **$411.31** | **$411.31** | **$411.31** | **$411.31** |
| CGECU Caustic Price, FOB | Calculated | - | Based upon prior quarter CMAI price ratio | | $207.10 | $207.10 | $207.10 | $207.10 | $229.26 | $229.26 | $229.26 | $258.57 | $258.57 | $258.57 | $288.81 | $288.81 |
| CGECU Chlorine Price, FOB | Calculated | - | Based upon prior quarter CMAI price ratio | | $170.19 | $170.19 | $170.19 | $170.19 | $145.82 | $145.82 | $145.82 | $126.89 | $126.89 | $126.89 | $93.62 | $93.62 |
| **NON CGECU Chlorine Price (Negotiated)** | Chlorine Director | Quarterly | Delivered a la carte chlorine price (any site) | $225.00 | $235.00 | $235.00 | $235.00 | $245.00 | $245.00 | $245.00 | $255.00 | $255.00 | $255.00 | $265.00 | $265.00 | $265.00 |
| ***ECU & Non ECU Chlorine Calculations*** | | | | | | | | | | | | | | | | |
| Chlorine shipped during current month | Calculated | - | Total volume from both Ethyl & Waldo | | 5,553.0 | 4,386.0 | 5,732.0 | 5,283.0 | 6,179.0 | 5,735.0 | 6,797.0 | 5,818.0 | 6,179.0 | 5,816.7 | 6,524.0 | 6,082.0 |
| CGECU-eligible chlorine volume | Calculated | - | Calculated by total caustic volume shipped | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Current month CGECU chlorine | Calculated | - | Cl2 balanced by a purchased Caustic ton | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Current month Non-CGECU chlorine | Calculated | - | Cl2 not balanced by purchased caustic tons | | 5,553.0 | 4,386.0 | 5,732.0 | 5,283.0 | 6,179.0 | 5,735.0 | 6,797.0 | 5,818.0 | 6,179.0 | 5,816.7 | 6,524.0 | 6,082.0 |
| Current-month CGECU excess credits | Calculated | - | Forward credit for excess caustic purchased | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Current Month CGECU credits available | Calculated | - | Caustic credits "in the bank" ready for use | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| CGECU credits consumed this month | Calculated | - | Caustic credits used to balance chlorine | | - | - | - | - | - | - | - | - | - | - | - | - |
| CGECU credits remaining (carry forward) | Calculated | - | Caustic credits to carry into next month | | - | - | - | - | - | - | - | - | - | - | - | - |
| **Invoice Volumes and Values** | | | | | | | | | | | | | | | | |
| ***Chlorine Volumes Invoiced*** | | | | | | | | | | | | | | | | |
| Chlorine volume invoiced as CGECU | Calculated | - | Total Cl2 shipments (Ethyl & Waldo) | | - | - | - | - | - | - | - | - | - | - | - | - |
| Chlorine volume invoiced as non-CGECU | Calculated | - | Determined by caustic credits available | | 5,553 | 4,386 | 5,732 | 5,283 | 6,179 | 5,735 | 6,797 | 5,818 | 6,179 | 5,817 | 6,524 | 6,082 |
| Total chlorine volume invoiced | Calculated | - | | | 5,553 | 4,386 | 5,732 | 5,283 | 6,179 | 5,735 | 6,797 | 5,818 | 6,179 | 5,817 | 6,524 | 6,082 |
| ***Total Chlorine Delivered Value*** | | | | | | | | | | | | | | | | |
| Chlorine value invoiced as CGECU - Unit Cost | Calculated | Monthly | [Line 59] | | $170.19 | $170.19 | $170.19 | $170.19 | $145.82 | $145.82 | $145.82 | $126.89 | $126.89 | $126.89 | $93.62 | $93.62 |
| Chlorine value invoiced as CGECU - Total Dollar Cos | Calculated | Monthly | [CGECU volume] x [CGCU Price: Line 82] | | $0.00 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Chlorine transportation cost for CGECU Chlorine - Unit Cost | Calculated | Monthly | [Line 12] | | $165.20 | $165.20 | $165.20 | $165.20 | $165.20 | $165.20 | $165.20 | $165.20 | $165.20 | $165.20 | $165.20 | $165.20 |
| Chlorine freight cost for CGECU Chlorine - Total Dol | Calculated | Monthly | [CGECU volume] x [chlorine frt: Row 86] | | $0.00 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Chlorine value invoiced as non-CGECU - Unit Price | Calculated | Monthly | [Line 61] | | $235.00 | $235.00 | $235.00 | $245.00 | $245.00 | $245.00 | $255.00 | $255.00 | $255.00 | $265.00 | $265.00 | $265.00 |
| Chlorine value invoiced as non-CGECU - Total Dollar | Calculated | Monthly | [Non-CGECU volume] x [Line 88] | | $1,304,955.00 | $1,030,710 | $1,347,020 | $1,294,335 | $1,513,855 | $1,405,075 | $1,733,235 | $1,483,590 | $1,575,645 | $1,541,431 | $1,728,860 | $1,611,730 |
| Total chlorine dollars invoiced | Calculated | - | | | 1,304,955.00 | 1,030,710.00 | 1,347,020.00 | 1,294,335.00 | 1,513,855.00 | 1,405,075.00 | 1,733,235.00 | 1,483,590.00 | 1,575,645.00 | 1,541,430.80 | 1,728,860.00 | 1,611,730.00 |
| ***Composite Chlorine Prices*** | | | | | | | | | | | | | | | | |
| Monthly Composite Chlorine, FOB Price | Calculated | - | Weighted Avg of CGECU & Non-CGECU | | $235.00 | $235.00 | $235.00 | $245.00 | $245.00 | $245.00 | $255.00 | $255.00 | $255.00 | $265.00 | $265.00 | $265.00 |
| Quarterly Composite Chlorine, FOB Price | Calculated | - | Weighted Avg of CGECU & Non-CGECU | | | | $235.00 | | | $245.00 | | | $255.00 | | | $265.00 |

| Pricing Model Input Data | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 | Jun-09 | Jul-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2009 | | | | | | | | | | | |
| | 1Q | | | 2Q | | | 3Q | | | 4Q | | |
| Albemarle chlorine transportation charge per ton | 165.2 | 168.3 | 168.3 | 165.9 | 164.9 | 165.5 | 165.6 | 169.1 | 164.9 | 165.5 | 187.2 | 190.2 |
| South Plant [Ethyl] | - | - | - | 443.0 | 1,250.0 | 3,581.5 | 3,225.8 | 3,310.0 | 3,400.4 | 3,664.2 | 4,208.4 | 4,564.2 |
| West Plant [Waldo] | - | - | - | - | - | - | 538.4 | 626.3 | 1,165.5 | 1,791.1 | 2,236.2 | 1,795.2 |
| Total Chlorine Shipped | - | - | - | 443.0 | 1,250.0 | 3,581.5 | 3,764.2 | 3,936.2 | 4,565.9 | 5,455.3 | 6,444.6 | 6,359.4 |
| *Chlorine Volume Warning* | No Vol | No Vol | No Vol | LOW | LOW | LOW | LOW | LOW | OK | OK | OK | OK |
| Total Commercial Grade Shipped | 3,761.3 | 2,903.0 | 3,036.0 | 3,312.0 | 2,567.3 | 4,661.8 | 4,535.2 | 3,163.5 | 4,072.4 | 2,289.9 | 4,612.1 | 4,329.2 |
| CMAI Chlorine Chemical Contract Low | $175.00 | $165.00 | $155.00 | $155.00 | $155.00 | $185.00 | $350.00 | $370.00 | $380.00 | $330.00 | $375.00 | $363.00 |
| CMAI Caustic, Average Acquisition Cost | $925.00 | $840.00 | $700.00 | $520.00 | $350.00 | $235.00 | $165.00 | $160.00 | $190.00 | $210.00 | $220.00 | $223.00 |
| Prior Qtr CMAI Average Chlorine Price | $255.00 | $226.67 | $226.67 | $226.67 | $165.00 | $165.00 | $165.00 | $165.00 | $165.00 | $165.00 | $366.67 | $366.67 |
| Prior Qtr CMAI Average Caustic Price | $786.67 | $970.00 | $970.00 | $970.00 | $821.67 | $821.67 | $821.67 | $368.33 | $368.33 | $368.33 | $171.67 | $171.67 |
| Prior Qtr CMAI Average ECU Price | $1,120.33 | $1,293.67 | $1,293.67 | $1,293.67 | $1,068.83 | $1,068.83 | $1,068.83 | $570.17 | $570.17 | $570.17 | $555.50 | $555.50 |
| Olin System Avg ECU Cost Escalator | $13.31 | $57.44 | $57.44 | $57.44 | $57.44 | $57.44 | $57.44 | $60.66 | $60.66 | $60.66 | $60.66 | $60.66 |
| GDP Deflator of Prior Calendar Year | 106.21400 | 108.483 | 108.48300 | 108.48300 | 108.48300 | 108.48300 | 108.48300 | 108.483 | 108.48300 | 108.48300 | 108.48300 | 108.48300 |
| Current Quarter Contract ECU Price | $315.31 | $359.44 | $359.44 | $359.44 | $359.44 | $359.44 | $359.44 | $362.66 | $362.66 | $362.66 | $362.66 | $362.66 |
| Contract Adder *(Escalated for GDP Deflator)* | $96.00 | $98.05 | $98.05 | $98.05 | $98.05 | $98.05 | $98.05 | $98.05 | $98.05 | $98.05 | $98.05 | $98.05 |
| **Effective Contract ECU Price, FOB** | **$411.31** | **$457.49** | **$457.49** | **$457.49** | **$457.49** | **$457.49** | **$457.49** | **$460.71** | **$460.71** | **$460.71** | **$460.71** | **$460.71** |
| CGECU Caustic Price, FOB | $288.81 | $343.03 | $343.03 | $343.03 | $351.70 | $351.70 | $351.70 | $297.62 | $297.62 | $297.62 | $142.37 | $142.37 |
| CGECU Chlorine Price, FOB | $93.62 | $80.16 | $80.16 | $80.16 | $70.62 | $70.62 | $70.62 | $133.32 | $133.32 | $133.32 | $304.10 | $304.10 |
| **NON CGECU Chlorine Price (Negotiated)** | $255.00 | $210.00 | $210.00 | $155.00 | $155.00 | $155.00 | $155.00 | $155.00 | $155.00 | $155.00 | $155.00 NA | |
| Chlorine shipped during current month | 0.0 | 0.0 | 0.0 | 443.0 | 1,250.0 | 3,581.5 | 3,764.2 | 3,936.2 | 4,565.9 | 5,455.3 | 6,444.6 | 6,359.4 |
| CGECU-eligible chlorine volume | 3,419.3 | 2,639.1 | 2,761.8 | 3,013.9 | 2,424.8 | 4,238.0 | 4,095.6 | 2,875.9 | 3,702.2 | 2,081.7 | 4,192.8 | 3,935.6 |
| Current month CGECU chlorine | 0.0 | 0.0 | 0.0 | 443.0 | 1,250.0 | 3,581.5 | 3,764.2 | 2,875.9 | 3,702.2 | 2,081.7 | 4,192.8 | 3,935.6 |
| Current month Non-CGECU chlorine | (3,419.3) | (2,639.1) | (2,761.8) | (2,562.9) | (1,174.8) | (656.5) | (331.5) | 1,060.3 | 863.7 | 3,373.6 | 2,251.7 | 2,423.8 |
| Current-month CGECU excess credits | 3,419.3 | 2,639.1 | 2,761.8 | 2,562.9 | 1,174.8 | 656.5 | 331.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Current Month CGECU credits available | 3,419.3 | 6,058.4 | 8,820.3 | 11,383.2 | 12,558.0 | 13,214.5 | 13,546.0 | 13,546.0 | 12,485.7 | 11,622.0 | 8,248.4 | 5,996.7 |
| CGECU credits consumed this month | - | - | - | - | - | - | - | 1,060.3 | 863.7 | 3,373.6 | 2,251.7 | 2,423.8 |
| CGECU credits remaining (carry forward) | 3,419.3 | 6,058.4 | 8,820.3 | 11,383.2 | 12,558.0 | 13,214.5 | 13,546.0 | 12,485.7 | 11,622.0 | 8,248.4 | 5,996.7 | 3,572.9 |
| Chlorine volume invoiced as CGECU | - | - | - | 443 | 1,250 | 3,581 | 3,764 | 3,936 | 4,565 | 5,455 | 6,445 | 6,359 |
| Chlorine volume invoiced as non-CGECU | - | - | - | - | - | - | - | - | - | - | - | - |
| Total chlorine volume invoiced | - | - | - | 443 | 1,250 | 3,581 | 3,764 | 3,936 | 4,566 | 5,455 | 6,445 | 6,359 |
| Chlorine value invoiced as CGECU - Unit Cost | $93.62 | $80.16 | $80.16 | $80.16 | $70.62 | $70.62 | $70.62 | $133.32 | $133.32 | $133.32 | $304.10 | $304.10 |
| Chlorine value invoiced as CGECU - Total Dollar Cos | $0 | $0 | $0 | $35,911 | $88,281 | $252,939 | $265,844 | $524,795 | $608,746 | $727,325 | $1,959,788 | $1,933,881 |
| Chlorine transportation cost for CGECU Chlorine - Unit Cost | $165.20 | $168.28 | $168.28 | $165.88 | $164.94 | $165.52 | $165.64 | $169.07 | $184.66 | $165.48 | $187.21 | $190.17 |
| Chlorine freight cost for CGECU Chlorine - Total Dol | $0 | $0 | $0 | $74,314 | $206,175 | $592,803 | $623,499 | $744,221 | $844,050 | $1,011,847 | $1,206,486 | $1,209,367 |
| Chlorine value invoiced as non-CGECU - Unit Price | $265.00 | $210.00 | $210.00 | $155.00 | $155.00 | $155.00 | $155.00 | $155.00 | $155.00 | $155.00 | $155.00 NA | |
| Chlorine value invoiced as non-CGECU - Total Dollar | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total chlorine dollars invoiced | 0.00 | 0.00 | 0.00 | 110,225.09 | 294,455.82 | 845,742.63 | 889,342.68 | 1,269,016.35 | 1,452,796.20 | 1,739,171.93 | 3,166,273.81 | 3,143,267.71 |
| Monthly Composite Chlorine, FOB Price | $258.82 | $248.44 | $248.44 | $246.04 | $235.56 | $236.14 | $236.26 | $322.39 | $318.18 | $318.80 | $491.31 | $494.27 |
| Quarterly Composite Chlorine, FOB Price | | | | | | $236.85 | | | $294.40 | | | $443.80 |

12/18/12








**OLIN**
CHLOR ALKALI
P R O D U C T S

490 Stuart Road NE
Cleveland, TN  37312

**Sales Contract**

Contract No.:  CC-14-319
Date:  October 10, 2007

OLIN CORPORATION, 190 Carondelet Plaza, Suite 1530, Clayton, MO 63105 ("Seller") agrees to sell to:

| Company |
|---|
| **Albemarle Corporation** |

| Address | City | State | Zip | |
|---|---|---|---|---|
| 451 Florida St. | Baton Rouge | Louisiana | 70801-1765 | ("Buyer") |

and Buyer agrees to purchase from Seller, the product described herein ("product") upon the terms and conditions herein set forth.

**Product**

- Chlorine – conforming to specifications attached as Addendum A
- Sodium Hydroxide – conforming to specifications attached as Addendum B

**Quantity**

A.1  COMMERCIAL GRADE ECUs - The intent of this contract is for Seller to sell and Buyer to purchase 100% of Buyer's commercial grade sodium hydroxide (CGSH) requirements from Seller in the form of commercial grade ECUs (CGECU) with one CGECU being defined as one short ton of chlorine and 1.1 tons of CGSH, 100% basis.  Membrane grade sodium hydroxide, 100% basis, shall be referred to as MGSH. Examples of this Quantity provision are included in Addendum H.

A.2  The expected volume is between 40,000 and 55,000 CGECUs per year.  Seller is not obligated to sell in excess of 55,000 CGECUs in any calendar year unless agreed to in writing by Seller.  Notwithstanding the requirement provisions described herein, this contract is not a take or pay agreement.

A.3  Buyer agrees to purchase and Seller agrees to sell 100% of Buyer's  CGSH  purchase requirements from Seller, and if this quantity should fall below 44,000 tons of CGSH in any year, and Buyer's total chlorine requirement is equal to or greater than 40,000 tons, then Seller has the option of:  i) supplying MGSH (at the pricing described in Addendum C) in lieu of CGSH in the form of ECUs to achieve the minimum volume of 40,000 CGECUs per year, or ii) elect not to supply MGSH in lieu of the CGSH shortfall, in which case the CGECU volume will be reduced accordingly and any chlorine supplied under this contract in excess of the CGECU volume will be considered non-CGECU chlorine pursuant to subpart B below and priced according to Addendum D.

A.4 i)  If Buyer's total chlorine requirements fall below 40,000 tons and the Buyer's total CGSH purchase requirements exceed 1.1 times its total chlorine volume, Buyer will purchase 100% of their chlorine from Seller in the form of CGECUs.  ii) If Buyer's total chlorine requirements fall below 40,000 tons and the Buyer's total CGSH purchase requirements is less than 1.1 times their total chlorine volume, and Buyer's total CGSH and MGSH  purchase requirements exceeds 1.1 times their total chlorine volume, and Seller agrees to balance the CGECU with MGSH, Buyer will purchase 100% of their chlorine from Seller in the form of CGECUs.

A.5  If Buyer's total chlorine requirements fall below 40,000 tons and the Buyer's  total sodium hydroxide purchase requirements are less than 1.1 times its total chlorine requirements, Seller has the option to: a) supply a quantity of MGSH at the pricing set forth in Addendum C in order to make the CGECU ratios balance, or b) elect not to supply MGSH under this scenario; any volume of chlorine purchased in excess of a quantity equal to the CGECU volume will be considered non-CGECU chlorine and priced according to Addendum D

A.6  Should Buyer fail to purchase product under this subpart A at a rate which would equate to more than 30,000 tons of chlorine per calendar year when annualized for any six (6) month period, then:

   a)  Seller shall have the option to notify Buyer in writing and the parties shall engage in good faith negotiations to amend this contract to account for such reduced volume, and
   b)  If the parties are unable to execute a mutually agreeable amendment within six (6) months from Seller's initial notification, Seller may terminate this contract upon six months written notice to Buyer. Such notice of termination must be given by Seller within fifteen (15) days of the expiration of the six

(6) month period for negotiation of a mutually agreeable amendment.  (See Volume Example in Addendum G).

B.1  NON-CGECU CHLORINE – Non-CGECU chlorine is defined as Buyer's chlorine requirements that are in excess of that volume of chlorine represented by the CGECUs purchased by Buyer pursuant to subpart A above.

B.2 Seller agrees to sell up to 100% and Buyer agrees to purchase a minimum of 75% of Buyer's non-CGECU chlorine requirements.

B.3   Seller is not obligated to sell in excess of 25,000 tons of non-CGECU chlorine in any calendar year unless agreed to in writing by Seller.

---

*Delivery Period*

The initial term of this contract will be January 1, 2009 through December 31, 2016, subject to earlier termination as provided for elsewhere in this contract, and after December 31, 2016 the contract shall continue in effect unless either party provides written notice of termination to the other party in which case such notice of termination shall be treated as having been given on December 31st of the year in which it is sent and the contract shall terminate two (2) years from such December 31st.

---

*Container*
- Chlorine – Rail car
- Sodium Hydroxide – Rail car, barge and/or tank truck

---

*Method Of Shipment*

Rail, tank truck common carrier(s) and/or barge.

---

*Price*

Please refer to Addenda C, E & F for CGECU pricing.  Please refer to Addendum D for pricing for non-CGECU chlorine.

---

*Terms Of Payment*          *NET CASH WITHIN 30 DAYS OF DATE OF INVOICE*

---

*Origin*

Any or all of Seller's production plants and terminal locations.   Seller may, at its option, supply either product that it has purchased from other producers from such producers' locations, provided the product conforms to the applicable specification stated in this contract.

---

*Destination*

Buyer's plants located in North America, including but not limited to Magnolia, AR, Bayport, TX, Pasadena, TX, and Orangeburg, SC.

---

*Further Terms And Conditions*
- This contract shall be of no force or effect until and unless Seller and Buyer execute contemporaneously herewith that certain Third Amendment to Contract # CL-14-125 extending that contract through 12/31/2008.
- Should, prior to December 31, 2016, Buyer's requirements for sodium hydroxide change such that Buyer requires a different grade of sodium hydroxide than sold pursuant to this contract, Seller shall have the option at its sole discretion to supply such different grade at the pricing in effect hereunder.
- Should, prior to December 31, 2016, Seller elect to discontinue the manufacture of diaphragm grade sodium hydroxide, Seller shall continue to supply Buyer with sodium hydroxide hereunder which Seller still manufactures after such discontinuance of the manufacture of diaphragm grade sodium hydroxide and which meets the specifications hereunder at the pricing in effect hereunder.

*THE OLIN TERMS AND CONDITIONS ATTACHED HERETO AND/OR PRINTED ON THE REVERSE SIDE HEREOF TOGETHER WITH ANY ADDENDUM ATTACHED HERETO AND REFERRED TO HEREIN ARE A PART OF THIS CONTRACT AS EFFECTIVELY AS THOUGH THEY PRECEDED THE SIGNATURES OF THE PARTIES.  THIS CONTRACT IS NOT VALID UNLESS EXECUTED AND RETURNED BY BUYER WITHIN SIXTY (60) DAYS FROM RECEIPT AND UNTIL ACCEPTED AND EXECUTED BY SELLER AND UNTIL BOTH PARTIES HAVE EXECUTED THAT CERTAIN THIRD AMENDMENT TO CONTRACT # CL-14-125.*

| BUYER: **ALBEMARLE CORPORATION** | SELLER: **OLIN CORPORATION** <br> **Chlor-Alkali Products Division** |
|---|---|
| BY: *Phillip B McVhoa* | BY: *John Martit* |
| TITLE: *Director Chemical Purchase* <br> *10/15/07* | TITLE: *Vice President* <br> *10/27/07* |

# **Olin** TERMS AND CONDITIONS

1. WARRANTIES. Seller warrants that (a) the product is of the quality set forth in Seller's published specifications, if any, or as may be otherwise expressly stated in this contract, and (b) the title conveyed is good and the product is free from any lawful security interest, lien or encumbrance. SELLER MAKES NO FURTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR OTHERWISE. Buyer assumes all risk of patent infringement by reason of any use Buyer makes of the product in combination with other material or in the operation of any process.

2. QUANTITY.
a. Throughout the term of this contract, Buyer will provide Seller with a written estimate of Buyer's product requirements on each November 1st for the following calendar year, subject to the limitations stated in the Quantity provision on the front page of this contract.
b. Additionally, Buyer shall supply Seller with written notice of monthly requirements by the 1st of each month via Buyer's purchase order.
c. The quantity shipped in any contract month may be limited by Seller to a maximum of (i) $1/10^{th}$ of the annual quantity declared pursuant to 2.a. above, or (ii) $1/5^{th}$ of the actual quantity purchased in the highest volume six months of the prior twelve (12) months.

3. PRICE, CHANGES AND FORMS OF WRITTEN NOTICE. Price and price changes shall be determined as set forth in Addendum C and D. Price changes shall be applicable to all product shipped hereunder on and after the date the changes become effective. Seller's notifications to Buyer regarding price changes and Buyer's notifications to Seller regarding volume estimates may be sent by electronic mail or facsimile (delivery confirmed). All other notices sent pursuant to this contract shall be in writing and shall be sent to the other party by nationally recognized overnight delivery service, facsimile (delivery confirmed), or registered or certified mail, return receipt requested and postage prepaid, at the respective party's address below given or such other address the parties shall from time-to-time designate in writing:

If to Seller:     Olin Corporation
                  490 Stuart Road NE
                  Cleveland, TN 37312
                  Facsimile: (423) 336-4830

If to Buyer:      Albemarle Corporation
                  451 Florida Street
                  Baton Rouge, Louisiana 70801-1765
                  Facsimile: (225) 388-7378

4. CREDIT. Seller may recover for each shipment hereunder as a separate transaction, without reference to any other shipment. If Buyer fails to pay any invoice within 60 days of the due date Seller may, at its option,

defer further shipments until payment has been made or, in addition to any other legal remedy, Seller may decline further performance of this contract with 90 days written notice. In the event that any amount due hereunder is not paid when due, then in addition to any other remedies afforded to Seller hereunder or by operation of law, interest shall accrue on the delinquent amount at an annual rate not to exceed the prime rate as reported in the Wall Street Journal on the due date, plus 2%. Interest shall accrue from the day following the due date of payment until all such due and unpaid sums are paid in full with interest. Additionally, in the event that any payment hereunder becomes delinquent, Buyer agrees to pay any and all costs associated with the collection of such amounts by Seller, including but not limited to reasonable attorneys' fees. If at any time, in the judgment of Seller (acting reasonably), the financial responsibility of Buyer is materially impaired, Seller may change the terms of payment and/or require payment as a condition of shipment.

5. TAXES. Buyer shall reimburse Seller for any federal, state or local excise or other tax, assessment, license fee or other charge, or increases thereof, which Seller may be required to pay upon the sale, production, transportation, delivery or use of the product.

6. Intentionally deleted.

7. TITLE. Title to and risk of loss of all product sold hereunder shall pass to Buyer at Seller's point of shipment whether or not Seller pays all or any part of the freight, except as specifically designated otherwise in this contract.

8. FORCE MAJEURE. Neither party shall be liable for its failure to perform hereunder if due to any contingency beyond the reasonable control of the party affected, including but not limited to acts of God, war, fire, bad weather, flood, accident, labor trouble or shortage, civil disturbance, plant shut down, equipment failure, or voluntary or involuntary compliance with any applicable governmental regulation or order. Seller shall not be liable for its failure to perform hereunder if due to any shortage or inability to obtain (on terms deemed economically and commercially practicable by Seller) any raw material (including energy), equipment or transportation. Any quantities not delivered or accepted because of any such contingency shall be eliminated from the contract. Seller shall not be obligated to deliver the product from other than the production or shipping points designated herein and there shall be no obligation to rebuild or repair any damage or destruction to such production or shipping points in order to fulfill this contract. During any period when Seller is unable to supply the contract quantity of the product, whether caused by the circumstances above or otherwise, Seller may allocate any available product equitably to Buyer and Seller's

3

other customers, including its own subsidiaries, divisions and departments, on a fair and reasonable basis in Seller's reasonable judgment.

9. GOVERNMENTAL REGULATION. Should either party elect to discontinue, curtail or limit the production or sale or use of the product in consequence of the application of any governmental regulation or order (including but not limited to those relating to environment, ecology, energy, occupational safety and health, toxic substances, product safety, packaging, sale, use or application, consumer protection or transportation), compliance with which will, in the sole judgment of the affected party, render the production, use, marketing or transportation of the product economically, technically or commercially infeasible, the affected party may terminate this contract upon thirty (30) days prior written notice to the other party.

10. CLAIMS. The weights, tares and tests fixed by Seller's invoice shall govern unless proven to be incorrect. However, in the event Buyer challenges the validity of such weights, tares or tests, the parties will discuss the related issues in good faith, with a view to obtaining a mutually satisfactory resolution. Claims relating to quantity, quality, weight, condition and loss of or damage to any of the product sold hereunder shall be waived by Buyer unless made within ninety (90) days after receipt of product by Buyer.

11. LIMITATION OF LIABILITY. Buyer's exclusive remedy and Seller's exclusive liability under this contract or otherwise (including negligence) shall be for damages which shall in no event exceed three times the purchase price as is applicable to that portion of the particular shipment with respect to which damages are claimed. In no event shall either party be liable to the other party for any incidental or consequential damages arising in connection with this contract or the product sold hereunder. Buyer assumes all risks and liability, and Seller assumes no liability, with respect to unloading and discharge of the product (including failure of discharge or unloading implements or materials used by Buyer, whether or not supplied by Seller), storage, handling, sale and use of the product (including its use alone or in combination with other substances or in the operation of any process), and the compliance or non-compliance with all federal, state and local laws and regulations applicable to the product.

12. CUSTOMER ASSESSMENT PROCESS. (a) As a member of the American Chemistry Council and the Chlorine Institute ("CI"), Seller is committed to supporting the Responsible Care initiative and is a signatory to the CI Member Safety Commitment. In connection with its efforts to implement these commitments, Seller, its employees, and agents shall have the right at any reasonable time to assess and inspect all of Buyer's locations where Seller's chlorine products are or will be used, handled, processed, stored, recycled, transported, or disposed, and Buyer shall cooperate fully with Seller, its employees, and agents during said assessments and inspections. In the

event that Seller exercises its right to inspect Buyer's locations, Buyer shall advise Seller, its employees, and agents of all safety rules applicable to the locations, and Seller shall require its employees and agents to comply with said safety rules.
(b) Seller shall also have the right at any reasonable time to inspect and obtain copies of all documents, records, reports, and other information, including, but not limited to, product storage and handling practices and procedures, related to Buyer's use, handling, storage, and transportation of Seller chlorine products, and to inspect any equipment, containers, tanks, vehicles, pipelines, and vessels used to handle, store, or transport Seller chlorine products. Moreover, Seller has the right to reject equipment provided by Buyer that is in Seller's sole judgment unsafe or unfit to load. Product loaded into such equipment will meet warranties provided by this contract at the time of loading. Should any product contamination result in whole or in part as a result of use of Buyer's equipment, then such warranties will be null and void with respect to any such contamination.
(c) Buyer shall participate in reviews regarding the proper use, handling, processing, storage, recycling, transportation, and disposal of Seller's chlorine products, and Buyer shall transmit information regarding the proper use, handling, storage, and transportation of Seller's chlorine products to Buyer's downstream customers and users of Seller's chlorine products.
(d) In the event that Buyer fails to comply with any of its obligations under subsections (a), (b), and/or (c) of this Section or in the event that Buyer fails to meet minimum safety standards identified by Seller, Seller reserves the right to take any and all action Seller deems appropriate, including, but not limited to, withholding delivery of Seller chlorine products and/or termination of this contract.

13. NON-WAIVER. Seller's or Buyer's waiver of any breach or failure to enforce any of the terms or conditions of this contract at any time shall not in any way affect, limit or waive such party's right thereafter to enforce strict compliance with every term and condition hereof.

14. ASSIGNMENT. Neither this contract nor any right or obligation hereunder is assignable or transferable by either party in whole or in part without the prior written consent of the other party and any such purported assignment without such consent shall be void, except that either party shall have the right to assign this contract and its rights and delegate its duties and obligations hereunder, without obtaining the prior written consent of the other party, to any entity (a) with which Seller or Buyer merges, (b) to which Seller or Buyer sells a substantial part of its assets or businesses, or (c) to which Seller or Buyer sells a substantial part of its assets or business relating to the manufacture and/or sale of the product.

15. APPLICABLE LAW. The parties hereto do hereby agree and acknowledge that this contract is made and entered into in the State of Tennessee and the parties

hereto do hereby consent to the jurisdiction of the state and federal courts of the State of Tennessee. Additionally, this contract shall be governed by and construed in accordance with the laws of the State of Tennessee without regard to its conflict of laws provisions.

16.  CAPTIONS. The titles contained in this contract are for reference purposes only and shall not affect in any way the meaning or interpretation of this contract.

17.  SEVERABILITY.  If any provision of this contract shall be prohibited or invalid, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision and the remaining provisions of this contract.

18.  AMENDMENT. This contract is intended as the final expression of the parties' agreement and is the complete and exclusive statement of the terms thereof. No statements or agreements, oral or written, made prior to or at the signing hereof, shall vary or modify the written terms hereof; and neither party shall claim any amendment, modification or release from any provision hereof by reason of (a) a course of action or mutual agreement unless such agreement is in writing signed by the other party, (b) course of performance, or (c) usage of trade. No modification or addition to this contract shall be effected by the acknowledgment or acceptance by Seller of any purchase order, acknowledgment, release or other forms submitted by Buyer containing other or different terms or conditions.

19.  HARDSHIP CLAUSE.  Either party has the right to terminate this contract at the end of any calendar year with twenty-four (24) months written notice of termination provided to the other party in the event unforeseen events develop that make compliance with the terms and conditions of this contract impossible or unreasonably difficult to execute as determined by such party in good faith. Examples of events that trigger this clause would be a catastrophic accident which causes the closure of a production or consuming location set forth in this contract for a time period greater than 180 days, production interruption at a production or consuming location set forth in this contract for a time period greater than 180 days, Buyer's election to establish chlorine and/or sodium hydroxide production at its facility or facilities, or regulatory and/or market developments that results in a decision by either party to exit their respective business and no longer supply or consume chlorine and sodium hydroxide.  Changing market conditions which result in economic hardship are specifically excluded from this clause.  In the event that Buyer elects to establish chlorine and/or sodium hydroxide production capabilities at any of its facilities or intends to sell, lease or otherwise allow the use of any portion of its real property to/by any third party which will establish chlorine and/or sodium hydroxide production capabilities, the parties shall engage in good faith negotiations wherein Seller and Buyer will use reasonable efforts to partner in the establishment, construction and operation of such production facility(ies).

20.  CONFIDENTIALITY.   Buyer may gain information about the Seller's operations, plans, processes, pricing, costs, and suppliers.  Buyer shall see that such information of Seller is kept confidential and not divulged to third parties except as authorized in writing by Seller.  Buyer further agrees not to use such information or circulate it within its own organization except to the extent necessary to perform under this contract.  Buyer may disclose or use such information which it can show: (a) is published and a matter of common knowledge other than through acts or omissions of Buyer; or (b) was rightfully made known to the Buyer by third parties, without restriction on disclosure.   Additionally, it is understood that the restrictions of this provision shall not limit Buyer's ability to obtain competitive offers pursuant to Addendum D and in obtaining such competitive offers Buyer may disclose to a third party from which a competitive offer is sought (i) the expected pricing under Addendum D for the time period for which a competitive offer is being sought, (ii) the Meet Competitive Offer clause set forth in Addendum D, (iii) the expected volume of chlorine to be purchased under Addendum D for the time period for which a competitive offer is being sought, and (iv) the term of this contract.  However, Buyer shall in no event disclose the other terms of this contract or the information disclosed to determine CGECU pricing to any third party or use such information other than to perform Buyer's obligations hereunder.  These obligations shall continue for a period of five (5) years beyond the termination of this contract.

21.    AUDITS.  Both parties acknowledge that Seller's internal accounting of its manufacturing costs is not necessarily in full compliance with GAAP. Buyer shall have the right to have a third party review, inspect and audit, at Buyer's expense, the books, records, data files and other information used to calculate the price and costs in Addenda C, D, E and F to ensure consistency and fairness provided, however that such review, inspection, and audit may be exercised only:

a) Not more than once per calendar year;
b) If Buyer informs Seller in writing of the request to audit at least thirty (30) days in advance;
c) When the party to perform the review executes a confidentiality agreement reasonably satisfactory to Seller;
d) During normal business hours;
e) For a period up to two (2) years preceding the date of the audit request;
f) If the audit is not for a period of less than one year; and
g) If the party conducting the audit is acceptable in Seller's reasonable judgment.

As soon as reasonably practicable after an audit report has been finalized by or for the Buyer, the Buyer shall provide Seller with a report of any problems, errors, or discrepancies found during the course of the review, inspection, and audit.  In the event the audit reveals

that an overcharge or undercharge has occurred, the Seller or Buyer, as the case may be, shall pay or issue a credit for the amount of the overcharge or undercharge to the other party within sixty (60) days. In the event the audit reveals an overcharge in excess of $50,000 for the period being audited, the Seller shall reimburse the Buyer for its audit costs.

## Addendum A.1

### Magnolia South Plant Chlorine Specifications

Raw Material Product Specification, Material Number: 100063

Product Description:  Chlorine, South Plant, diaphragm or membrane grade
Chemical Name:  CHLORINE,  Revision No.: 0
Grade/Form: Liquefied gas in railcars      Approval Date: 09/13/91
CAS No.: 007782-50-5          Conversion Factor:  NA

Specifications
COA Property                Units   Tst Mthd   Min    Typ    Max
Comments

| | COA Property | Units | Tst Mthd | Min | Typ | Max |
|---|---|---|---|---|---|---|
| * | Chlorine | wt% | | 99.5 | | |
| * | Water | wt ppm | | | | 30 |
| * | Non volatiles (residue) | wt ppm | | | | 25 |
| * | Total Organics | wt ppm | | | | 20 |
| | Comment:  Chloroform & carbon tet | | | | | |
| | Iron | wt ppm | | | | 5 |

* Property Must be Reported on Certificate of Analysis

Packaging Specifications:

Other Special Instructions:

## Addendum A.2

## Magnolia West Plant Chlorine Specifications

Raw Material Product Specification, Material Number: 100360

Product Description: Chlorine, West Plant, Diaphragm or Membrane Grade

Chemical Name: CHLORINE,   Revision No.: 0
Grade/Form: Liquefied gas in railcars      Approval Date: 09/13/91
CAS No.: 007782-50-5        Conversion Factor: NA

Specifications

| COA Property | Units | Tst Mthd | Min | Typ | Max |
|---|---|---|---|---|---|
| Comments | | | | | |
| * Chlorine | wt% | TBA | 99.5 | | |
| * Water | wt ppm | TBA | | | 30 |
| * Non-volatiles (residue) | wt ppm | TBA | | | 25 |
| * Total organics | wt ppm | TBA | | | 5 |
| Comment: Chloroform & carbon tet | | | | | |
| Iron | wt ppm | TBA | | | 5 |

* Property Must be Reported on Certificate of Analysis

Packaging Specifications:

Other Special Instructions:

8

**Addendum B.1**

**Magnolia Sodium Hydroxide Specifications**

Raw Material Product Specification
Material Number: 100056 and 100898

Product Description:  Caustic Soda - 50%

Chemical Name: Sodium Hydroxide, NaOH

Revision No.: 0
Grade/Form: Diaphram grade/50% solution      Approval Date: 9/12/1991
                                              Reissue Date:  9/11/2007
CAS No.: 001310-73-2                          Conversion Factor:

Specifications

| COA | Property | Units | Tst Mthd | Min | Typ | Max |
|---|---|---|---|---|---|---|
| * | Sodium Hydroxide, NaOH | wt% | | 49.0 | | 52.0 |
| * | Sodium Oxide(Na20) | wt% | | 38.10 | | 40.29 |
| * | Sodium Chloride NaCl | wt% | | | | 1.3 |
| * | Iron, Fe | wt ppm | | | | 5.0 |
| | Sodium Carbonate | wt% | | | | 0.2 |
| | Sodium Sulfate | wt% | | | | 0.05 |
| | Sodium Chlorate | wt% | | | | 0.30 |
| | Sodium Chloride | wt% | | | | 1.30 |
| | Calcium Oxide | wt ppm | | | | 25 |
| | Magnesium Oxide | wt ppm | | | | 10.0 |
| | Aluminum Oxide | wt ppm | | | | 5.0 |
| | Manganese | wt ppm | | | | <1.0 |
| | Copper | wt ppm | | | | 1.0 |
| | Appearance | clear, colorless liquid | | | | |
| | Color | Gardner | | | | <2.0 |
| | Color | APHA | | | | <10.0 |
| | Turbidity | | | 0.0 | | 10.0 |

* Property Must be Reported on Certificate of Analysis

Packaging Specifications:

Other Special Instructions:

## Addendum B.2

## Orangeburg Sodium Hydroxide Specifications

```
Raw Material Product Specification
Material Number: 100058

Product Description:  Caustic Soda, 50% Solution

Chemical Name: SODIUM HYDROXIDE, NAOH

Revision No.: 4
Grade/Form: Diaphragm Grade        Approval Date: 09/28/99
CAS No.: 001310-73-2               Conversion Factor:

Specifications
COA  Property             Units   Tst Mthd   Min   Typ    Max
Comments
```

| | Property | Units | Tst Mthd | Min | Typ | Max |
|---|---|---|---|---|---|---|
| * | Sodium Hydroxide, NaOH | wt% | | 49 | | 52 |
| * | Sodium Oxide, Na2O | wt% | | 38.0 | | 40.4 |
| * | Sodium Chloride, NaCl | wt% | | | | 1.3 |
| * | Iron, Fe | wt% | | | | 0.0009 |
| * | Sodium Carbonate, Na2CO3 | wt% | | | | 0.2 |
| * | Appearance | | | | | |

```
Comment:  Water White to Hazy


* Property Must be Reported on Certificate of Analysis


Packaging Specifications:

Other Special Instructions:  Material is to be shipped from dedicated storage tank with
no co-mingled material.
```

10

## Addendum B.3

### Pasadena Sodium Hydroxide Specifications

```
Raw Material Product Specification
Material Number: 100057

Product Description:  Caustic Soda Liquid, 50%

Chemical Name: SODIUM HYDROXIDE, NaOH

Revision No.:  1
Grade/Form:                    Approval Date: 6/29/92
CAS No.: Diaphragm Grade       Conversion Factor:

Specifications
```

| COA | Property | Units | Tst Mthd | Min | Typ | Max |
|-----|----------|-------|----------|-----|-----|-----|
| * | NaOH | % | | 49 | | 52 |
| | or | | | | | |
| | NaO2 | % | | 38 | | 39.5 |
| | Na2CO3 | % | | | | 0.20 |
| * | NaCl | % | | | | 1.10 |
| | Na2SO4 | % | | | | 0.02 |
| | NaClO3 | % | | | | 0.35 |

```
* Property Must be Reported on Certificate of Analysis

Packaging Specifications:

Other Special Instructions:
```

Addendum B.4

## Bayport Sodium Hydroxide Specifications

| | |
|---|---|
| Pasadena Catalyst Quality Assurance System | Reference  :  ICS 300 |
| Quality Assurance Department | Authorization  : QA Manager |
| Page Number  :  1 | Signature on file |
| Total Pages  :  1 | Version  : 9/10/2007 |
| Document Id.  :  **ACA-CAT-3** | Revision Level : 04 |
| Author  :  QA Supervisor | |
|   Signature on file | |

**CHEMICAL NAME**  : Sodium Hydroxide - 50%

**TRADE NAME**  : Caustic Soda

**CHEMICAL FORMULA**  : NaOH

| TEST | SPECIFICATION | | | TEST METHOD |
|---|---|---|---|---|
| | Minimum | Maximum | Typical | |
| NaOH  % | 49.0 | 52.0 | 50.2 | IC115-C50.09 |
| Fe     % | | 0.002 | | IC115-C50.13 |
| $Na_2CO_3$ % | | 0.9 | | * |
| NaCl    % | | 1.1 | | * |
| Sp. Gravity (@ 20° C) | 1.520 | 1.554 | | IC115-M54.03 |
| Physical Appearance | Water white to hazy | | | IC115-M56.02 |
| Comments: * The certificate of analysis from the manufacturer will be accepted for this analysis. | | | | |

**Addendum C**

**CGECU Pricing**

1.   **ECU Pricing** – FOB Olin producing facility

Although supply of CGECUs does not begin until January 1, 2009, the initial CGECU price effective February 1, 2008 will be $302/CGECU, FOB production point, based on the calendar year 2007 manufacturing costs incurred by Seller at the McIntosh, AL (excluding SunBelt) and Charleston, TN chlor alkali manufacturing facilities.

The CGECU price will change every six (6) months based on the change in the actual manufacturing costs incurred by Seller at the McIntosh, AL (excluding SunBelt) and Charleston, TN chlor alkali manufacturing facilities.

Effective August 1, 2008 and every six months thereafter (the adjustment date), the CGECU price will be adjusted based on the volume weighted change in Seller's manufacturing cost per ECU during the first or second half of the calendar year ending one month prior to the adjustment date, when compared to Seller's calendar year 2007 manufacturing cost incurred at the McIntosh, AL (excluding SunBelt) and Charleston, TN chlor alkali manufacturing facilities.

The general cost categories included in Seller's full cost of production calculations include, but are not limited to, the following:

- Raw Materials
  - Brine
  - Acid
  - Other
- Hydrogen Credit
- Utilities
  - Power
  - Steam
  - Other purchased services
- Labor for all plant site activities
- Maintenance
- Laboratory
- Taxes and Insurance
- Depreciation

A list of the specific cost accounts that will be utilized in calculating the change in Seller's manufacturing costs is attached in Addendum E; but specific account numbers and costing methodologies are subject to change at Seller's discretion as long as such change is (i) not for the purpose of increasing the price of CGECUs to Buyer and (ii) likewise implemented by Seller in its calculation of the cost of product manufactured and sold other than pursuant to this contract.

Manufacturing cost categories are intended to be consistent over time in terms of the cost categories included in order to reflect Olin's actual full ECU manufacturing costs.

For every $1/ECU price change, up or down, derived from the cost change calculations outlined above, the ECU price will be adjusted, up or down, by the same amount.   At the same time Seller provides Buyer with the semi-annual price notification, Seller shall notify Buyer of any changes to the specific account numbers and/or cost methodologies.

13

**2.  Transportation Charges –**

a. All transportation charges, including without limitation railroad line haul rates and fuel surcharges, actual demurrage charges, ancillary charges, common carrier truck rates and fuel surcharges, and barge charges will be prepaid by the Seller and Seller will invoice Buyer and Buyer will pay Seller for all of these costs provided Buyer will not pay such costs that are in excess of what the costs would have been if the product was shipped from either McIntosh, AL, or Charleston, TN. Additionally, Buyer will be responsible for its allocated share of the Seller's cost of leasing, owning, and properly maintaining a fleet of rail cars and barges used to transport chlorine and sodium hydroxide.

b. Seller's actual rail car cost will be used to calculate a "cost per rail car" for shipping chlorine and sodium hydroxide which cost is to be paid by Buyer. Seller's current rail car cost based on 2006 data is approximately $17.00/ton for chlorine and $9.00/dry short ton for sodium hydroxide. These costs are subject to change based on changes in Seller's cost.  Rail car cost will consist of:

| | |
|---|---|
| Lease cost | Rail car maintenance cost |
| Rail car inspection cost | Rail car angle valve repair |
| Depreciation Expense | Any other rail car cost |

Deduction for rail car mileage credit

A detailed list of rail car cost accounts is included in Addendum F but such cost accounts are subject to change at Seller's discretion.

The method used to allocate rail car costs will be as follows:

These costs will be totaled every six months and divided by the number of rail cars in Seller's fleet during the period to arrive at a cost per rail car for chlorine and for sodium hydroxide.  Buyer's actual rail car usage, in terms of tons shipped per rail car in service to Buyer, will also be used in the calculation. Together, these two costs will be used to calculate the number of rail cars in service for Buyer and a total rail car cost for Buyer, to be paid by Buyer on a monthly basis.  This cost will be calculated every January and July and the result of the calculation will be used effective February 1 and August 1, respectively, of each year.

Example of the calculation:

| | |
|---|---|
| Olin cost per chlorine tank car/month: | $785 |
| Albemarle's chlorine tank car usage: | 96 cars (including 15% surge capacity) |
| Tons of chlorine issued in 2006: | 54,407 |

Calculation:      $785 x 96 x 12 / 54,407= $16.62 per ton of chlorine

Buyer and Seller acknowledge that changes in chlorine rail car construction beginning on January 1, 2007 may result in higher equipment and transportation costs.  In such case, Buyer shall not be unduly burdened by paying more than Buyer's proportionate share of the new rail car costs.  For example, the new rail cars may not be able to carry as much chlorine as the prior design cars and, as such, the unit cost to deliver product will be higher in the new cars.  For this reason, Buyer shall not be unduly burdened with an inequitable share of the new rail cars used to supply Buyer.

c. Seller's actual barge cost will be used to calculate a "cost per barge" for shipping product, to be paid on a monthly basis.

d.      (i)   Seller may, at its option, deliver from points other than Seller's manufacturing facility located at McIntosh, AL or Charleston, TN (but shall not be obligated to do so) provided that such delivery shall not result in any additional charge to Buyer, with any extra costs absorbed by Seller. Where the contract price provides for absorption by Seller of freight charges, wholly or in part, Seller shall have the right to select the route, mode and carrier. If Buyer requires a route, mode or carrier other than that selected by Seller, any extra

14

cost incurred shall be paid by Buyer. If freight or other transportation costs are increased, Seller may add any increase to the contract price.

(ii)   Rail car mileage earnings on equipment owned or leased by Seller used to transport product pursuant to this Addendum C shall be credited to the Buyer via a deduction from the rail car transportation costs.

(iii)   Tank truck orders require 72 hours notice prior to shipment to ensure meeting Buyer's schedule. Seller will continue to acknowledge orders placed with less notice but cannot guarantee shipping before 72 hours.

(iv) Any demurrage charged by common carriers and/or railroads, after departure from Seller's facilities, will be for the Buyer's account. Rail cars of chlorine are to be unloaded at Buyer's facilities only or other facilities as mutually agreed to in writing by both parties.


**3.   Profit Adder –**

$96 per ECU will be added as a return on investment for Seller.  This adder shall be adjusted annually, with the first adjustment to occur on February 1, 2009, based on the annual change in the U.S. Department of Commerce, Bureau of Economic Analysis Table 1.1.9 Implicit Price Deflators for Gross Domestic Product [Index numbers, 2000=100] Seasonally Adjusted, which is located at:
http://www.bea.gov/national/nipaweb/SelectTable.asp?Selected=Y
Should such index no longer be published, the parties shall meet and negotiate in good faith to determine an alternative index or other method for determining adjustments to the Profit Adder.  The $96 per ECU number is based on the 2007 full year index, and the February 1, 2009 Profit Adder will be $96 times the 2008 full year index divided by the 2007 full year index.   The February 1, 2010 Profit Adder shall be $96 times the 2009 full year index divided by the 2007 full year index, and so on for each year.

For example, if the 2007 full year index is 117 and the 2008 full year index is 118, commencing February 1, 2009, the Profit Adder will be adjusted as follows:

$96 x 118/117 = $96.82 per ECU Profit Adder commencing February 1, 2009

**Addendum D**

**Non-CGECU Chlorine Pricing**

**1. Base price** - Effective January 1, 2009, initial pricing will be $265 per ton delivered until January 31, 2009, and thereafter the pricing will be negotiated quarterly (first negotiation to occur in January 2009 for the "first quarter pricing" to be effective February 1, 2009 through April 30, 2009). The direction and magnitude of pricing adjustments will be determined by market based negotiations between both parties. If both parties are unable to reach an agreement on a pricing adjustment for a calendar quarter, either party shall be free to discontinue sale or purchase of non-CGECU chlorine for such quarter. Nevertheless, if either party discontinues the sale or purchase of non-CGECU chlorine for any quarter, the parties shall still engage in market based negotiations in the next quarter and each subsequent quarter to determine if the parties can resume the sale and purchase of non-CGECU chlorine hereunder. In any negotiation for quarterly pricing, if the Seller agrees to meet the price which Buyer demands based on satisfactory evidence of pricing which Buyer can obtain from another supplier, Buyer shall be obligated to purchase such product hereunder and not from such other supplier.

**2. Transportation costs** - Seller may, at its option, deliver from points other than that specified (but shall not be obligated to do so) provided that such delivery shall be at the contract price. Where the contract price provides for absorption by Seller of freight charges, wholly or in part, Seller shall have the right to select the route, mode and carrier and add a delivery charge to the sale price for each shipment under this contract. The amount of the delivery charge may be revised by Seller as rate changes and surcharges are imposed by carriers, and as rail car rental, maintenance, inspection, and repair costs, insurance premium changes and other factors dictate. Rail car mileage earnings on equipment owned or leased by Seller shall be for the sole account of Seller. Rail car hold time shall be limited to thirty (30) days averaged over each calendar quarter. Demurrage will be billed at a rate of seventy-five dollars ($75.00) per day until Buyer officially releases the car. Rail cars of chlorine are to be unloaded at Buyer's facility only or other facilities as mutually agreed to in writing by both parties. Any demurrage incurred shall only apply to the percentage of chlorine which is non-CGECU chlorine.

**3. Meet Competitive Offer** - If Buyer provides Seller with satisfactory evidence (which Seller may require be in written form by notifying Buyer within seven (7) business days of Seller's receipt of Buyer's initial notification of the specific competitive offer, in which case the provisions below regarding third-party review shall apply) that Buyer can purchase for a minimum of six (6) months, from an unrelated U.S. manufacturer (product manufactured at a U.S. production facility), the same volume of chlorine, meeting the Buyer's specifications, as Seller is supplying under the non-CGECU portion of this contract, at prices which would result in a delivered cost to Buyer lower than that then in effect under this Addendum D, Seller shall be given the opportunity to meet the same price for the same period offered to Buyer. In the event Seller requires such evidence be provided in written form, then Buyer shall deliver such evidence to an accounting firm selected by Buyer (reasonably acceptable to Seller), which accounting firm shall provide certification to Seller as to the satisfaction of the conditions contained in the preceding sentence, specifically confirming the price, volume and duration under the alternative offer, but without disclosing the identity of the alternative supplier. All costs associated with the accounting firm's review shall be paid by Buyer. If Seller, within twenty one (21) days after receipt of written notice (or written evidence, whichever is later) does not agree to reduce the price under this Addendum D to meet such lower price effective the date (on or after 21 days after receipt of such notice or written evidence, whichever is later) of the first availability of such price, then:

   a) Buyer may purchase such chlorine from the other source for the length of time stated in the written evidence of the competitive offer;
   b) the parties' respective obligations to sell or purchase product shall be reduced by the volume the Buyer purchases from the competitor;
   c) Buyer shall notify Seller in writing of quantities purchased from a competitor if Seller declines to meet a competitive offer; and
   d) Purchases hereunder shall resume upon completion of the period offered and declined by Seller.

If Seller elects to meet a competitive offer, Buyer may not present any additional competitive offers to Seller for the period for which Seller has met the competitive offer.  If Seller elects not to meet any competitive offer that exceeds a time period of two (2)  years, Seller may cancel this contract.

**4. Limited Most Favored Nations Clause** - Should Seller provide the same quantity of chlorine to another U.S. bromine producer at a lower price than that being provided to Buyer pursuant to this Addendum D, Seller will supply the quarterly volume of non-CGECU chlorine to Buyer at the lower price then in effect.

## Addendum E

### Chlor Alkali Variable/Fixed Cost Elements

**RAW MATERIALS**

ELECTRICITY
SALT
HCL
MERCURY
HYDROGEN
SULFURIC ACID
ASBESTOS #1
ASBESTOS #2
HAYLAR POLYMER
NITROGEN
SULFITE SODIUM TECHN
SOLKA-FLOC FILTER A
AC ELECTRICITY
STEAM
WATER
AIR

**FIXED COST ELEMENTS**
DIRECT LABOR
VARIABLE-COMP
OVERTIME PREM-DIR PR
INDIRECT PROD LABOR
MAINTENANCE LABOR
*   HOURLY WAGES
EXEMPT SALARY
TEMP LABOR-OLIN
ADM & CLERICAL-NONEX
NON EXEMPT OVERTIME
BONUSES AND VARIABLE PAY
*   SALARY
FICA TAXES
FED&STATE UNEMPL TXS
GROUP INSURANCE
THRIFT PLAN
WORKERS COMPENSATION
OTHER FRNGE BENEFIT
FRINGE BENENFIT DIST
*   FRINGE BENEFITS
PROPERTY TAXES
MISCELLANEOUS TAXES
TAXES-SALES&USE
TAXES-SALES&USE CHARLESTON
TAXES-MISCELLANEOUS
CONTRIBUTIONS-OTHER
INSURANCE-GENERAL
INSURANCE-INCIDENTS
*   TAXES & INSURANCE
DEPRECIATION

\* DEPRECIATION
FLEET ANGLE VALVE PARTS
FLEET PARTS
REPAIRS TO PLANT
CELL ROOM COMPUTER PARTS
REPAIRS TO EQUIPMENT
MAINTENANCE MATERIAL
FREE ISSUE ITEMS
MAINT MATL -WH ISSUE
CONTR SVC-HARDWARE
CONTR SVC-MAINTNANCE
CONTR SVC-OFFICE EQ
Maint cont - w/o to cost center
Maint material – w/o to cost center
Rubber Service Labor
\* MATERIAL & CONTRACTS
MINOR MTLS(MIN.PROP)
SUPPLIES
PROCUREMENT CARDS
PALLETS
SUPPLIES DIRECT
SAFETY SUPPLIES
POLLUTION SUPPLIES
LAB.SUP.& REAGENTS
SOFTWARE PURCHASES
SUPPLIES, INDIRECT
R/C TAGS & VARIOUS LABELS
\* SUPPLIES
CONSULTING-ENGINEER
CONSULTING-GENERAL
CONTR SVC-MEDICAL
CONTR SVC-SECURITY
CONTRSVC ENGINEERING
CONTR SVC-SOFTWARE
CONTR SVC-OTHER EDP
CONTR SVC-MARKETING
CONTRACT SERVICES
CONTR SVC-WASTE DISP
CONTR SVC-JANITORIAL
CONTR SVC-OTHER
LABORATORY FEES
OUTSIDE LABOR
Outside Services-Res Tank Car Repair
\* CONTRACT SERVICES
CAR EXPENSE
RETIREMENT EXPENSE
SETTLE CAR EXPENSE TO CC'S
SETTLE PROJECTS TO COST CENTERS
\* CAR EXPENSE
FUEL OIL
UTILITY
FXD UTIL-ELECTRICTY
FXD UTIL-NATURAL GAS
FXD UTIL-TREAT WATER
FXD UTIL-STEAM
\* FIXED UTILITIES
DIRECT MATERIAL

RAW MATERIAL-CONSUMTION
SCRAP
GAS
OBSOL INV ADJ-SUPPLY
FREIGHT
SWITCHING CHARGES
VEH OPER EXP-GAS/OIL
VEH.OPER EXP-OTHER
DEMURRAGE - TRUCK
DEMURRAGE CYLINDER
TRAINING
Training Maintenance
TRAINING-SUPPLIES
DIVISION TRAINING PROJECTS
RECRUITING
TUITION AID
EMPLOY. ACTIVITIES
PRIZES AND AWARDS
CLOTHING/UNIFORMS
OVERTIME MEALS-PLANT
Outside Services Track Lease
LEGAL FEES
TRAVEL
TRAVEL-MEALS
TRAVL-DAY TRIP MEALS
ENTERTAINMENT
BUSINESS MEET/SEMNAR
TRADE SHOWS
MEETINGS - MEALS
ANNUAL MEETING
DUES&MEMBERSHIP-CLUB
DUES&MEMBERSHIP-OTHR
SUBSCRIPTIONS
POSTAGE
TELECOMMUNICATIONS
Telecommunications
TEL.EQUIP.& LOC.SVC
PUBLIC REL-COMMUNITY
P R-RESPONSIBLE CARE
PRODUCT REGISTR FEES
FEES-LICENSING RENEWAL
MISCELLANEOUS EXPENS
ENVIRONMNTAL CST/FEE
RENT-EQUIPMENT
RENT-TRUCK/AUTO
RENT-DATA PROC SOFTW
RENT-LEASED BARGES
SCRAP CREDIT
PROJECT MATERIALS
PROJECT OTHER
PROJECT CONTRACTS
SETTLE LEGAL TO COST CENTERS
*   OTHER COST
CHRG OUT-OTHER DEPT
CHRG OUT-CORP ASSESS
CHRG OUT-ENG TO CAR
ENGINEERING LABOR CHARGEOUT

CHRG OUT-PLANT OPER
CHRG OUT-REGIONAL
CHRG OUT-DISTRIBUTN
CHG OUT-VENTURE MANAGER-
SUNBELT
CHRG OUT-TRF TO STOR
CHRG OUT-TO RESERVE
CHRG OUT-ALL OTHER
CHRG OUT-ARCH
CHARGE OUT - TANK TESTING
Rubber Services Labor Charleston
Rubber Services Labor Other Plants
R/S Labor External
Shipping Chargeouts to Distribution
*   CHARGE OUTS
CHRG IN-ISD PRODUCTN
CHRG IN-PURCHASING
CHGS IN-PLANTS
CHRG IN-PLANT LAB SV
Charges In MRO Stores Operation
CHRG IN-DIV HR & DEVELOPMENT
CHRG IN DIV ACCOUNTING
CHGS IN-ARCH
Shipping Labor to Distribution
*   CHARGE IN
Maint services - w/o to cost center
Maint services labor
*   MAINTENANCE

**Addendum F**

**Rail Car Cost Accounts**

DIRECT LABOR
EXEMPT SALARY
FRINGE BENENFIT DIST
PROPERTY TAXES
DEPRECIATION
FLEET ANGLE VALVE PARTS
FLEET PARTS
REPAIRS TO PLANT
REPAIRS TO EQUIPMENT
MAINTENANCE MATERIAL ISSUED FROM WAREHOU
CONTR SVC-MAINTNANCE
Maint cont - w/o to cost center
Maint material - w/o to cost center
Rubber Service Labor
SUPPLIES
SUPPLIES DIRECT
SAFETY SUPPLIES
SUPPLIES, INDIRECT
R/C TAGS & VARIOUS LABELS
CONSULTING-GENERAL
CONTR SVC-GROUNDS
CONTR SVC-OTHER
LABORATORY FEES
OUTSIDE LABOR
SETTLE CAR EXPENSE TO CC'S
FREIGHT
SWITCHING CHARGES
Outside Services Track Lease
TRAVEL
TRAVEL-MEALS
DUES&MEMBERSHIP-OTHR
TELECOMMUNICATIONS
MISCELLANEOUS EXPENS
TANK WASHES
REJECTED SHIPMENT
DIVERSION/RECONSIGNMENT
OTHER ACCESSORIALS
EXTRA STOP
RENT-LEASED RAILROAD CARS
Rent
SCRAP CREDIT
CHRG OUT-DISTRIBUTN
CHARGES OUT - DETENTION ON TANK CARS
CHRG OUT-MILEAGE CREDITS
CHARGE OUT - TANK TESTING
Charges In - Tank Testing
FLEET ANGLE VALVE LABOR
FLEET GENERAL REPAIR LABOR
Shipping Labor to Distribution
OS BRAKE REPAIRS
OS TRUCKS, WHEELS DRAFT GEAR REPAIRS
OS CLEANING
OS GENERAL REPAIR COST
OS REPAINT & PARTIAL REPAINT

OS VALVE & SERVICE EQUIPMENT REPAIRS
O/S-Tank Car Angle Valve Repair
OS CORROSION CLAIMS
OS TESTING-HM 201 & OTHER
FLEET REUNNING REPAIRS
FLEET MOBIL UNIT REPAIRS
Maint services – w/o to cost center
Remote Monitoring Assessment
Division Tank Car Assessment

## Addendum G

### Volume Example

Should Buyer purchase 4,000 tons per month of chlorine under the CGECU portion of this contract from January 2009 until June 2009 and, starting July 2009, purchase 2,000 tons of chlorine monthly for six months under the CGECU portion of this contract, then Seller shall have the option to notify Buyer in writing of a volume shortfall in January of 2010, as the purchase for the prior six months (July – December 2009) will total only 12,000 tons which is not more than a 30,000 ton minimum annual rate. Commencing on the date of Seller's written notification to Buyer of this volume shortfall, the parties have six months to execute a mutually agreeable amendment to address the issues related to the volume shortfall.  If a successful negotiation is not completed by the end of such six month period, Seller may cancel the contract by giving Buyer written notice on or before the date which is fifteen (15) days from the expiration of the six month period for negotiation of a mutually agreeable amendment. Cancellation of the contract would be effective six (6) months from the date of the written notice of termination.

Exhibit 2
Albemarle's January 30, 2023 Press Release



Back to Corporate Site  〉

**Overview**   **News & Events**   **Financials** ⌄   **Governance** ⌄   **Resources** ⌄   🔍

🔍

**News Details**

VIEW ALL NEWS  〉

## Albemarle Announces Launch Of Ketjen Corporation

01/30/2023

*New, wholly owned subsidiary focuses on advanced catalyst solutions*

HOUSTON, Jan. 30, 2023 /PRNewswire/ -- Albemarle Corporation (NYSE: ALB), a leader in the global specialty chemicals industry, today announced the official brand launch of Ketjen, its wholly owned subsidiary that crafts tailored, advanced catalyst solutions for the petrochemical, refining and specialty chemicals industries.



The company shared the new name of its catalysts business in November 2022 after announcing plans to operate the business as a subsidiary. As a distinct brand, Ketjen will continue to support customers in their unique energy transition journeys from fluidized catalytic cracking to clean fuels to hydro-processing to organometallics and curatives.

"As the industry responds to global market dynamics, our customers need innovative solutions to help them navigate their changing landscapes," said Ketjen President Raphael Crawford. "Ketjen will continue to provide its portfolio of advanced catalyst and specialty chemicals solutions, which are unique to each customer's needs, to increase production performance and business value."

Headquartered in Houston, Texas, Ketjen will collaborate with customers in the petrochemical, refining and specialty chemical industries across three divisions, Fluidized Catalytic Cracking (FCC), Clean Fuels and Hydroprocessing Catalysts (HPC), and Performance Catalyst & Curative Solutions (PCS). Albemarle's existing advanced catalyst solutions team will lead Ketjen operations.

"The launch of Ketjen continues our legacy as a partner-of-choice for industry leaders," said Albemarle CEO Kent Masters. "Establishing Ketjen under this separate structure will allow the business even greater focus and continued development of custom, high-impact catalyst products."

Skip to main content



Ketjen is a provider of advanced catalysts solutions to leading producers in the petrochemical, refining and specialty chemicals industries. From fluidized catalytic cracking to clean fuels solutions to hydro-processing to organometallics and curatives, Ketjen delivers safe and reliable solutions that increase production performance and business value. A wholly owned subsidiary of Albemarle Corporation (NYSE: ALB), Ketjen Corporation is headquartered in Houston, Texas, and serves global customers through operations in 27 markets. For more information, visit www.ketjen.com.

**About Albemarle**

Albemarle Corporation (NYSE: ALB) is a global specialty chemicals company that thinks beyond business as usual to power the potential of companies in many of the world's largest and most critical industries, such as energy, electronics, and transportation. We actively pursue a sustainable approach to managing our diverse global footprint of world-class resources. In conjunction with our highly experienced and talented global teams, our deep-seated values, and our collaborative customer relationships, we create value-added and performance-based solutions that enable a safer and more sustainable future.



View original content to download multimedia:https://www.prnewswire.com/news-releases/albemarle-announces-launch-of-ketjen-corporation-301733708.html

SOURCE Albemarle Corporation

**VIEW ALL NEWS** ›



 

## IR Contact

📞 +1-980-299-5700
✉ INVEST@ALBEMARLE.COM

## Email Alerts

Enter your Email Address

**Sign Up**

☐ News                    ☐ Quarterly Reports
☐ Annual Reports          ☐ SEC Filings
☐ EOD Stock Quote         ☐ Events & Presentations

Unsubscribe

Privacy Policy   |   Cookies Policy

© 2023 Albemarle Inc. - All rights reserved
Powered By Q4 Inc. 5.90.0.6

Exhibit 3
Termination Notice



**190 Carondelet Plaza, Suite 1530**
**Clayton, Missouri 63105-3443**

June 6, 2022

<u>*Via Federal Express*</u>
Albemarle Corporation
451 Florida Street
Baton Rouge, LA 70801-1765

**Re:      Notice of Termination of Sales Contract No. CC-14-319 dated October 10, 2007 between Olin**
**Corporation and Albemarle Corporation ("Albemarle"), as amended (the "Contract")**

Dear Customer:

Pursuant to the Delivery Period section of the above-referenced Contract, Olin is hereby providing written notice of cancellation of the Contract. Accordingly, the Contract will terminate December 31, 2024, and the parties will be released from their respective future obligations to supply and purchase the product volumes stated in the Contract.

Olin has enjoyed its business relationship with Albemarle and looks forward to continuing its business relationship with Albemarle in the future pursuant to a new sales contract. If you have any questions, please do not hesitate to contact me.

Sincerely,

Pedro Dias Jorge                                     Todd Tessier
Business Director – Chlorine & HCl         Business Director - North America Alkali

Cc:      Ronan Magennis – Albemarle
          Tim Herrod – Albemarle
          Mike Graveson – Olin
          Rene Whigham - Olin