# Exhibit B

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

| | |
|---|---|
| **OLIN CORPORATION,** )<br>)<br>*Plaintiff/Counterclaim* )<br>*Defendant,* )<br>)<br>**v.** )<br>)<br>**ALBEMARLE CORPORATION,** )<br>)<br>*Defendant/Counterclaim* )<br>*Plaintiff.* ) | **Case No. CL23-1331-6** |

### ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM TO COMPLAINT

Defendant/Counterclaim Plaintiff Albemarle Corporation ("Albemarle") answers the

Complaint of Plaintiff/Counterclaim Defendant Olin Corporation ("Olin") as follows:

1.   Olin Corporation ("Olin") and Albemarle Corporation ("Albemarle") entered into a contract in 2007 that is currently valued at $60,000,000. The express intent of the contract was for "[Olin] to sell and [Albemarle] to buy 100% of [Albemarle's] commercial grade" chlorine and sodium hydroxide product requirements from Olin. Albemarle was provided advantageous pricing and, in return agreed to Olin's terms and conditions; including a strict limitation on assignment of the contract. Now, Albemarle has breached this contract by attempting to assign the contract benefits and its advantageous pricing to a newly formed subsidiary without Olin's consent.

ANSWER:  Admitted that Albemarle entered into a contract in 2007 with Olin. Albemarle

admits that the value of the purchases contemplated by the product volumes and corresponding

pricing in the Contract should total approximately $60,000,000 on an annual basis.  Albemarle

further admits that the contract states that "[t]he intent of this contract is for [Olin] to sell and

[Albemarle] to purchase 100% of [Albemarle's] commercial grade sodium hydroxide (CGSH)

requirements from [Buyer] in the form of commercial grade ECUs (CGECU) with one CGECU

being defined as one short ton of chlorine and 1.1 tons of CGSH, 100% basis."  All remaining

allegations are denied.

2.   Olin is a Virginia stock corporation incorporated in Virginia.

154351077v1

ANSWER: Admitted.

3. Upon information and belief, Albemarle is a Virginia stock corporation incorporated in Virginia.

ANSWER: Admitted.

4. Jurisdiction is proper in this Court under Virginia Code § 17.1-513.

ANSWER: Admitted.

5. The Circuit Court for the City of Richmond is the proper venue for this action under, at least, Virginia Code § 8.01-262(2) ("Wherein the defendant has a registered office, has appointed an agent to receive process").

ANSWER: Admitted.

6. Albemarle has appointed John Owen Gwathmey, Esq. of Troutman Pepper to receive process on its behalf as its registered agent. Mr. Gwathmey's office is located within the City of Richmond, Virginia.

ANSWER: Admitted.

## FACTUAL BACKGROUND

### I.

### Background on Contract Between Olin and Albemarle

7. Olin and Albemarle entered into a sales contract dated October 10, 2007. That contract was subsequently amended three times. The sales contract and its three amendments are collectively referred to as the "Contract" and are attached to this Complaint as Exhibit 1.

ANSWER: Admitted.

8. The Contract is "governed by and construed in accordance with the laws of the State of Tennessee[.]" *See* Ex. 1 at pg. 4, ¶ 15.

ANSWER: Admitted that the quoted language is contained in the Contract.

9. In the very first line of the original agreement, the Contract expressly states, that "the intent of this contract is for Seller [Olin] to sell and Buyer [Albemarle] to purchase 100% of [Albemarle's]" chlorine and sodium hydroxide from Olin "in the form of commercial grade ECUs (CGECU) with one CGECU being defined as one short ton of chlorine and 1.1 tons of CSGH, 100% basis". *See* Ex. 1, Original Agreement, ¶ A.1. This intent has been restated in subsequent amendments including the most recent amendment. *See* Ex. 1 at Third Amendment.

ANSWER: Admitted that the October 2007 Contract includes the quoted language.   All

2

remaining allegations are denied.

10. The Third Amendment specifically states: "The intent of the contract is for [Olin] to sell and [Albemarle] to purchase 100% of [Albemarle's] commercial grade ECU (CGECU) requirements up to 55,000 CGECU's per year from [Olin], with one CGECU being defined as one ton of chlorine (CGECU CHLORINE) and 1.1 DST of 100% basis commercial grade sodium hydroxide (CGECU SODIUM HYDROXIDE)." Ex. 1, Third Amendment. The term "ECU" is a recognized industry term for "electro chemical unit" "Electrochemical Unit" or "ECU" are terms the industry use to describe the production method and amount of producing chlorine and sodium hydroxide. Chlorine and sodium hydroxide are co-produced commercially by the electrolysis of salt. These co-produced products are produced simultaneously, and in a fixed ratio of 1.0 ton of chlorine to 1.1 tons of caustic soda.

**ANSWER:** Admitted that the quoted language is contained in the Contract and further admits the remaining allegations.

11. The Contract further states:

The expected volume is between 40,000 and 55,000 CGECUs per year. [Olin] is not obligated to sell in excess of 55,000 CGECUs in any calendar year unless agreed to in writing by [Olin]. Ex. 1, Third Amendment.

**ANSWER:** Admitted that the October 2007 contract includes the quoted language.

12. The Contract identifies Albemarle, and only Albemarle, as the "Buyer" for the product. Ex. 1 at Third Amendment, Second Amendment, First Amendment, Original Contract.

**ANSWER:** Admitted that Albemarle is identified as the "Buyer" in the Contract. All remaining allegations are denied.

13. Albemarle's facilities that use the materials supplied under the Contract include, but may not be limited to, facilities in Magnolia, Arkansas; Bayport, Texas; and Pasadena, Texas. *See* Ex. 1.

**ANSWER:** Admitted that Albemarle used the materials supplied under the Contract at its facilities located in Magnolia, Arkansas, Bayport, Texas, and Pasadena, Texas. Denied that Albemarle uses the materials at any other locations.

14. The current approximate value of the Contract is $60,000,000.

**ANSWER:** Albemarle admits that the value of the purchases contemplated by the product volumes and corresponding pricing in the Contract should total approximately $60,000,000 on an

3

annual basis. All remaining allegations are denied.

15. The Contract provides Albemarle with product at advantageous prices; significantly below current market prices.

**ANSWER:** The pricing set forth in the Contract reflects negotiated and agreed prices. Since at least 2021, however, Olin, *inter alia,* has unilaterally, materially increased its prices, failed to honor contracted supply amounts, improperly declared force majeure and breached the Contract in other ways. The chemicals Albemarle purchased from Olin, chlorine and caustic soda, are in limited supply and essential to Albemarle's manufacturing processes. Chlorine is in especially limited supply, has significant storage restrictions for safety reasons and cannot be imported for Albemarle's purposes. Given the importance of the chemicals to Albemarle's business, Albemarle paid Olin's higher prices, accepted Olin's unilateral volume shortages and otherwise acquiesced to Olin's myriad material prior breaches under duress and protest. All remaining allegations are denied.

16. Olin provided notice of the termination of the Contract on June 6, 2022, so the Contract will terminate on December 31, 2024. *See* Ex. 1 at Third Amendment, ¶ 3; Ex. 3, Termination Notice.

**ANSWER:** Admitted that Olin provided notice of termination of the Contract on June 6, 2022, said notice indicating a termination date of December 31, 2024. All remaining allegations are denied.

17. The Contract does not permit any subsidiary or affiliate of Albemarle to serve as "Buyer". In fact, the Contract terms do not refer to any subsidiary or affiliate of Albemarle and do not include the terms "subsidiary" or "affiliate" in any form.

**ANSWER:** Denied.

18. Under the express terms of the Contract, only Albemarle can be a "Buyer". No other company or person, whether via a subsidiary or affiliate of Albemarle or otherwise can be a "Buyer" under the Contract.

**ANSWER:** Denied.

4

## II.

### Background on Albemarle's Newly Created Subsidiary, Ketjen Corporation

19. On January 30, 2023, Albemarle announced "the official brand launch of Ketjen, its wholly owned subsidiary that crafts tailored, advanced catalyst solutions for the petrochemical, refining and specialty chemicals industries." A copy of the press release is attached as Exhibit 2.

**ANSWER:** Admitted that the press release attached as Exhibit 2 includes the quoted language.

20. Albemarle's press release stated, in relevant part:

Albemarle Corporation (NYSE: ALB), a leader in the global specialty chemicals industry, today announced the official brand launch of Ketjen, its wholly owned subsidiary that crafts tailored, advanced catalyst solutions for the petrochemical, refining and specialty chemicals industries.

The company shared the new name of its catalysts business in November 2022 after announcing plans to operate the business as a subsidiary. As a distinct brand, Ketjen will continue to support customers in their unique energy transition journeys from fluidized catalytic cracking to clean fuels to hydro-processing to organometallics and curatives.

"As the industry responds to global market dynamics, our customers need innovative solutions to help them navigate their changing landscapes," said Ketjen President Raphael Crawford. "Ketjen will continue to provide its portfolio of advanced catalyst and specialty chemicals solutions, which are unique to each customer's needs, to increase production performance and business value."

Headquartered in Houston, Texas, Ketjen will collaborate with customers in the petrochemical, refining and specialty chemical industries across three divisions, Fluidized Catalytic Cracking (FCC), Clean Fuels and Hydroprocessing Catalysts (HPC), and Performance Catalyst & Curative Solutions (PCS). Albemarle's existing advanced catalyst solutions team will lead Ketjen operations.

"The launch of Ketjen continues our legacy as a partner-of-choice for industry leaders," said Albemarle CEO Kent Masters. "Establishing Ketjen under this separate structure will allow the business even greater focus and continued development of custom, high-impact catalyst products."

Ketjen's team of qualified experts adopt a flexible, hands-on approach to customer operations to counsel and lead on mission-critical functions. With strong industry engagement and continuing long-term partnerships with major corporations, Ketjen will lead the industry in safe and reliable advanced catalyst solutions.

Ex. 2. This press release can be found online at: https://investors.albemarle.com/news-and-events/news/news-details/2023/Albemarle-Announces-Launch-of-Ketjen-Corporation/default.aspx.

5

**ANSWER:**  Admitted that the quoted language is contained in Ex. 2.

21. Albemarle describes Ketjen as "a provider of advanced catalysts solutions to leading producers in the petrochemical, refining and specialty chemicals industries. From fluidized catalytic cracking to clean fuels solutions to hydro-processing to organometallics and curatives, Ketjen delivers safe and reliable solutions that increase production performance and business value. A wholly owned subsidiary of Albemarle Corporation (NYSE: ALB), Ketjen Corporation is headquartered in Houston, Texas, and serves global customers through operations in 27 markets." Ex. 2.

**ANSWER:**  Admitted that the quoted language is contained in Ex. 2.

22. Based on Albemarle's press release, it appears that Ketjen will continue Albemarle's catalyst business. *See* Ex. 2.

**ANSWER:**  Denied.

23. Upon information and belief, Albemarle intends for Ketjen to take advantage of the chlorine and sodium hydroxide product sold by Olin under the Contract.

**ANSWER:**  Denied.

### III.
### Albemarle's Breach of Contract

24. The Contract has clear language prohibiting assignment of the rights and obligations arising under the Contract:

> 14. ASSIGNMENT. Neither this contract nor any right or obligation hereunder is assignable or transferable by either party in whole or in part without the prior written consent of the other party and any such purported assignment without such consent shall be void, except that either party shall have the right to assign this contract and its rights and delegate its duties and obligations hereunder, without obtaining the prior written consent of the other party, to any entity (a) with which Seller or Buyer merges, (b) to which Seller or Buyer sells a substantial part of its assets or businesses, or (c) to which Seller or Buyer sells a substantial part of its assets or business relating to the manufacture and/or sale of the product. Ex. 1 at pg. 15, Ii14 (the "Assignment Clause").

**ANSWER:**  Admitted that the language in this allegation is included in the Contract.  Further,

any alleged breach claimed by Olin fails for many reasons, including, without limitation, because

Olin materially and repeatedly breached the Contract starting no later than 2021.  All remaining

6

allegations are denied.

25. Under the Contract, Albemarle must meet certain purchase requirements to garner the preferential pricing under the Contract. If Albemarle fails to meet those purchase requirements, it could be subject to less advantageous pricing, among other consequences. Ex. 1 at Third Amendment.

**ANSWER:** The language of the Contract is provided in the Contract. All remaining allegations

are denied.

26. If Olin were to provide the same product to another buyer on the open market, Olin would be able to sell the product at a substantially higher price and realize a greater profit.

**ANSWER:** Admitted.

27. Albemarle cannot assign the Contract to another entity without Olin's permission (unless one of three preconditions in the Assignment clause is met). Albemarle cannot purchase product beyond its own requirements and cannot resell or transfer that product to another entity because the Contract limits sales to "100% of Buyer's [Albemarle's] commercial grade" product requirements. *See* Ex. 1, Third Amendment.

**ANSWER:** Denied.

28. Upon information and belief, Albemarle has or will assign the Contract (in whole or in part) to Ketjen.

**ANSWER:** Denied.

29. Olin has not consented to the assignment of the Contract, in whole or in part, to Ketjen. Further, upon information and belief, none of the exceptions in the Assignment clause (Ex. 1, Assignment Clause) applies that would permit Albemarle to assign the Contract without Olin's consent.

**ANSWER:** Denied.

30. Even when one of the exceptions to the Assignment Clause applies, only the entire Contract can be assigned; partial assignments remain prohibited without Olin's consent. *See* Ex. 1.

**ANSWER:** Denied.

31. Neither Albemarle, nor Ketjen, has requested Olin's consent in assigning the Contract to Ketjen.

**ANSWER:** Denied.

32. Any putative assignment of the Contract from Albemarle to Ketjen is void under

154351077v1

the Contract.

**ANSWER:** Denied.

33. Alternatively, on information and belief, Albemarle intends to purchase product from Olin and transfer that product to Ketjen. *See* Ex. 2.

**ANSWER:** Denied.

34. The Contract does not permit Albemarle to purchase Ketjen's commercial needs for product and transfer the product to Ketjen. Ex. 1. The express terms of the Contract state that Albemarle must "purchase 100%" of its requirements from Seller Olin. If Albemarle purchases product from Olin and then passes it along to Ketjen, it breaches the Contract.

**ANSWER:** Denied.

35. Further, if Albemarle purchases product from Olin and then transfers it to Ketjen, then Albemarle is not acting in good faith in the performance of the Contract. The Contract only provides for Albemarle to purchase its own requirements—not that of a subsidiary.

**ANSWER:** Denied.

36. Albemarle's assignment of the Contract to Ketjen Corporation violates the Contract's Assignment Clause and financially harms Olin. It deprives Olin of the benefit of sales to Ketjen on the open market. Similarly, if Albemarle buys product from Olin pursuant to the Contract and then transfers that product to Ketjen, it deprives Olin of the benefit of sales to Ketjen on the open market.

**ANSWER:** Denied. Further, any alleged breach claimed by Olin fails for many reasons, including without limitation because Olin materially and repeatedly breached the Contract starting no later than 2021.

**COUNT I**
**(Breach of Contract)**

37. Olin restates and incorporates by reference all the preceding paragraphs of this Complaint as if fully stated herein.

**ANSWER:** Albemarle incorporates its previous responses to the allegations in all the preceding paragraphs of the Complaint.

38. A valid and enforceable contract exists between Olin and Albemarle.

**ANSWER:** Albemarle admits that a valid and enforceable contract existed between Olin and

8

Albemarle.  Answering further, Albemarle is discharged from any further obligations under the

Contract due to Olin's material breaches detailed herein and in Albemarle's Counterclaims.

39. Olin has fully performed its obligations under the contract.

**ANSWER:**  Denied.  *See, inter alia,* prior answers and Counterclaims *infra.*

40. Albemarle has not performed according to the terms of the Contract.

**ANSWER:**  Denied.

41. Albemarle's creation of Ketjen and its formal, or *de facto*, assignment of the Contract to Ketjen without Olin's consent violates, *inter alia*, the Assignment Clause of the Contract.

**ANSWER:**  Denied.  Further, any alleged breach claimed by Olin fails for many reasons,

including without limitation because Olin materially and repeatedly breached the Contract

starting no later than 2021.

42. None of the exceptions to seeking and obtaining Olin's consent for an assignment exists. Therefore, Albemarle must obtain Olin's consent before assigning the Contract, in whole or in part, to Ketjen.

**ANSWER:**  Denied.

43. Albemarle has breached the Contract.

**ANSWER:**  Denied. Further, any alleged breach claimed by Olin fails for many reasons,

including without limitation because Olin materially and repeatedly breached the Contract

starting no later than 2021.

44. Albemarle's improper assignment of the Contract to Ketjen without Olin's consent is a material breach of the Contract, which has not been cured.

**ANSWER:**  Denied. Further, any alleged breach claimed by Olin fails for many reasons,

including without limitation because Olin materially and repeatedly breached the Contract

starting no later than 2021.

45. Olin has been damaged as a result of Albemarle's breach of the contract.

**ANSWER**:  Denied.

46. Albemarle's improper assignment of the Contract prevents Olin from selling product at market value (which is substantially higher than the prices in the Contract).

**ANSWER**:  Denied.

## COUNT II
### (Breach of the Covenant of Good Faith and Fair Dealing)

47. Olin restates and incorporates by reference all the preceding paragraphs of this Complaint as if fully stated herein.

**ANSWER**:  Albemarle filed a Demurrer directed to this Count concurrently with this Answer.

Accordingly, Albemarle does not answer this allegation.

48. A valid and enforceable contract exists between Olin and Albemarle.

**ANSWER**:  Albemarle filed a Demurrer directed to this Count concurrently with this Answer.

Accordingly, Albemarle does not answer this allegation.

49. Olin has fully performed its obligations under the contract.

**ANSWER**:  Albemarle filed a Demurrer directed to this Count concurrently with this Answer.

Accordingly, Albemarle does not answer this allegation.

50. There is an implied covenant of good faith and fair dealing present in every contract.

**ANSWER**:  Albemarle filed a Demurrer directed to this Count concurrently with this Answer.

Accordingly, Albemarle does not answer this allegation.

51. There is an implied covenant of good faith and fair dealing present in the Contract between Olin and Albemarle.

**ANSWER**:  Albemarle filed a Demurrer directed to this Count concurrently with this Answer.

Accordingly, Albemarle does not answer this allegation.

52. Albemarle has breached the implied covenant of good faith and fair dealing in the Contract.

**ANSWER**:  Albemarle filed a Demurrer directed to this Count concurrently with this Answer.

10

Accordingly, Albemarle does not answer this allegation.

53. Olin entered into the Contract and placed strict limits on the assignment of the Contract. Albemarle's creation of Ketjen and assignment of the Contract to Ketjen violates, *inter alia*, the implied covenant of good faith and fair dealing.

**ANSWER:**  Albemarle filed a Demurrer directed to this Count concurrently with this Answer.

Accordingly, Albemarle does not answer this allegation.

54. Olin has been damaged as a result of Albemarle's breach of the implied covenant of good faith and fair dealing.

**ANSWER:**  Albemarle filed a Demurrer directed to this Count concurrently with this Answer.

Accordingly, Albemarle does not answer this allegation.

55. Albemarle's improper violation of the implied covenant of good faith and fair dealing prevents Olin from selling product at market value (which is substantially higher than the prices in the Contract).

**ANSWER:**  Albemarle filed a Demurrer directed to this Count concurrently with this Answer.

Accordingly, Albemarle does not answer this allegation.

56. Albemarle's breach of the implied covenant includes its wrongful abuse of the requirements Contract by purchasing, or attempting to purchase, material to meet the requirements of its subsidiary.

**ANSWER:**  Albemarle filed a Demurrer directed to this Count concurrently with this Answer.

Accordingly, Albemarle does not answer this allegation.

**COUNT III**
**(Declaratory Judgment)**

57. Olin restates and incorporates by reference all the preceding paragraphs of this Complaint as if fully stated herein.

**ANSWER:**  Albemarle incorporates its previous responses to the allegations in all the preceding

paragraphs of the Complaint.

58. The Assignment Clause states as follows:

> 14. ASSIGNMENT. Neither this contract nor any right or obligation
> hereunder is assignable or transferable by either party in whole or in

11

> part without the prior written consent of the other party and any such purported assignment without such consent shall be void, except that either party shall have the right to assign this contract and its rights and delegate its duties and obligations hereunder, without obtaining the prior written consent of the other party, to any entity (a) with which Seller or Buyer merges, (b) to which Seller or Buyer sells a substantial part of its assets or businesses, or (c) to which Seller or Buyer sells a substantial part of its assets or business relating to the manufacture and/or sale of the product. Ex. l at pg. 15, ¶ 14.

**ANSWER:** Admitted that the language referenced in Par. 58 is contained in the Contract.

59. Albemarle's creation of Ketjen and subsequent assignment of the Contract, formally or *de facto*, to Ketjen violates the Assignment Clause.

**ANSWER:** Denied. Further, any alleged breach claimed by Olin fails for many reasons,

including without limitation because Olin materially and repeatedly breached the Contract

starting no later than 2021.

60. The Contract identifies Albemarle as the "Buyer" for the product. The Contract does not identify any subsidiary or affiliate of Albemarle as the buyer. The Contract terms do not even use the words "subsidiary" or "affiliate". No subsidiary or affiliate of Albemarle has the right to buy product under the Contract.

**ANSWER:** Admitted that the language of the Contract is stated in the Contract. All remaining

allegations are denied.

61. An actual controversy exists between Olin and Albemarle relating to the Assignment Clause.

**ANSWER:** Denied.

62. This Court has the power to issue a declaratory judgment in this case. Va. Code § 8.01-184 ("In cases of actual controversy, circuit courts within the scope of their respective jurisdictions shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed and no action or proceeding shall be open to objection on the ground that a judgment order or decree merely declaratory of right is prayed for.").

**ANSWER:** Admitted as to the language of the referenced Code language. All remaining

allegations are denied.

63. This Court should enter a declaratory judgment:

a. Declaring that Albemarle may not assign the Contract or the rights or benefits of the Contract to Ketjen without Olin's express consent;

b. Declaring that Albemarle may not purchase Ketjen's requirements from Olin under the Contract and then transfer those requirements to Ketjen.

c. Declaring that Albemarle can only purchase product under the Contract that it requires; not product that its subsidiaries, including Ketjen, requires.

**ANSWER:** Denied.

WHEREFORE, Albemarle denies that Olin is entitled to any of the relief requested in its Complaint and denies that Olin is entitled to judgment against Albemarle in any amount whatsoever.

## AFFIRMATIVE DEFENSES

Albemarle asserts the following defenses to the claims made by Olin in its Complaint as complete or partial bars to the relief claimed:

### FIRST AFFIRMATIVE DEFENSE

Olin's claims are barred because of its prior materials breaches of the Contract.

### SECOND AFFIRMATIVE DEFENSE

Olin's claims are barred, in whole or in part, because it has suffered no injury or damages as a result of the conduct alleged herein.

### THIRD AFFIRMATIVE DEFENSE

Olin's claim for a declaratory judgment is barred, in whole or in part, by the doctrines of unclean hands, estoppel, and adequate remedy at law.

### FOURTH AFFIRMATIVE DEFENSE

Olin fails to state a claim.

### FIFTH AFFIRMATIVE DEFENSE

Olin has failed to mitigate any alleged losses.

13

## SIXTH AFFIRMATIVE DEFENSE

Albemarle reserves the right to assert any and all other defenses, including affirmative defenses, that become available during the course of discovery or trial.

## COUNTERCLAIMS

Albemarle asserts the following counterclaims based on currently available information and reserves the right to assert additional counterclaims as discovery proceeds.   The following allegations are relevant to Albemarle's counterclaim:

## PARTIES

1.      Albemarle is a Virginia stock corporation incorporated in Virginia.

2.      Upon information and belief, Olin is a Virginia stock corporation incorporated in Virginia.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction under Virginia Code § 17.1-513.

4.      This Court has personal jurisdiction over Olin because Olin is a citizen of the Commonwealth of Virginia, Olin does business in this state, and Olin has submitted to the jurisdiction of this Court by filing its original Complaint here.

5.      Venue is proper in the Circuit Court for the City of Richmond under Virginia Code § 8.01-262(2).

## FACTUAL BACKGROUND

### Albemarle's and Olin's Commercial Relationship

6.      Albemarle is a specialty chemical manufacturer and supplier. It carries out the development, manufacturing and marketing of highly-engineered, value added products including catalysts, bromine and derivatives and lithium compounds.

7.      Olin is manufacturer of ammunition, chlorine, and sodium hydroxide.  For over 15

14

years, Olin has been Albemarle's primary provider of chlorine and sodium hydroxide.

8.      On October 10, 2007, Albemarle and Olin entered into the Sales Contract No. CC-14-319.  The parties subsequently agreed to three amendments to the Sales Contract: First Amendment to Sales Contract No. CC-14-319, dated November 8, 2012, Second Amendment to Sales Contract No. CC-14-319, dated November 11, 2014, and Third Amendment to Sales Contract No. CC-14-319, dated January 1, 2016.  The Sales Contract and three Amendments are collectively referred to herein as the "Contract".

9.      The Contract is governed by the laws of the State of Tennessee.

10.     The original Contract mandated that Olin will be the exclusive supplier of 100% of Albemarle's commercial grade ECU ("CGEDU") requirements from Olin.   One CGECU is defined in the Contract as one short ton of chlorine and 1.1 tons of 100% basis commercial grade sodium hydroxide ("CGSH").    The Contract also specifies that membrane grade sodium hydroxide, 100% basis, shall be referred to as MGSH.

11.     Pursuant to the Contract, Olin was to be Albemarle's exclusive supplier from January 1, 2009 through December 31, 2016.  The Third Amendment later extended the term of the Contract through December 31, 2024.  The term of the Contract was important to Albemarle because it guaranteed Albemarle access to products that are critical to its manufacturing processes and in short supply.  The chemicals Albemarle purchased from Olin pursuant to the Contract are in limited supply and critical components of Albemarle's manufacturing processes.  The chlorine is in especially limited supply, has significant storage restrictions for safety reasons and cannot be imported for Albemarle's purposes.  Albemarle developed long-term business plans in reliance on the Contract, including, *inter alia,* the pricing and promised volumes thereunder.

12.     Pursuant to the Contract, Olin is expected to provide between 40,000 and 55,000

15

CGECUs to Albemarle each year.  *See* Contract at A2.  Olin is not obligated to sell in excess of

55,000 CGECUs unless agreed to between the parties in writing.

13.     The Third Amendment revised the quantities to specify as follows:

A.1 The intent of this contract is for [Olin] to sell and [Albemarle] to purchase 100% of [Albemarle's] commercial grade ECU (CGECU) requirements up to 55,000 CGECU's per year from [Olin], with one CGECU being defined as one ton of chlorine (CGECU CHLORINE) and 1.1 DST of 100% basis commercial grade sodium hydroxide (CGECU SODIUM HYDROXIDE).  Membrane grade sodium hydroxide, 100% basis, shall be referred to as MGSH.  Examples of this Quantity provision are included in Addendum H.

> A.1.1 [Albemarle] must purchase the first 15,126 DST of commercial grade sodium hydroxide ("CGSH") demand from [Olin] each calendar quarter. Beginning the first calendar quarter of 2016, if [Albemarle] purchases more than 15,126 DST of CGSH from [Olin], the next quarter [Albemarle] shall have the right to purchase any remaining quarterly quantities exceeding 15,126 DST of CGSH from any supplier of [Albemarle's] choice or from [Olin] at a negotiated market price, such price to be negotiated quarterly. However, should [Albemarle] purchase less than 15,126 DST of CGSH from [Olin] in any given quarter, the deficit shall be carried forward and added to the next quarter's purchase quantity requirements.  The deficit or surplus will be carried forward quarter to quarter thereafter until eliminated. Addendum I, attached hereto, sets forth an example. In no event will Seller be obligated to supply in excess of 18,000 DST of CGSH in any calendar quarter unless the deficit volume plus the quarterly commitment of 15, 126 OST of CGSH exceed 18,000 DST in which case Seller will supply the deficit volume plus the quarterly commitment of 15, 126 DST and no more unless agreed to in writing by Seller.

> A.1.2 [Albemarle] must purchase the first 55,000 tons of chlorine demand from [Olin] in each calendar year. The month following the month in which [Albemarle] purchases reach 55,000 tons of chlorine, and each month thereafter for the remainder of the calendar year, [Albemarle] has the right to purchase chlorine requirements over 55,000 tons from any supplier of [Albemarle] choice or may purchase from [Olin] at a negotiated market price, such price to be negotiated quarterly. In no event will [Olin] be obligated to supply in excess of 59,000 tons of chlorine in any calendar year unless agreed to in writing by [Olin].

A.2 The expected volume is between 40,000 and 55,000 CGECUs per year. [Olin] is not obligated to sell in excess of 55,000 CGECUs in any calendar year unless agreed to in writing by [Olin].

A.3 [Albemarle] agrees to purchase and [Olin] agrees to sell 100% of [Albemarle's]

16

CGSH purchase requirements from [Olin] up to 60,500 OST per calendar year as set forth above, but if this quantity should fall below 44,000 DST of CGSH in any year, and [Albemarle's] total chlorine requirement is equal to or greater than 40,000 tons, then [Olin] has the option of: i) supplying MGSH (at the pricing described in Addendum CJ in lieu of CGSH in the form of ECUs to achieve the minimum volume of 40,000. CGECUs per year, or ii) elect not to supply MGSH in lieu of the CGSH shortfall, in which case the CGECU volume will be reduced accordingly and any chlorine supplied under this contract in excess of the CGECU volume will be considered non-CGECU chlorine pursuant to subpart B below and priced according to Addendum D. [Albemarle] may elect, by providing twelve (12) months prior written notice, to substitute MGSH for CGSH, provided that [Olin] is not required to provide more MGSH than CGSH that is being substituted, and in its sole discretion, may limit the maximum quantity of MGSH it is required to supply to 30,000 dst per calendar year. If [Albemarle] elects to substitute MGSH for CGSH, the total sodium hydroxide purchase requirement shall remain at 60,500 DST per calendar year as set forth above. In the event [Albemarle] elects to use MGSH and [Olin] agrees to supply MGSH as set forth in the preceding sentences the Membrane Premium, as defined by the /HS index, shall be added to the contract price. Should [Olin] elect to supply MGSH in the absence of a request from [Albemarle], the Membrane Premium shall not be added to the contract price.

14.     Albemarle relied on Olin's delivery of the contracted chemicals to manufacture products for which its customers have placed purchase orders. Olin's expected provision of the chemicals was pivotal to Albemarle's ability to fulfill the purchase orders in a timely and cost-effective manner.

15.     The pricing is dictated in Addendum C and Addendum D to the Contract. As of January 1, 2013, the First Amendment dictated that Exhibit 1 to Addendum C, which was attached to the First Amendment, determined and implemented price adjustments.

16.     The Contract also has a non-waiver clause that provides as follows:

[Olin's] or [Albemarle's] waiver of any breach or failure to enforce any of the terms or conditions of this contract at any time shall not in any way affect, limit or waive such party's right thereafter to enforce strict compliance with every term and condition hereof.

***Olin's Contractual Breaches and Resulting Harm***

17.     Since no later than 2021, Olin has materially breached the Contract repeatedly and consistently.

18.     Olin on several occasions unilaterally, materially increased the prices it required Albemarle to pay for the chemicals contrary to the agreed prices in the Contract, leaving Albemarle to either pay the higher prices or be without supply.  If Albemarle would not acquiesce to these price increases, it was Albemarle's belief, based on Olin's conduct and statements, that Olin would have refused ongoing supply notwithstanding its obligations under the Contract. In one particular instance, Olin expressly stated that it would not ensure it could honor its volume commitments under the Contract unless Albemarle agreed to renegotiate the pricing terms.  Given the limited supply of the contracted chemicals, Albemarle had no choice but to agree because it required the chemicals to manufacture products its customers previously ordered. Although Albemarle paid for the chemicals despite these unilateral changes, it did so under protest and duress.

19.     Olin also repeatedly, unilaterally decreased its contract volume requirements for the contracted chemicals, again leaving Albemarle to either accept the reduced supply amounts for periods of time or be without supply.  If Albemarle would not acquiesce to these volume reductions, it was Albemarle's belief, based on Olin's conduct and statements, that Olin would have refused ongoing supply notwithstanding its obligations under the Contract.  Albemarle had no choice but to agree because it required the chemicals to manufacture products its customers previously ordered. Although Albemarle accepted and paid for these improper short supplies of product, it did so under duress and protest. Olin's actions forced Albemarle to source the chemicals from alternative suppliers at prices materially higher than the prices set forth in the Contract, upwards of double the price for chlorine.

20.     Also starting in 2021, Olin several times failed to perform under the Contract based on "force majeure" and otherwise improperly used force majeure to further manipulate its pricing and volume requirements under the Contract.  When Albemarle requested information concerning

the stated bases for claiming and acting on force majeure, Olin refused to provide such details. Had Albemarle pushed for more information or rejected Olin's claims of force majeure, it was Albemarle's belief, based on Olin's conduct and statements, that Olin would have refused ongoing supply notwithstanding its obligations under the Contract.

21.     Olin has desired to terminate and/or force Albemarle to agree to renegotiate the terms of the Contract with Albemarle since at least 2021. Olin's desire to terminate was confirmed on June 6, 2022, among other times, when it sent Albemarle a 24-month termination letter, ending the contract effective December 31, 2024. Olin personnel have also communicated to Albemarle that Olin is changing its business model and trying to terminate all contracts similar to the Contract. Consistent with Olin's express plans to either terminate existing contracts with negotiated prices or compel customers under those contracts to agree to higher prices and different terms and conditions, Olin manufactured a purported breach by Albemarle and, in March 2023, abruptly notified Albemarle that it would no longer supply the chemicals required under the Contract. Olin, in fact, failed to supply Albemarle's April supply of chemicals.

22.     Olin's conduct towards Albemarle is consistent with Olin's conduct towards other purchasers in the industry. Numerous other purchasers have made similar allegations in other courts around the country.

23.     Innovative Water Care, LLC filed a successful Motion for a Temporary Restraining Order and Preliminary Injunction against Olin in 2022 in the Eastern District of Tennessee (Case No. 1:22-cv-0070). Innovative Water Care is a chemical manufacturer that focuses on water treatment that purchased chlorine and caustic soda from Olin. Innovative Water Care and Olin had a relationship that spanned over 20 years and together they operated a water treatment plant in Tennessee. Olin delivered the chemicals through a pipe system that connected the two

19

companies' facilities. Olin agreed to, *inter alia*, provide 100% of Innovative Water Care's requirements up to certain limits for chlorine and caustic soda. In late 2021, Olin notified Innovative Water Care that it was unilaterally changing the contract to reduce the amount of chlorine and caustic soda Olin would provide and increase the price Olin would charge for those chemicals on the basis that Olin wants to "make more money." Olin threatened that it would stop its supply of chlorine and caustic soda unless Innovative Water Care paid the upcharge Olin was now charging. In April 2022, Olin stopped providing the required amount of chemicals to Innovative Water Care forcing the shutdown of the water treatment plant. The court in Tennessee ordered Olin to supply Innovative Water Care with the requisite amounts of chlorine and caustic soda on April 28, 2022.

24.    In another case in the Southern District of Texas, Olin sued Tenaska Power (Case No. 4:21-cv-1447) in March 2022. Similar to the instant case, Olin filed an action for breach of contract and declaratory relief concerning Tenaska's alleged breaches of two contracts and two related transaction confirmations. One of the alleged breaches involved Tenaska's rejection of Olin's February 19, 2021 declaration of force majeure as an excuse for failing to deliver the required chemicals to Tenaska. While this case is still pending in Texas, it shows Olin's pattern of using force majeure clauses to excuse Olin's failure to perform.

25.    Third, *ARG International v. Olin* in E.D. Mo. filed in April 2020. ARG sued Olin for failing to deliver its supply of caustic soda. Upon information and belief, as a result of the changing market conditions, Olin's contract with ARG was no longer advantageous to Olin as it could sell caustic soda for a higher price to another buyer. Upon information and belief, Olin attempted to renegotiate the terms of the contract by conditioning Olin's performance of the contract upon ARG's purchase of a receivable of approximately $1.3 million from Olin. Olin

sought to use the changing market conditions and ARG's need for caustic soda in order to leverage payment of the receivable by ARG – even though ARG was not a party to Olin's receivable and had no obligation to pay it.  When ARG refused, Olin disavowed the existence of the contract and/or any agreement to sell caustic soda to ARG and informed ARG that it would not deliver the caustic soda. As a result thereof, ARG was unable to secure the tonnage of caustic soda needed. With respect to the caustic soda, ARG has been able to purchase only one barge of caustic soda in the market thus far in an attempt to cover and mitigate its damages. For this one barge, ARG had to pay substantially more per dry metric ton delivered than what it would have paid to Olin under the Contract or agreement between the parties due to the change in market conditions and having to procure caustic soda on an expedited basis. For the balance of the volume owed by Olin to ARG under the Contract, ARG has yet to be able to find any alternative supply, irrespective of price.

26.     These lawsuits demonstrate Olin's pattern of breaching its agreements with purchasers in similar fashion to the present case.  Upon information and belief, Olin's repeated breaching of its contracts is the result of, *inter alia,* a change of leadership (prompted by an activist investor).

27.     Since 2021, Olin's new Chief Executive Officer and Chief Financial Officer have repeatedly commented during earnings release calls that Olin intends to require long-standing customers already under contract to negotiate new deals at, *inter alia*, higher prices.  As it relates to the Contract, Olin's new Chief Executive Officer, Scott Sutton, was uniquely aware of, and in opportunistic fashion exploited his knowledge of, Albemarle's needs and special reliance on the Olin-supplied chlorine gained during his almost 20-year tenure as an Albemarle employee.  During that time, he became intimately involved with Albemarle's production processes and supply vulnerabilities, especially as it relates to chlorine as he helped to lead the development of

21

Albemarle's chlor-alkali self-production capability at its other facility in the Middle East.

28.     In a question-and-answer session during the fourth quarter of 2021 earnings call,

the Chief Executive Officer made plain Olin's new strategy:

Q. "And I also wanted to get your update on some of these legacy chlorine contracts that you've talked about not renewing on expiry. Did some of those roll off at the end of the calendar year and are there more to go on that?"

A. "Yes. Some of them did roll off. So we've set those back to freely negotiated. And there's still some more that we have that continue throughout 2022. But now it's the minority of our business is still attached to sort of the nonfunctioning type of index out there."

29.     This strategy continued into the fourth quarter of 2022 when during the earnings

call, the Chief Executive Officer confirmed Olin's position:

Q. "One is, can you comment on how much of your merchant or total chlorine was sold on below-market legacy contracts as of December 2022?"

A. "We won't give you a specific number, but I would say that that's turned into the minority share now. As Patrick said, we still have an uplift coming in 2024 that will essentially place almost 100% of our chlorine on a different standard, likely the Olin chlorine index."

30.     Many additional comments during earnings calls over the past two years have

confirmed this strategy, including the following:

- Olin's claim that it "[s]hifted another 10% of merchant chlorine to freely negotiated, less than 1/3 of volume remains under index." 2021 Q3 Earnings Call Presentation;

- "Announced price increases on all chlor-alkali products, in combination with an order control program." 2021 Q3 Earnings Call Presentation;

- "I mean it's really like a chicken-or-egg question, right? I mean this is, of course, a hypothetical case, just trying to demonstrate the extent that we're willing to go to, to preserve our product pricing. I mean the reason you would take your complete global chemicals assets down to a 50% utilization rate for a whole year is to preserve product pricing, right? So we control our own destiny there, and we're positioned to do that even in the case of a global recession, particularly on -- you brought up merchant chlorine. That, for many years, sort of priced in the low $100 a ton, and we're directionally moving it towards $1,000 a ton on a pricing ratchet that we won't have to move back from. Even in a recession, when you think about

22

the applications that are left with merchant chlorine, it's things like water treatment and wastewater treatment and pharmaceuticals and agrichemicals, those demands continue." 2022 Q1 Earnings Call Transcript;

- "So let me make sure I understand your question. You're saying, if we were to get the volume that we are instead making proactive decisions to walk away from what would be the outcome on EBITDA relative to what we forecasted...Well, look, I mean we're purposely not participating for a reason, right? So if we were to go out and grab that volume, it would be exactly counter to what we're trying to achieve. It's not impossible that we could accomplish that and have significantly higher EBITDA in the quarter, but it wouldn't be the right thing to do for 2023 at the back half of this year." 2022 Q2 Earnings Call Transcript;

- "Improved chlorine and caustic pricing," 2022 Q3 Earnings Call Presentation;

- "Pricing in the vinyls chain remains weak and continues to necessitate lower Olin operating rates. On the positive side, our merchant chlorine ratchet continues to turn only one way. Chlorine pricing is expected to step up through 2023 as legacy contracts end." 2022 Q4 Earnings Call Transcript;

- "But when you go all the way to merchant chlorine, just as Patrick said, Mike. I mean that's something that -- we've had contract resets. Patrick already mentioned $100 million a year. And even looking beyond 2023, we would expect additional resets as well. So chlorine has a very nice runway." 2022 Q4 Earnings Call Transcript;

- "Well, look, I would say overall, I mean, we're certainly running lower operating rates. I mean, the highlights of those lows really are that if you went all the way down into our epoxy resin, you'd find that we're running below 50% capacity. And that situation is certainly going to continue because we're just not going to sell too much volume into an undervalued marketplace." 2022 Q4 Earnings Call Transcript;

- "Continue to lean on value over volume," 2022 Q4 Earnings Call Presentation; and

- "Idling/campaigning assets with <50% utilization," 2022 Q4 Earnings Call Presentation.

31.    Further, Albemarle has learned, anecdotally, that other companies similarly situated to Albemarle reported that Olin unilaterally ceased supplying them pursuant to those companies' contracts with Olin at or about the same time as Olin stopped supplying Albemarle. This is consistent with the approach stated by Olin Executives of not continuing to sell into the "undervalued marketplace."

## COUNTERCLAIM I – BREACH OF CONTRACT (PAST CONDUCT)

32.     Albemarle incorporates by reference the allegations in Paragraphs 1-31 above.

33.     Albemarle and Olin entered into a valid, binding, and legally enforceable contract in exchange for good and valuable consideration, including the Sales Contract No. CC-14-319, dated October 10, 2007, First Amendment to Sales Contract No. CC-14-319, dated November 8, 2012, Second Amendment to Sales Contract No. CC-14-319, dated November 11, 2014, and Third Amendment to Sales Contract No. CC-14-319, dated January 1, 2016 (collectively, the "Contract").

34.     At all material times, Albemarle has performed all of its obligations under the Contract.

35.     As alleged herein, Olin breached the Contract by, *inter alia*:

  (a) Unilaterally increasing prices above those required in the Contract;

  (b) Unilaterally decreasing the volume requirements below those required in the Contract; and

  (c) Refusing to provide adequate detail or explanation to support its claims of force majeure and otherwise improperly using force majeure to manipulate the pricing and volume commitments under the Contract.

36.     As alleged herein, Albemarle has been harmed as a direct and proximate result of Olin's contractual breaches in an amount to be proved at trial.  Further damages in the form of attorneys' fees and other court costs continue to accrue.

## COUNTERCLAIM II – BREACH OF CONTRACT (FUTURE CONDUCT)

37.     Albemarle incorporates by reference the allegations in Paragraphs 1-36 above.

38.     Albemarle and Olin entered into a valid, binding, and legally enforceable contract

24

in exchange for good and valuable consideration, including the Sales Contract No. CC-14-319, dated October 10, 2007, First Amendment to Sales Contract No. CC-14-319, dated November 8, 2012, Second Amendment to Sales Contract No. CC-14-319, dated November 11, 2014, and Third Amendment to Sales Contract No. CC-14-319, dated January 1, 2016 (collectively, the "Contract").

39.     At all material times, Albemarle has performed all its obligations under the Contract.

40.     As alleged herein, Olin materially breached the Contract by, *inter alia,* abruptly ceasing supply under the Contract on a wholesale basis and otherwise refusing to honor the Contract with almost two years remaining on the term of the Contract, further relieving Albemarle of its obligations under the Contract.

41.     As a result, Albemarle was forced to source supply of the chemicals for April 2023 at materially higher prices (almost double for chlorine) than those promised under the Contract.

42.     As alleged herein, Albemarle has been, and continues to be, harmed as a direct and proximate result of Olin's contractual breaches in an amount to be proved at trial.  Further damages in the form of attorneys' fees and other court costs continue to accrue.

### REQUEST FOR RELIEF

WHEREFORE, Counterclaim Plaintiff Albemarle respectfully requests this Court enter a judgment in its favor and against Counterclaim Defendant Olin, and grant Albemarle the following relief:

a) Awarding Albemarle past monetary damages resulting from the prior, material breaches of the Contract in an amount of at least $10,000,000 for past damages and damages in an amount of at least $35,000,000 for the future damages to be proven at trial;

25

154351077v1

b)  Awarding Albemarle damages for the differential in price Albemarle must pay going forward versus the Contract pricing as a result of Olin's abrupt cessation of the supply of any product to Albemarle;

c)  Awarding Albemarle its costs and expenses, including attorneys' fees and costs; and

d)  Granting Albemarle such other and further relief as the Court deems just and proper.

## JURY DEMAND

Albemarle respectfully demands a trial by jury of all issues triable by a jury, regardless of whether the issues were raised as a claim or defense, and regardless of which party raised the issue.

Dated: May 3, 2023

Respectfully submitted,

Michael E. Lacy (VSB No. 48477)
TROUTMAN PEPPER LLP
1001 Haxall Point
15th Floor
Richmond, Virginia 23219
Tel:  804. 697.1326
Fax:  804. 698.6061
michael.lacy@troutmansanders.com

*Attorneys for Defendant/Counterclaim
Plaintiff Albemarle Corporation*

26

154351077v1

## CERTIFICATE OF SERVICE

I, Michael E. Lacy, hereby certify that on May 3, 2023, the foregoing **ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM** was served via first-class mail, postage prepaid, and electronic mail to:

Robert F. Redmond, Jr.
Matthew D. Fender
John J. Woolard
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
rredmond@mcguirewoods.com
mfender@mcguirewoods.com
jwoolard@mcguirewoods.com

*Attorneys for Plaintiff/Counterclaim Defendant Olin Corporation*


Michael E. Lacy (VSB No. 48477)
TROUTMAN PEPPER LLP
1001 Haxall Point
15th Floor
Richmond, Virginia 23219
Tel:    804. 697.1326
Fax:    804. 698.6061
michael.lacy@troutmansanders.com

*Attorneys for Defendant/Counterclaim Plaintiff Albemarle Corporation*

154351077v1